**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-80051-CIV-HURLEY/HOPKINS**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and STATE FARM
FIRE & CASUALTY COMPANY,

Plaintiffs,

        vs.

JEFFREY KUGLER, MD, JANE BISTLINE, MD,
and HELDO GOMEZ, MD,

JEFFREY L. KUGLER, M.D., P.A. n/k/a
NATIONAL ORTHOPEDICS AND
NEUROSURGERY, P.A., JANE E. BISTLINE, M.D.,
P.A., HELDO GOMEZ, M.D., P.A., and
NORTH PALM NEUROSURGERY, P.L.,

2047 PALM BEACH LAKES PARTNERS, LLC,
a/k/a Palm Beach Lakes Surgery Center

GARY CARROLL, MARK IZYDORE, and PALM
BEACH PRACTICE MANAGEMENT, INC., and

JONATHAN CUTLER, MD,

Defendants.

_____/

**AMENDED COMPLAINT**

      State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty

Company (collectively "State Farm"), for their Complaint, allege as follows:

I.      **NATURE OF THE CASE**

      1.     This case involves a scheme to defraud State Farm and other insurers out of

millions of dollars through the submission of fraudulent personal injury claims based upon

medically unnecessary diagnostic procedures known as provocative discograms ("discograms"),

and surgical procedures known as percutaneous discectomies ("PDs") which are performed on

individuals who have been in automobile accidents ("Patients").  The defendants perform the medically unnecessary discograms and PDs, or cause them to be performed, to grossly inflate the value of personal injury claims and leverage State Farm and other insurers into significant settlements to avoid the costs and risks of bad faith lawsuits.

2.       Each defendant needed and depended upon the participation of the other defendants to accomplish their common purpose of defrauding State Farm and other insurers through the fraudulent personal injury claims.  Specifically, the defendants are:

(a)      doctor Jane Bistline who knowingly performs medically unnecessary discograms, and assists in the performance of medically unnecessary PDs based upon the purported results of her discograms;

(b)      doctors Heldo Gomez and Jeffrey Kugler who knowingly perform medically unnecessary PDs based upon the purported results of discograms by Dr. Bistline;

(c)      Jeffrey L. Kugler, M.D., P.A. n/k/a National Orthopedics and Neurosurgery, P.A., Jane E. Bistline, M.D., P.A., Heldo Gomez, MD, P.A., and North Palm Neurosurgery, P.L. which are medical practices owned by Drs. Kugler, Bistline, and Gomez and are knowingly used to submit fraudulent charges and documentation relating to the professional fees for the medically unnecessary discograms and PDs;

(d)      2047 Palm Beach Lakes Partners, LLC, a/k/a Palm Beach Lakes Surgery Center, which has been owned in part by Drs. Gomez and Kugler, as well as defendant Jonathan Cutler, and is used to knowingly submit fraudulent charges for the facility fees relating to the medically unnecessary discograms and PDs;

(e)      lay people Gary Carroll and Mark Izydore who have knowingly coordinated and controlled the activities of and relationships among all defendants to knowingly profit from the medically unnecessary discograms and PDs;

(f)      Palm Beach Lakes Practice Management, Inc., a management company through which defendants Gary Carroll and Mark Izydore managed and controlled Dr. Kugler's medical practice Jeffrey L. Kugler, M.D., P.A.; and

(g)     doctor Jonathan Cutler, a podiatrist, who knowingly profits from the charges for the medically unnecessary discograms and PDs through his partial ownership interest in the Palm Beach Lakes Surgery Center, and his former ownership of non-party Discocare, Inc. ("Discocare") which is described below.

3.      In carrying out their scheme, the defendants also forged a symbiotic relationship with non-parties Arthrocare Corporation ("Arthrocare") and Discocare.     Arthrocare manufactured the Spine Wand device that is used to perform the medically unnecessary PDs, and forged a partnership with the defendants to market the Spine Wand to personal injury attorneys, doctors and surgery centers across the country.  Their joint marketing campaign represented that the Spine Wand was a fast, easy way to substantially increase profits from personal injury claims, and relied heavily on the financial success the defendants enjoyed by performing and advancing personal injury claims based upon medically unnecessary discograms and PDs at the Palm Beach Lakes Surgery Center.

4.      As a result of these illicit relationships and coordinated activities, the defendants' scheme has defrauded State Farm out of more than $13 million.

## II.  **JURISDICTION AND VENUE**

5.      Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. ("RICO") because they arise under the laws of the United States.  This Court also has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

III.  **PARTIES**

     A.     **Plaintiffs**

     7.     State Farm Mutual Automobile Insurance Company is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and issues automobile insurance policies in the state of Florida.

     8.     State Farm Fire & Casualty Company is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and issues automobile insurance policies in the state of Florida.

     B.     **Defendants**

     9.     Jeffrey Kugler is a citizen of Florida and resides in Royal Palm Beach, Florida. Dr. Kugler is licensed to practice medicine in Florida, is a member of defendant 2047 Palm Beach Lakes Partners, LLC, and is the sole shareholder of defendant Jeffrey L. Kugler, M.D., P.A.  As set forth in Exhibit A attached hereto, Dr. Kugler knowingly performed at least 113 of the medically unnecessary PDs.

     10.     Jeffrey L. Kugler, M.D., P.A. is a Florida professional association with its principal place of business located at 3618 Lantana Rd., Suite 100, Lantana, Florida 33462. Jeffrey L. Kugler, M.D., P.A. is now known as National Orthopedics and Neurosurgery, P.A.  In each instance in which Dr. Kugler knowingly performed medically unnecessary PDs, Jeffrey L. Kugler, M.D., P.A. submitted fraudulent charges and related documentation for the professional fees relating to the procedures.

     11.     Jane Bistline is a citizen of Florida and resides in Boynton Beach, Florida.  Dr. Bistline is licensed to practice medicine in Florida, is the Medical Director of the Palm Beach

Lakes Surgery Center, and is the sole shareholder of defendant Jane E. Bistline, M.D., P.A.  As set forth in Ex. A attached hereto, Dr. Bistline knowingly performed at least 182 of the medically unnecessary discograms.  In each such instance, Dr. Bistline also provided the related anesthesia services and assisted Drs. Kugler and Gomez, as well as other doctors, with the medically unnecessary PDs that were performed based upon the purported results of her discograms.

12.     Jane E. Bistline, M.D., P.A. is a Florida professional association with its principal place of business located at 2047 Palm Beach Lakes Blvd., Suite 300, West Palm Beach, Florida 33409.  In each instance in which Dr. Bistline knowingly performed medically unnecessary discograms, assisted with the medically unnecessary PDs and provided the related anesthesia services, Jane E. Bistline, M.D., P.A. submitted fraudulent charges and related documentation for the professional fees relating to the procedures.

13.     Heldo Gomez is a citizen of Florida and resides in West Palm Beach, Florida.  Dr. Gomez is licensed to practice medicine in Florida, was a member of defendant 2047 Palm Beach Lakes Partners, LLC until at least 2008, and is the sole shareholder of defendant Heldo Gomez, M.D., P.A. and North Palm Neurosurgery, P.L.  As set forth in Ex. A attached hereto, Dr. Gomez knowingly performed at least 61 of the medically unnecessary PDs.  Dr. Gomez has never taken any affirmative step inconsistent with or to defeat the objects of the scheme.

14.     Heldo Gomez, M.D., P.A. is a Florida professional association with its principal place of business located at 4290 Professional Center Drive, Suite 105, Palm Beach Gardens, Florida 33410.  In instances in which Dr. Gomez knowingly performed medically unnecessary PDs, Heldo Gomez, M.D., P.A. submitted fraudulent charges and related documentation for the professional fees relating to the procedures.

15.     North Palm Neurosurgery, P.L. is a Florida professional limited company with its principal place of business located at 4290 Professional Center Drive, Suite 105, Palm Beach Gardens, Florida 33410.   In instances in which Dr. Gomez knowingly performed medically unnecessary PDs, North Palm Neurosurgery, P.L. submitted charges and related documentation for the professional fees relating to the procedures.

16.     2047 Palm Beach Lakes Partners, LLC is a Florida limited liability company with its principal place of business located at 2047 Palm Beach Lakes Blvd., Suite 100, West Palm Beach, Florida 33401.  It owns and operates the Palm Beach Lakes Surgery Center, an outpatient surgery center at 2047 Palm Beach Lakes Boulevard in West Palm Beach, Florida.   In every claim at issue, the Palm Beach Lakes Surgery Center submitted fraudulent charges and related documentation for the facility fees relating to the medically unnecessary discograms and PDs at issue.

17.     Gary Carroll is a citizen of Florida and resides in Delray Beach, Florida.  Carroll has never been licensed to provide any professional service.  Carroll was a member of 2047 Palm Beach Lakes Partners, LLC from its formation until approximately May, 2007.  During the same period, Carroll was also a shareholder of defendant Palm Beach Practice Management, Inc. Carroll coordinated and exerted control over the activities of and relationships among all defendants, as well as their relationships with personal injury attorneys, to knowingly profit from the medically unnecessary discograms and PDs performed through at least May 2007, and has never taken any affirmative step inconsistent with or to defeat the objects of the scheme.

18.     Mark Izydore is a citizen of Florida and resides in Jupiter, Florida.  Izydore has never been licensed to provide any professional service.  Izydore coordinated and exerted control over the activities of and relationships among all defendants, as well as their relationships with

personal injury attorneys, to knowingly profit from the medically unnecessary discograms and PDs performed in every claim at issue.

19.     Palm Beach Practice Management, Inc. ("PBPM") is a Florida corporation with its principal place of business located at 3618 Lantana Road, Lantana, Florida.  PBPM is the entity formed and used by Carroll and Izydore to funnel profits to themselves from the medically unnecessary PDs and other services performed by Dr. Kugler.

20.     Jonathan Cutler is a citizen of Florida and resides in West Palm Beach, Florida. Dr. Cutler is licensed to practice podiatry in Florida, is a member of the defendant 2047 Palm Beach Lakes Partners, LLC, and was the sole shareholder of Discocare from its formation in December 2005 through December 31, 2007 when Arthrocare purchased Discocare from him for $25 million.

## IV.     ALLEGATIONS COMMON TO ALL CLAIMS

### A.     Insurance Benefits Under Florida Law

21.     With limited exceptions, drivers who allegedly caused accidents ("the At-Fault Drivers") seeking reimbursement for medically necessary expenses and wage losses are generally limited to Personal Injury Protection claims ("PIP Claims") against their own insurance companies up to a maximum of $10,000 in benefits.  State Farm is required to pay or deny PIP claims within 30 days, and may be ordered to pay interest and attorney's fees if it fails to pay the full amount owed within that time period.

22.     Patients who are not at fault, in addition to PIP Claims with policy limits of $10,000, can potentially recover: (a) from the insurance companies of the At-Fault Drivers through a Bodily Injury claim ("BI Claim"), and/or (b) if recovery under the BI Claim is insufficient, from the Patients' own insurance companies through an Uninsured or Underinsured Motorist claim ("UM Claim").  The benefits potentially available to Patients through BI Claims

and UM Claims include pain and suffering and other forms of non-economic damages, as well as any necessary medical expenses and wage losses.

23.     To bring BI Claims or UM Claims, Patients must meet at least one of several statutory requirements.  Specifically, Patients must have a doctor's finding of at least: (a) a significant and permanent loss of an important bodily function, or (b) a permanent injury (other than scarring or disfigurement) within a reasonable degree of medical probability.

24.     The policy limits for BI Claims and UM Claims are often $100,000 or more.  If an insurer unreasonably declines to settle a BI Claim or UM Claim within policy limits, it potentially can be sued by its own insured for bad faith.  If found liable for bad faith, insurers may be required to pay compensatory and consequential damages, attorney's fees and punitive damages.  These potential risks create significant pressure for insurers to settle BI Claims and UM Claims within policy limits, and the defendants' scheme is deliberately designed to fully exploit this leverage and defraud State Farm and other insurers into paying policy limits for BI Claims and UM Claims based upon medically unnecessary discograms and PDs.

**B.**     *Quid Pro Quo* **Relationships That Drive The Scheme**

25.     The defendants' fraud scheme primarily targets and exploits Patients who have potential BI Claims or UM Claims affording $100,000 or more in policy limits.  The scheme is designed to subject such Patients to medically unnecessary discograms and PDs to inflate the value of their PIP Claims, BI Claims and UM Claims and enrich the defendants, not to benefit the Patients' conditions.  The defendants submit charges that typically exceed $50,000 for the professional and facility fees relating to these procedures, along with supporting documentation, to State Farm and other insurers through personal injury attorneys with whom they have substantial referral relationships ("the PI Attorneys") to substantiate settlement demands that are virtually always within policy limits of $100,000 or more.  If State Farm and other insurers

8

decline to meet these settlement demands, they face significant costs in defending lawsuits based upon the fraudulent charges and supporting documentation, the risk of an adverse judgment which is inherent in any tort suit, and the risk of subsequent bad faith claims if an adverse judgment exceeds policy limits.

26.     As a result, (a) Patients are subjected to the inherent health risks associated with medically unnecessary discograms and PDs, which involve the insertion of devices into their intevertebral discs to inject fluids to provoke pain, purportedly for diagnostic purposes, and to dissolve small amounts of tissue from the discs; (b) At-Fault Drivers become defendants or potential defendants in fraudulent lawsuits based upon BI Claims; (c) State Farm and other insurers are either forced to comply with settlement demands within their policy limits for PIP Claims, BI Claims or UM Claims, or face the costs and risks inherent in defending against fraudulent lawsuits based upon the medically unnecessary discograms and PDs; and, (d) the defendants, not the Patients, reap virtually all the financial rewards from the medically unnecessary procedures.

27.     The success of the defendants' scheme depends on *quid pro quo* relationships among themselves.  Specifically, (a) all defendants relied upon Carroll and Izydore to develop and maintain strong relationships with the PI Attorneys with whom they had substantial referral relationships and with whom they depended to demand settlements for policy limits based upon the defendants' fraudulent charges and supporting documentation, (b) Drs. Gomez and Kugler have relied upon Dr. Bistline to perform medically unnecessary discograms and report positive results to justify medically unnecessary PDs on the purportedly positive discs, and (c) based upon the medically unnecessary discograms and PDs, (i) Dr. Cutler has submitted fraudulent charges for the Spine Wand used to perform the medically unnecessary PDs to State Farm and

other insurers through Discocare, (ii) Drs. Bistline, Gomez and Kugler have submitted fraudulent charges for the professional fees associated with the medically unnecessary discograms and PDs to State Farm and other insurers through their medical practices, (iii) the Palm Beach Lakes Surgery Center submitted fraudulent charges for the facility fees associated with the medically unnecessary discograms and PDs to State Farm and other insurers, and (iv) all of the defendants profited from these fraudulent charges as owners and/or operators of the medical practices and the Palm Beach Lakes Surgery Center.  None of the defendants could carry out the scheme without the active, complicit involvement of the other defendants.

28.     The success of the defendants' scheme depends heavily upon referral relationships with the PI Attorneys to obtain Patients whom they can exploit by subjecting them to medically unnecessary discograms and PDs.  Through these relationships, the defendants gain referrals of Patients upon whom they can perform the medically unnecessary discograms and PDs, and the PI Attorneys are able to substantially inflate the value of the PIP, UM and BI Claims thereby increasing the amount of their contingency fees for these claims.  The defendants' most significant referral relationship in this regard has been with PI Attorneys Michael Steinger ("Steinger") and Gary Iscoe ("Iscoe").  As set forth in Ex. A, Steinger and Iscoe have represented at least 59 Patients who have received medically unnecessary discograms and PDs from Drs. Bistline, Gomez and Kugler in claims against State Farm or At Fault Drivers insured by State Farm.  The relationship with Steinger and Iscoe is described in more detail at paragraphs 93-96 below.

29.     The success of the defendants' scheme also depends heavily upon referral relationships with other health care providers to obtain Patients whom they can exploit by subjecting them to medically unnecessary discograms and PDs.  These other health care provider

referral sources have included the emergency room at the Bethesda Memorial Hospital in Boynton Beach, Florida, which had a referral program described as the "motor vehicle accident ortho call," in which the hospital referred emergency room patients who had orthopedic injuries to Dr. Kugler.  Dr. Kugler was able to obtain these referrals by agreeing to refer patients back to the hospital if they needed additional medical services which could be provided by the hospital. The agreement amounted to a kickback in which Dr. Kugler promised to and did refer patients to the hospital for treatment for the intended purpose of obtaining referrals from the hospital.  At least seven of the Patients at issue treated at the Bethesda Memorial Hospital emergency room before receiving medically unnecessary discograms and PDs; Dr. Kugler performed PDs on six of the Patients and another doctor whose professional fees were billed by Jeffrey L Kugler M.D., P.A. performed PDs on the seventh Patient.

30.     All defendants also had a *quid pro quo* relationship with non-parties Arthrocare and Discocare, through which the defendants actively marketed the Spine Wand and PDs to personal injury attorneys, doctors and surgery centers across the country in return for financial or other incentives from Arthrocare and Discocare. These relationships between the defendants, Arthrocare and Discocare are described in detail in paragraphs 97-128 below.

31.     As a result of these *quid pro quo* relationships, the number of Patients subjected to medically unnecessary discograms and PDs at the Palm Beach Lakes Surgery Center has been remarkable.  According to data from the Florida Agency for Health Care Administration, from 2005 through 2008, Drs. Bistline, Gomez, Kugler and other doctors performed discograms and PDs on more than 1,550 patients at the Palm Beach Lakes Surgery Center.  This represents almost 30% of all the percutaneous lumbar discectomies of any kind performed at every ambulatory surgery facility in Florida during the same period.

### C.       The Medically Unnecessary Discograms and PDs

32.       Patients are typically subjected to the medically unnecessary discograms and PDs if they purportedly continue to experience pain after completing a program of physical therapy and some form of pain management intervention such as epidural steroid injections.  If MRI reports reflect that these Patients have bulging or herniated discs, regardless of whether the films actually reflect any such bulges or herniations, most or all such discs are subjected to discograms by Dr. Bistline.  In virtually every instance in which Dr. Bistline performs a discogram, she reports that some form of pathology in one or more of the Patients' discs is a cause of the Patients' pain and the Patients will benefit from PDs in those discs.  Drs. Kugler, Gomez or other doctors then immediately perform PDs on the discs that Dr. Bistline has reported are causing the Patients' pain.  Dr. Bistline provides the anesthesia services and purports to assist Drs. Kugler and Gomez and the other doctors who perform the PDs.

33.       The defendants then submit, or cause to be submitted, fraudulent charges for the professional and facility fees associated with the medically unnecessary discograms and PDs, and Discocare submits a fraudulent charge for the Spine Wand used to perform the PDs on each Patient.  These charges typically exceed $50,000 and constitute the majority of the medical expenses supporting the fraudulent claims.

### 1.       The Medically Unnecessary Discograms

34.       Discograms are a highly controversial diagnostic procedure used to identify discs that may be causing intractable discogenic pain, which is pain caused by some form of pathology in a disc.  In the best case scenario, discograms should be performed only if significant risk factors for false positive results and other contraindications do not exist, and patients have been fully informed of proven limitations regarding the reliability, validity, utility and safety of the tests.

35.     If a doctor suspects that a patient's intractable pain may be caused by some form of pathology in a disc, the doctor inserts a needle into the nucleus of the suspect disc and injects radiographic contrast.  While injecting contrast into the disc, the doctor monitors the pressure building in the disc in pounds per square inch ("psi").  If the patient reports concordant pain (i.e., reproduction of his usual pain) during pressurization of the disc up to a certain level of psi, that particular disc is considered positive (i.e., possibly contributing to the patient's pain).  If the patient does not report concordant pain during pressurization of the disc up to a certain level of psi, that particular disc is considered negative (i.e., not contributing to the patient's pain).

36.     The reliability, validity, utility and safety of discograms are controversial because the test depends on: (a) the subjective responses of patients who present unique characteristics that could influence their responses, such as different pain tolerances, psychological factors, and financial or other motivations (e.g., patient is making an injury claim, or patient does not want to return to work), (b) the varying abilities of patients to accurately describe the location and character of their pain during the discogram, and whether it is concordant, (c) the subjective interpretation of the doctor performing the discogram, who may be financially motivated to interpret the test as positive to justify medically unnecessary surgeries, and (d) whether the provoked pain response of the patient is caused by the puncture of the disc and disruption of the chemical balance and physical structures inside the disc, or by the needle pushing on and displacing the dorsal root ganglion around the disc, as opposed to some form of pathology in the disc.  For all these reasons, discograms have been found to have unusually high percentages of false positive results, and even higher rates of false positives for patients who are making injury claims and may be financially motivated or prone to over-report concordant pain, irrespective of whether there is a disc injury.

37.     Based upon the above-described factors, serious issues exist regarding the reliability (i.e., whether the test gives the same result on repeated testing), validity (i.e., whether the test proves what it purports to prove), and utility (i.e., whether the test improves the outcome of treatment for patients) of discograms.

38.     In addition to the controversy regarding the diagnostic reliability, validity and utility of discography, there are also concerns regarding its safety. Specifically, risks to the patients subjected to discograms include increased pain from the puncture and injection of contrast into the disc which can disrupt the chemical balances and physical structure inside the discs, as well as accelerated disc degeneration, disc herniation, and loss of disc height and signal intensity in the discs.

39.     In addition to issues regarding the reliability, validity, utility and safety of discograms, even proponents of discography such as the International Spine Intervention Society acknowledge that they are easily subject to abuse.  For all these reasons, if used at all, strict protocols should be followed for patient selection as well as for the performance and interpretation of discograms.  These protocols should include: (a) selecting patients who would not be prone to over-reporting pain responses, which would typically exclude patients with financial incentives based upon injury claims; (b) performing a discogram on a control-level disc above or below a positive disc, and making a negative finding for the control-level disc; (c) scoring positive responses at more or less than 6 on a scale of 1-10 with pressurization of a disc at 50 psi or less; (d) validating the patient's initial pain response by recording the persistence of pain at 30 – 60 seconds post provocation; (e) repeating pressurization of the disc to provoke concordant pain at the same or greater intensity; and (f) if concordant pain is reported upon injection of a disc, it should be confirmed by injecting a local anesthetic into the same disc which

should eliminate the pain.  Dr. Bistline did not follow any of these protocols in performing the discograms on any of the Patients at issue, because the results of her discogram were pre-determined to justify medically unnecessary PDs by Drs. Gomez, Kugler and other doctors.

40.    As a threshold matter, every Patient at issue was purportedly reporting intractable pain and had a financial motive or was prone to over-report pain.  Therefore, every Patient had a significant risk factor for a false positive discogram and should not have been considered as appropriate candidates for a reliable and valid discogram in the first place.

41.    Moreover, Dr. Bistline did not make a negative finding in a control-level disc for almost one-half the Patients at issue, which undermines the reliability, validity and credibility of her positive discogram results for those Patients.

42.    Dr. Bistline also did not score the pain responses on a scale of 1–10 for any Patient, did not assess whether any Patient's pain persisted for 30-60 seconds, or any other period of time post provocation, did not repeat the pressurization in any supposedly positive disc to attempt to provoke concordant pain at the same or greater intensity for any Patient, and did not attempt to confirm any positive results by injecting a local anesthetic into the positive disc to determine if it would eliminate the Patients' pain.  Dr. Bistline's failure to take these steps undermined the reliability, validity and credibility of her positive discogram results for the Patients.

43.    Dr. Bistline interpreted the discograms that she performed on virtually every Patient as positive for one or more discs, meaning that she concluded that each such Patient's pain was primarily or solely caused by some form of pathology in one or more of their discs. This percentage of positive results deviates grossly from clinical norms, and  further undermines the reliability, validity and credibility of her positive discogram results for the Patients.

44.     In many instances in which Dr. Bistline interpreted discograms as positive for one or more discs, it should have been obvious to her from x-rays, MRIs and other evidence that other neurological, anatomical, musculoskeletal, degenerative or neuropsychological conditions were the primary or sole cause of the Patients' pain.  This further undermines the reliability, validity and credibility of her positive discogram results for these Patients.

45.     Dr. Bistline never reported any Patient as having pain that was not concordant pain.  This further undermines the reliability, validity and credibility of the positive discogram results for the Patients.

46.     Typically, discograms are most reliable when a patient's pain is caused by some form of pathology in a single disc.  Yet, for the majority of the Patients, Dr. Bistline reported positive results for multiple discs upon which she performed a discogram.  These results further undermine the reliability, validity and credibility of the positive discogram results for those Patients, as it is unlikely that their pain was caused by some form of pathology in multiple discs.

47.     In every instance the positive results from the discograms performed by Dr. Bistline were used to justify the medical necessity of PDs performed by Drs. Kugler, Gomez and other doctors.  For all the reasons described above, the discogram results were not reliable,  valid or credible.  Therefore, they did not justify the necessity for the PDs performed on these discs by Drs. Kugler, Gomez or other doctors.

48.     Furthermore, even if Dr. Bistline's positive discogram results were reliable, valid and credible, they would not have justified the medical necessity for PDs.  At best, positive discogram results mean that the Patient's pain is caused by some form of pathology in the positive disc.  As set forth in paragraphs 48-54, it is unproven that PDs can provide any benefit

16

to patients whose pain is caused by some form of pathology in a disc.  Therefore, there is no evidence that PDs could have benefited any of the Patients.

49.     In sum, none of the Patients were appropriate candidates for discograms and Dr. Bistline failed to follow basic protocols to arrive at reliable, valid and credible results.  Yet, she subjected each Patient to the immediate and long-term risks inherent in puncturing and pressurizing their discs to complete discograms, and reached incredible conclusions that virtually every Patient had at least one disc that was the primary or sole cause of their pain.  Indeed, for the vast majority of Patients, Dr. Bistline concluded that they had two or more discs that were the primary or sole causes of their pain, which is even more incredible.

50.     Dr. Bistline did not perform the discograms on the Patients because they were medically necessary.  She performed them for the purpose of and in a manner designed to lead to a pre-determined result, namely that the Patients had intractable pain that was caused by one or more discs.  This pre-determined result was then used by Drs. Kugler, Gomez and other doctors to ostensibly -- albeit falsely -- justify the medical necessity for them to perform PDs on every positive disc immediately following Dr. Bistline's discograms.

2.     The Medically Unnecessary PDs

51.     The Spine Wand is a long probe that is inserted into the nucleus of a disc.  Radio frequency waves are then emitted from the tip of the probe to dissolve a small amount of tissue from the nucleus, and thermal energy is used to stabilize the remaining disc material.   The Spine Wand is then withdrawn from the disc.  In theory, this procedure decompresses the disc which, in turn, removes unwanted pressure that a contained protrusion in the disc is having on nerve roots.

52.     On September 29, 2008, the Center for Medicare and Medicaid Services ("Medicare") issued a national noncoverage determination for a variety of thermal intradiscal

procedures, including PDs performed with the Spine Wand.  This determination was based on an exhaustive review of studies that were not limited to the Medicare population, as well as public comment from providers, medical device manufacturers, and other interested persons.  Based upon that review, Medicare determined there was no evidence that PDs or related procedures improve health or are an effective treatment for lower back pain.  As a result of this noncoverage determination, Medicare does not pay for PDs performed with the Spine Wand.

53.     Arthrocare is the manufacturer of the Spine Wand, and sponsored a study ("the Arthrocare Study") that is the only randomized, controlled study published in the peer-reviewed medical literature demonstrating the efficacy of PDs performed with the Spine Wand for any purpose.  Even if the results or the Arthrocare Study were valid, they would support the possible efficacy of PDs performed with the Spine Wand only for a very limited population of patients with a primary radicular pain syndrome (i.e., pain and other neurological symptoms are greater in the legs than in the back) associated with a symptomatic contained disc protrusion in a single lumbar disc, and a pain score of greater than 50 on a scale of 0 – 100.  Significantly, the Arthrocare Study excluded anyone receiving worker's compensation benefits or that was in litigation related to back or leg pain, anyone with radicular pain originating from more than one disc level, anyone with axial pain greater than radicular pain, anyone with radiological evidence of spondylolisthesis or moderate to severe stenosis at the level to be treated, patients, and anyone with extruded or sequestered disc herniation identified through an MRI.

54.     Even if the Arthrocare Study were valid, it would not support the efficacy of the PDs performed by Drs. Gomez, Kugler and other doctors on the Patients at issue because every Patient would have been excluded from Arthrocare Study based upon their involvement in litigation related to leg or back pain, and many Patients would also have been excluded based

upon the other above-described exclusion criteria.  Furthermore, very few of the Patients would have fit the inclusion criteria for the Arthrocare Study, which included a primary radicular pain syndrome associated with a symptomatic contained protrusion in a single lumbar disc, and a pain score of greater than 50 on a scale of 0 - 100.  In fact, as reflected in the chart attached hereto as Ex. A, Dr. Bistline diagnosed the vast majority of the Patients with multiple symptomatic discs, often in the cervical spine, and did not document whether those purportedly symptomatic discs had contained protusions, were associated with radicular pain as opposed to axial pain, and if they were associated with radicular pain, whether it was greater than 50 on a scale of 0 – 100.

55.     Furthermore, inclusion criteria for the Arthrocare Study included patients with a contained protrusion in a single lumbar disc that was confirmed through MRIs.  Notably, the Arthrocare Study did not involve a single patient who had been diagnosed through a discogram. This is entirely understandable because a positive discogram, even if reliable and valid, would purportedly identify nothing more than a disc with some form of internal pathology causing the patients' pain.  PDs are not designed or proven to benefit this condition.  At best, PDs are designed to benefit patients whose pain is caused by a contained disc protrusion causing pathologic pressure on a nerve root resulting in radicular symptoms.  This explains why the Arthrocare Study did not involve patients who received PDs based upon positive discograms.

56.     Furthermore, the PDs performed on every Patient were performed based upon the inherently unreliable, invalid and incredible results of Dr. Bistline's discograms.  Even if those results were valid, however, there was no reason to perform PDs based upon them.

57.     In fact, as set forth below, the defendants' own documents, including medical reports, attorney demand letters, either do not describe any benefit to the Patients or describe far

less benefits than the Patients likely would have had if they had done nothing at all, or participated in some form of active physical therapy and rehabilitation.

**D.      The Fraudulent Charges for the Medically Unnecessary Discograms and PDs**

58.     The financial motives for all defendants to carry out the scheme involving medically unnecessary discograms and PDs are enormous.  As set forth below, their aggregate charges for these procedures performed on each Patient are typically more than $50,000, constitute much more than half the medical expenses incurred by the Patient, and provide virtually all the leverage used by the PI Attorneys, including Steinger and Iscoe, to pressure State Farm and other insurers to settle PIP Claims, BI Claims and UM Claims for full policy limits to avoid the costs and risks of bad faith lawsuits.

1.      Fraudulent Charges Prior to August 2006

59.     Prior to August 2006, Dr. Bistline typically charged at least $2,000 for a discogram performed on one disc and $1,000 for a discogram performed on each additional disc. In addition, the Palm Beach Lakes Surgery Center typically charged a facility fee equal to $1,500 for each disc subjected to Dr. Bistline's discogram.  Therefore, they were financially motivated to, and did, perform discograms on multiple discs for the vast majority of the Patients.  *See* Ex. A.

60.     Prior to August 2006, Dr. Kugler typically charged $19,800 for a PD performed on one disc, and $7,500 for a PD performed on each additional disc.  Therefore, he was financially motivated to, and did, perform PDs on multiple discs for the vast majority of the Patients.  *See* Ex. A.

61.     Prior to August 2006, Dr. Gomez typically charged $25,621 for a PD performed on one disc, and $14,448 for a PD performed on each additional disc.  Therefore, he was

financially motivated to, and did, perform PDs on multiple discs for the vast majority of the Patients. *See* Ex. A.

62.     Prior to August 2006, Dr. Bistline typically charged at least $3,200 for the anesthesia services and $3,750 for performing "surgical assists" in connection with the PDs performed on each Patient. Therefore, she was financially motivated to, and did, interpret the discograms performed on every Patient as positive to justify the necessity for PDs. *See* Ex. A.

63.     Prior to about August 2006, the Palm Beach Lakes Surgery Center typically charged a $1,500 facility fee relating to the discograms performed by Dr. Bistline, and a $12,000 facility fee relating to the PDs performed by Drs Kugler, Gomez and other doctors. *See* Ex. A.

2.      Increased Fraudulent Charges After August 2006

64.     In approximately August 2006, Drs. Kugler, Gomez and other doctors, as well as the Palm Beach Lakes Surgery Center, began to use materially false billing codes ("CPT Codes") to describe the PDs performed on the Patients.   They intentionally did so to materially misrepresent and exaggerate the seriousness of the PD procedures and to substantially increase their already grossly exorbitant charges.

65.     Specifically, the American Medical Association publishes thousands of CPT Codes, which are five digit numbers for health care providers to use to describe specific services and procedures for which they seek to be paid.  CPT Code 62287 is to be used to describe a medically necessary lumbar percutaneous discectomy, which would accurately describe a PD on one or more lumbar discs if it were medically necessary.  There is no CPT Code for a cervical PD.  Therefore, the appropriate CPT Code for a medically necessary PD performed on one or more cervical discs would be 64999, which describes an unlisted procedure involving the nervous system.

66.     Prior to August 2006, Drs. Gomez, Kugler and other doctors, as well as the Palm Beach Lakes Surgery Center, consistently used CPT Code 62287 on bills submitted to State Farm to describe the PDs performed on cervical and lumbar discs.

67.     In about August 2006, Drs. Gomez, Kugler and other doctors, as well as the Palm Beach Lakes Surgery Center, began using CPT Codes 63056 and 63057 on bills submitted to State Farm to describe PDs performed on lumbar discs.  The use of these CPT Codes constitutes a material misrepresentation of these procedures.

68.     CPT Codes 63056 and 63057 represent that the procedure performed was an open discectomy to relieve pressure on the spinal cord, cauda equina or nerve roots caused by a serious pathology, such as a herniated disc in the lumbar spine.  The procedure represented by CPT Codes 63056 and 63057 is highly invasive.  The doctor removes the lamina, facet joint or pedicle to gain direct visualization of the pathologic condition causing compression of the spinal cord, cauda equina or nerve root, and directly removes the pathologic materials that are causing the compression.  After removing the disc materials and relieving the pressure, the doctor closes the wound in layers.  The open discectomy procedure defined by CPT Codes 63056 and 63057 is not remotely close to the PDs performed by Drs. Gomez, Kugler and other doctors.

69.     CPT Codes 63056 and 63057 represent much more serious procedures than CPT Code 62287 and, as such, provide distinct billing advantages.  For example, when performed to decompress a herniated disc, CPT Code 62287 describes a minimally invasive procedure that does not require direct visualization of the herniated disc, while CPT Codes 63056 and 63057 require a highly invasive, open procedure that requires direct visualization and removal of the herniated disc material at the point of compression.  The procedure described by CPT Code 62287 is typically an outpatient procedure, while the procedure described by CPT Codes 63056

and 63057 may involve inpatient hospital stays of several days.  The procedure described by CPT Code 62287 does not permit a second doctor to charge for assisting the primary surgeon or participating as a co-surgeon, while the procedure described by CPT Codes 63056 and 63057 allows for such charges.  Finally, CPT Code 62287 is to be used once with a single charge no matter how many lumbar discs are subjected to the procedure, while CPT Code 63056 is to be used to charge for the procedure performed on one lumbar disc, and CPT Code 63057 is to be used to support another separate charge for the procedure performed on each additional lumbar disc.

70.     The substantial differences between the procedures represented by CPT Codes 62287 on the one hand, and 63056 and 63057 on the other hand, are reflected in Medicare's reimbursement rates.  When a doctor in the West Palm Beach area performs a medically necessary lumbar percutaneous decompression, he is required by Medicare to use CPT Code 62287.  Under the 2006 Physician Fee Schedule, for example, the maximum allowable payment for this procedure was $551.82 regardless of how many discs were subjected to the procedure.  If the same doctor performs a medically necessary open discectomy, he is required by Medicare to use CPT Code 63056 and the maximum allowable payment under the 2006 Physician Fee Schedule was $1,548.80 for one disc.  For each additional disc upon which he performs a medically necessary discectomy, he is required by Medicare to use CPT Code 63057 and the maximum allowable payment under the 2006 Physician Fee Schedule was $376.55.  Therefore, at a minimum, Medicare pays almost three times as much for an open discectomy billed under CPT Code 63056 than it does for a medically necessary percutaneous lumbar discectomy billed under CPT Code 62287.

71.     In August 2006, when Drs. Gomez, Kugler and other doctors, as well as the Palm Beach Lakes Surgery Center, began improperly using CPT Codes 63056 and 63057, the charges for the facility fees relating to the PDs increased significantly.  Specifically, the Palm Beach Lakes Surgery Center went from charging a facility fee of $12,000 regardless of how many discs were treated, to charging a facility fee of $16,650 for a PD performed on one lumbar disc and $5,250 for PDs performed on each additional lumbar disc.

72.     These false CPT Codes and increased charges facilitated the ability of the PI Attorneys, including Steinger and Iscoe, to inflate the value of and increase the leverage against State Farm and other insurers in connection with PIP Claims, BI Claims and UM Claims.

**E.     The Evolution of the Relationships And Scheme Among The Defendants**

1.     <u>In Early 2004, Carroll, Izydore and Dr. Bistline Join Forces</u>

73.     In 2001, shortly after finishing a five-year term of incarceration for a federal bankruptcy and wire fraud conviction, Izydore began working with Carroll.  At the time, they both worked for Dr. Anthony Rogers ("Dr. Rogers"), a pain management doctor in West Palm Beach whose practice consisted largely of treating auto accident patients.

74.     From 2001 through approximately 2005, Izydore and Carroll managed Dr. Rogers' pain management practice. Their services included marketing and building relationships with PI Attorneys, including Steinger and Iscoe, who referred their clients to Dr. Rogers for treatment.  As reflected in the chart attached hereto as Ex. A, this treatment included medically unnecessary discograms performed by Dr. Rogers which were used to justify medically unnecessary PDs by Dr. Kugler at the Palm Beach Lakes Surgery Center in 2004 and 2005.

75.     In approximately early 2004, Dr. Rogers was the subject of professional disciplinary charges.  To continue practicing during this period, Dr. Rogers was required to have another doctor act as his sponsor.  In approximately early 2004, Carroll and Izydore recruited Dr.

Bistline to act as Dr. Rogers' sponsor.  This enabled Dr. Rogers to continue practicing medicine while the disciplinary charges were pending, though serious issues existed regarding Dr. Bistline's own capacity to practice at the time.

76.    Dr. Bistline had been unemployed for approximately five years before going to work with Carroll, Izydore and sponsoring Dr. Rogers in early 2004.  In December 1999, Dr. Bistline was injured while working as an anesthesiologist in the operating rooms at North Ridge Medical Center in Fort Lauderdale, Florida.  Approximately two weeks following her injury, Dr. Bistline underwent a surgical procedure involving the fusion of vertebra in her cervical spine with a bone plate and screws.  She then made worker's compensation and disability claims, contending that a variety of serious physical conditions and impaired cognitive functioning made it impossible for her to work during the next five years.

77.    In June 2001, Dr. Bistline testified in connection with her worker's compensation claim arising from the 1999 injury, and described several serious conditions from which she was allegedly still suffering.  For example, she testified that she had horrible memory loss, pain and numbness, problems concentrating, as well as serious problems with her visual perception and cognitive functioning.  Specifically, she testified that that she could look at her car keys in her hand and not know what they were.  She did not recognize her own friends.  She could not "figure out how to open a door."  She became "confused really easily," and "her ability to handle stress [was] zero."  She stated that she had "literally . . . gotten lost in [her] own kitchen."  Her hands atrophied, and could not do anything that required fine motor skills, like cutting her own food.  She also testified that she had carpal tunnel in her left hand.  She did not know where her hands were if she was not looking at them.  She had similar problems of atrophy with her feet, and could not tell where they were if she closed her eyes.  She could not see practicing

anesthesia ever again because the stimulation, the blinking lights, and the cold in the operating room would make her too stressed.  She felt that if she had "to answer someone quickly and do something quickly", it would be like asking someone to "run 300 miles".  She also felt that she would not have the manual dexterity to do an epidural and did not think she could do any job that required her to be on her feet.

78.     A year and a half later, in December, 2002, Dr. Bistline was deposed again in connection with her worker's compensation claim. In that deposition, she testified that practicing anesthesiology remained impossible because her hands had "gotten worse, not better," she continued to have decreased range of motion, significant pain, and difficulty with short term memory, which led to periods of confusion.  To illustrate, she testified that she had tried to participate in the taping of a cable program for a nutritional supplement but was unsuccessful because she "could not remember two sentences in a row off of a piece of paper."  She further testified that she had "pretty severe spasticity," which is a neurological condition in which nerve impulses fire continuously into muscles causing them to contract and expand involuntarily.

79.     Based upon the above-described conditions, Dr. Bistline collected substantial worker's compensation and disability benefits until approximately early 2004 when she apparently experienced a remarkable and sudden recovery from her physical and cognitive conditions, which enabled her to actively sponsor Dr. Rogers.  Dr. Bistline continued to sponsor Dr. Rogers through approximately mid 2005.  During this period, Izydore and Carroll worked for and managed Dr. Rogers' medical practice

80.     In approximately mid 2005, Dr. Rogers' relationship with Carroll and Izydore terminated, resulting in litigation between them.

2.     In 2004 and 2005, All Defendants Join Forces

26

      a.    In Early 2004, Carroll, Izydore and Dr. Kugler join forces

81.    In early 2004, Carroll and Izydore formed a relationship with Dr. Kugler.

82.    Prior to 2004, Dr. Kugler had been practicing orthopedic surgery for many years. His practice focused on conditions of the hips, knees and shoulders, not conditions of the spine and not PDs. In fact, Dr. Kugler had never performed a PD prior to 2004 when he joined forces with Carroll, Izydore, and the other defendants.

83.    After joining forces with Carroll, and Izydore, the scope, nature and financial rewards of Dr. Kugler's practice changed and grew dramatically. Specifically, in 2004 Dr. Kugler formed Jeffrey L. Kugler, M.D., P.A. and commenced a new practice focusing primarily, if not exclusively, on treating auto accident patients with back and neck pain.

84.    Shortly after the formation of Jeffrey L. Kugler, M.D., P.A., Izydore and Carroll formed PBPM as a vehicle to siphon substantial proceeds from Jeffrey L. Kugler, M.D., P.A. under the guise of ostensibly legitimate "management" fees. To give the relationship an aura of legitimacy, Carroll, Izydore and Dr. Kugler caused PBPM and Jeffrey L. Kugler, M.D., P.A. to enter into an "Exclusive Management Agreement" ("the Management Contract"), attached hereto as Exhibit B.

85.    The Management Contract was structured to create a symbiotic relationship and to bind the fates of Carroll, Izydore and Dr. Kugler. To accomplish these ends, the Management Contract provided for PBPM to manage the daily affairs of Jeffrey L. Kugler, M.D., P.A. from May 2004 through May 2007. *See* Ex. B.

86.    Under the Management Contract, PBPM was required to use its best efforts to market and sell the services of Jeffrey L. Kugler, M.D., P.A. to maximize the revenues of Dr. Kugler's practices. The Management Contract further required Carroll and Izydore "to be

27

personally involved in" the management of Jeffrey L. Kugler, M.D., P.A., and required Izydore to be present at the Palm Beach Lakes Surgery Center or the Lantana Road location of Jeffrey L. Kugler, M.D., P.A. all or part of four out of five business days each week.  To motivate PBPM, as well as Carroll and Izydore, to market and sell Dr. Kugler's services, the Management Contract called for PBPM to receive 45% to 50% of the profits of Jeffrey Kugler, MD, P.A.  *See* Ex. B.

87.     To motivate Dr. Kugler to maximize his services and the corresponding revenues, the Management Contract required that, after overhead expenses were paid each month, Dr. Kugler was entitled to receive compensation of $41,666.67 per month.  The Management Contract further required PBPM to advance any amounts that were necessary to meet these monthly obligations, before PBPM could be paid any amounts to which it was entitled under the Management Contract.  *See* Ex. B.

88.     On at least two occasions, Izydore has attempted to avoid being deposed in litigation matters by filing false and misleading affidavits regarding his relationship with Dr. Kugler, Jeffrey Kugler, MD, P.A. and other defendants.  Specifically, in *Mohammed Islam v. Alexander Anderson*, Case No.: CACE 07-013797 (09), Circuit Court of the 17th Judicial Circuit in and for Broward County ("the Islam Case"), which involved a BI Claim based upon a discogram performed by Dr. Bistline and a PD performed by Dr. Kugler, the defendant served Izydore with a subpoena for his deposition to occur on March 10, 2008.  Izydore moved for a protective order to avoid the deposition, and supported his motion with an affidavit in which he swore that he was "not employed by any doctor, medical facility or company that provided any product, service or treatment to Plaintiff [Islam]. . ."  *See* Exhibit C.  Similarly, in Jeffrey Kugler, MD, P.A. *v. Rajendran Naidoo, MD, et al*, Case No.: 50 2010CA001707 MB AF, Circuit Court

of the 15th Judicial Circuit in and for Palm Beach County ("the Naidoo Case"), which involved competing claims between Dr. Kugler and an orthopedic surgeon who worked for Jeffrey L. Kugler, M.D., P.A. from approximately 2008 through December, 2009, the defendants served Izydore with a subpoena dated June 28, 2010 for his deposition.  Izydore moved for a protective order to avoid the deposition, and supported his motion with an affidavit in which he swore that "[a]t no time during the time that Dr. Naidoo was an employee of Jeffrey L. Kugler, MD, P.A., from January 1, 2008 through December 2009, was I an employee or agent of Jeffrey L. Kugler, MD, P.A., let alone in any communications with Dr. Naidoo."  *See* Exhibit D, ¶ 5.  In the affidavit, Izydore further swore that he worked as a paralegal for attorney Steven Robbins, and that all of Izydore's communications with Dr. Naidoo from January 1, 2008 through December 2009, "would have been under the auspices of Steven L. Robbins, Esquire, as counsel for Jeffrey L. Kugler, MD, P.A. and Dr. Naidoo's status" as an employee of Jeffrey L. Kugler, M.D., P.A.  *See* Ex. D, ¶¶ 3-4.

89.     The above-described Izydore affidavits from the Islam Case and the Naidoo Case are false and misleading.  In fact, beyond Izydore's position with PBPM, several former employees of Jeffrey L. Kugler, M.D., P.A. understood that Izydore was in charge of Dr. Kugler's practice.  *See* Exhibits E ¶ 13, F ¶ 14, G ¶ 14 and H ¶¶ 7 and 9.

90.     Furthermore, in light of his substantial personal financial incentives relating to Dr. Kugler's practice, Izydore constantly monitored the number of new patients, surgical procedures, daily receipts and financial operations of Jeffrey L. Kugler, M.D., P.A., and insisted upon more new patients and more spinal surgeries.  Indeed, Izydore instructed at least one doctor who was employed by Jeffrey L. Kugler, M.D., P.A. from late 2007 through late 2009, to perform more PDs because of their higher reimbursement rate.  Moreover:

(a) one former employee who worked for Jeffrey L. Kugler, M.D., P.A. from about July 2007 through July 2009 has stated that she "needed Izydore's approval before she could schedule certain surgeries." *See* Ex. E ¶ 13;

(b) another former employee who worked for Jeffrey L. Kugler, M.D., P.A. from 2007 through late 2009, has stated that:

  (i) she was required to maintain approval logs listing potential surgeries for patients referred by personal injury attorneys which had to be reviewed and pre-approved by Izydore or Mark Nathanson (who is attorney Mark Steinger's brother-in-law and is discussed at ¶¶ 96-99 below);

  (ii) Izydore insisted that more patients needed to be scheduled for surgeries; and

  (iii) Izydore stated that Dr. Naidoo should perform more disc procedures because the reimbursement was high. *See* Ex. F ¶¶ 8, 14-15;

(c) another former employee who worked for Jeffrey L. Kugler, M.D., P.A. for about two years, ending in February 2010, has stated:

  (i) Izydore was always concerned with the financial success of the practice and seeing enough new patients to keep each doctor busy;

  (ii) at the end of each day someone was required to contact Izydore to report the daily receipts of Jeffrey L. Kugler, M.D., P.A.;

  (iii) Izydore constantly complained that Jeffrey L. Kugler, M.D., P.A. was not treating enough patients, and stated that the practice needed to see 700 new patients each month; and

  (iv) Izydore met monthly with the accountant for Jeffrey L. Kugler, M.D., P.A. regarding the practice's financials, *See* Ex. G ¶¶ 12, 15-16; and

(d) Dr. Naidoo who worked for Jeffrey L. Kugler, M.D., P.A., for about two years, ending on December 4, 2009 has stated:

  (i) Izydore had offices at the location of Jeffrey L. Kugler, M.D., P.A., and the Palm Beach Lakes Surgery Center;

      (ii)     Izydore kept books and computer records reflecting revenue and other financial informing concerning Jeffrey L. Kugler, M.D., P.A., including the billing and collections relating to each physician;

      (iii)    Izydore monitored the financial success of Jeffrey L. Kugler, M.D., P.A. and kept computer records on the financials of the practice;

      (iv)    Izydore monitored the number of new patients scheduled at Jeffrey L. Kugler, M.D., P.A. and constantly complained to Dr. Naidoo's staff that they needed to schedule more new patients; and

      (v)     Izydore told Dr. Naidoo's staff that they would not get new patients if they did not do more spine surgeries, undoubtedly implying that personal attorneys would not refer patients to the practice if they felt it was unlikely that surgeries would be performed on them.  *See* Ex. H 5-10, 13.

    b.     In early 2004, Carroll, Izydore and Dr. Kugler also join forces with all defendants

91.    In early 2004, Carroll and Drs. Gomez, Kugler, Cutler and Rogers, as well as others, formed the Palm Beach Lakes Surgery Center.  Dr. Bistline was named and remains the Medical Director of the facility.  Their purpose was to perform surgical procedures at the Palm Beach Lakes Surgery Center, and to profit from exorbitant facility fees associated with those procedures.  Drs. Gomez, Kugler, Bistline and Rogers performed procedures at the Palm Beach Lakes Surgery Center, while Carroll and Izydore managed the facility and cultivated referral relationships with other health care providers as well as the PI Attorneys, including Steinger and Iscoe.

92.    In 2004 and through at least early 2005, the procedures performed on the Patients at the Palm Beach Lakes Surgery Center included medically unnecessary discograms by Dr. Rogers which were used to justify medically unnecessary PDs by Dr. Kugler.

93.     In approximately mid 2005 when Dr. Rogers' relationship with Carroll and Izydore ended, Dr. Rogers was forced to terminate his interest in and relationship with Palm Beach Lakes Surgery Center.  Because Dr. Rogers was no longer available to perform medically unnecessary discograms on Patients at the Palm Beach Lakes Surgical Center, Dr. Bistline took his place.  Since that time, the performance of medically unnecessary discograms and PDs at the Palm Beach Lakes Surgical Center has exploded.

94.     According to data from the Florida Agency for Health Care Administration, from 2005 through 2008, Drs. Bistline, Gomez, Kugler and other doctors performed discograms and PDs on more than 1,550 patients at the Palm Beach Lakes Surgery Center.  This represents almost 30% of all the percutaneous lumbar discectomies of any kind performed at every ambulatory surgery facility in Florida during the same period.

95.     As owners and/or operators of the Palm Beach Lakes Surgery Center, Carroll and Drs. Kugler, Gomez, Cutler and Bistline have profited directly and substantially from the fraudulent facility fees relating to the medically unnecessary discograms and PDs performed there.

c.     The intertwined relationships with attorneys Steinger and Iscoe

96.     Steinger and Iscoe are personal injury attorneys.  The web page of their law firm, Steinger, Iscoe & Greene, PA ("SIG"), is www.injurylawyers.com and its phone number is 1-800-INJURY-LAW.

97.     Steinger and Iscoe represent clients who have PIP Claims, BI Claims and UM Claims and take contingency fees based upon percentages of actual recoveries.  The larger the recovery, the higher the fees they can recover.

98.     Since 2004, Steinger and Iscoe have represented at least 59 Patients who were subjected to medically unnecessary discograms and PDs at the Palm Beach Lakes Surgery Center and made claims against State Farm or At-Fault Drivers insured by State Farm.  As reflected in the chart attached hereto as Ex. A, in virtually every such instance the clients had a BI Claim and/or a UM Claim with at least $100,000 in potential policy limits available from State Farm and Steinger and Iscoe demanded that State Farm settle these claims by paying full policy limits to avoid the costs and risks of bad faith lawsuits.  *See* Representative demand letters from Steinger and Iscoe attached as Exhibit I.  As reflected in the chart attached hereto as Ex. A, State Farm was defrauded into paying more than $4,300,000 in connection with these claims.

99.     Since 2004, Steinger, Iscoe and their staff and relatives have become integrally intertwined with the defendants.  For example, (a) two individuals who had been incarcerated with Izydore prior to 2001, Frank Camillo and Orlando Gomez, worked as "investigators" in Steinger and Iscoe's office; (b) Steinger's brother-in-law, Mark Nathanson, worked at the Palm Beach Lakes Surgery Center, assisting Izydore and Carroll; (c) before scheduling patients who were referred by personal injury attorneys for surgeries, employees were required to obtain approval from either Mark Nathanson or Izydore; (d) Mark Nathanson and Izydore taught employees the personal injury side of the business, which involved meeting with attorneys and chiropractors and learning about auto insurance; (e) every month, Mark Nathanson was provided with new patient logs recording how many new patients each doctor who worked for Dr. Kugler saw each month; (f) Mark Nathanson's wife, Lisa Reyes, was a paralegal for Steinger and Iscoe; (g) Izydore often attended meetings at the office of Steinger and Iscoe to review their files and discuss the handling or personal injury claims with attorneys, paralegals and other employees; (h) Izydore directed attorneys and paralegals working for Steinger and Iscoe which medical

services and procedures their clients should receive based upon the available insurance policy limits; (i) Iscoe traveled out of state with Izydore, Dr. Cutler and others to recruit doctors to perform PDs with the Spine Wand; and, (j) Iscoe's brother Matthew Iscoe was a sales representative for Discocare.

3.   Arthrocare And Discocare Join The Scheme

a.   The importance of the Spine Unit to Arthrocare and its officers

100.   Arthrocare manufactures and sells many kinds of medical devices, including Spine Wands that are used solely to perform PDs.  Arthrocare does so through three business units.

101.   Arthrocare's largest unit in terms of gross sales has been the Sports Medicine Unit.  Arthrocare's next largest unit in terms of gross sales has been the Ear, Nose and Throat ("ENT") Unit.  Arthrocare's smallest unit in terms of gross sales has been the Spinal Unit, which is responsible for marketing and selling Spine Wands.  Despite its position as the smallest of Arthrocare's units, the performance of the Spinal Unit from 2005 through 2007 was key to a significant increase in Arthrocare's stock price that enabled Arthrocare's officers to reap millions of dollars through stock sales.  As set forth below, this was accomplished in large part through an illicit and unlawful relationship between Arthrocare and the defendants.

102.   From January 2005 through December 2007, the reported sales and profits of Arthrocare's two largest units—the Sports Medicine Unit and ENT Unit—grew modestly in very competitive business environments.  As a result, Arthrocare had to rely on its smallest unit, the Spinal Unit, to demonstrate substantially greater reported growth in sales and profits, to inspire investor interest and to drive up Arthrocare's stock price.  In fact, for the years 2006 and 2007, Arthrocare reported growth in the Spine Unit's sales and profits was at least twice as much as the reported growth of sales and profits in the Sports Medicine and ENT Units.

103.     Arthrocare's stock rose from $30.69 on January 3, 2005 to $56.14 on October 1, 2007.  The dramatic increase in the stock price was, in large part, attributable to an intentional campaign by Arthrocare executives to tout the rapid growth in sales and profits from the Spine Wand.   In 2006 and 2007, Arthrocare's then-CEO Michael Baker and then-Chief Financial Officer Michael Gluk aggressively promoted to stock analysts and investors the growth in sales and profits from the Spine Unit, much of which they claimed was attributable to the increased popularity and supposed success of Spine Wands for use in PDs.

104.     During this period, Arthrocare's officers took full advantage of the increase in the company's stock price.  For example, during this period: (a) Michael Baker reaped at least $11,519,000 by selling at least 230,000 shares of Arthrocare's stock between August, 2006 and August, 2007; (b) Michael Gluk reaped at least $817,900 by selling at least 16,000 shares of Arthrocare's stock between August, 2006 and January, 2008; (c) the Senior Vice President, Surgical, Jack Giroux, reaped at least $2,792,900 by selling at least 55,000 shares of Arthrocare's stock between August, 2006 and December, 2007; (d) the Senior Vice President, Strategic Business, John Raffle, reaped at least $4,538,000 by selling at least 82,000 shares of Arthrocare's stock between September, 2006 and November, 2007; and (e) the Senior Vice President, Operations, Richard Christensen, reaped at least $982,000 by selling at least 19,000 shares of Arthrocare's stock between May, 2007 and October, 2007.

105.     Thus, Arthrocare's officers have been motivated to take steps -- regardless of their legitimacy -- designed to encourage an appreciation in the share price of Arthrocare's stock.  The most important of such steps included Dr. Cutler's formation of Discocare, and a full fledged partnership with the other defendants in this case to market and promote the Spine Wand to personal injury attorneys, doctors and surgery centers across the country.

    b.  Creation of Discocare and the Discocare "business model"

106. From approximately 2002 to 2005, before joining the scheme, Arthrocare primarily sold Spine Wands to surgery centers for less than $1,500 each.  The surgery centers would then include a charge for the Spine Wand in its facility fees for PDs, and assume the risk that the patients' insurance companies would pay the Spine Wand charge as part of the facility fees.

107. In approximately 2005, Arthrocare joined forces with Dr. Cutler and the other defendants to launch a joint marketing scheme designed to rapidly increase the sales and use of Spine Wands to perform PDs on patients with personal injury claims.  The formation of Discocare was a key  component of their joint marketing scheme.

108. The scheme began in or around 2005 when Arthrocare discovered that Jackie Marsh, an Arthrocare sales representative in Southeast Florida, sold a considerable number of Spine Wands to the physicians at the Palm Beach Lakes Surgery Center.  Arthrocare was so impressed with the Palm Beach Lakes Surgery Center scheme, and Marsh's success with it, that they encouraged sales representatives to employ the model throughout their territories.  Moreover, in late 2005, as part of the scheme, Arthrocare formalized its relationship with the Palm Beach Lakes Surgery Center by creating a joint venture to form Discocare.  In particular, on December 23, 2005, Dr. Cutler formed Discocare and Arthrocare placed Michael Denker, an Arthrocare Spine Wand sales manager, at the helm of Discocare as its "director."

109. Discocare was ostensibly Arthrocare's exclusive, independent distributor of the Spine Wand.  In fact, Arthrocare and Discocare were not independent at all; they were full fledged partners.  Several Arthrocare employees, including Jackie Marsh, Nikki Bryant and Denker prepared marketing materials, presentations, scripts and training materials that were used by Discocare, and participated directly in the personal marketing efforts aimed at personal injury

attorneys, doctors and surgery centers. Indeed, once Discocare was formed, Arthrocare formalized the Palm Beach Lakes Surgery Center's scheme into what became know as the "Discocare Model." This model was presented at Arthrocare sales meetings throughout the country. In these sales meetings, Arthrocare encouraged its network of sales representatives to establish a "network" of law firms, surgeons, physicians, and facilities who would then refer business to one another.

110. The creation of Discocare also further tangled the web of relationships between Arthrocare, the Palm Beach Lakes Surgery Center, and Steinger and Iscoe. For example, Izydore, along with Drs. Cutler, Bistline and Kugler, and Iscoe, would participate in the marketing efforts by meeting, speaking with and training doctors to perform PDs with the Spine Wand. And, as noted above, Iscoe's brother, Matthew Iscoe, became a Discocare sales representative. In addition, Discocare's functional address was 2047 Palm Beach Lakes Boulevard — the same address at the Palm Beach Lakes Surgery Center. In fact, meetings with Denker were often held at the Palm Beach Lakes Surgery Center.

111. Discocare was created for several purposes, one of which was to encourage doctors and surgery centers to use Spine Wands to perform PDs by providing them for use at no cost to the doctors or surgery centers. To accomplish this purpose, Discocare purported to purchase Spine Wands from Arthrocare. Discocare would then provide the Spine Wands at no cost to doctors and surgery centers for use in PDs. Discocare would then submit a bill to the patient for $7,454 under a "letter of protection" which created a lien for Discocare against any recovery that the patient might obtain from his injury claim. If the patient obtained a recovery, some or all of Discocare's charges could be paid from the proceeds. If the patient did not obtain

a recovery, Discocare's charges would not be paid.  Accordingly, Discocare assumed the risk of non-payment for the Spine Wands, and the doctors and surgery centers had no such risks.

112.    To encourage State Farm and other insurers to pay $7,454 for each Spine Wand, Discocare would often submit with its bill an invoice from Arthrocare purporting to show that Discocare had purchased the Spine Wand from Arthrocare for $7,500.  *See* Representative Discocare bill and related Arthrocare invoice attached as Exhibit J.   These Arthrocare invoices were fraudulent as there was no real expectation that Discocare would pay Arthrocare $7,500 for each Spine Wand.

113.    Discocare was also created to aggressively promote the benefits of the Spine Wand and PDs to attorneys, doctors and surgery centers involved in personal injury claims across the country.  To do so, Discocare's marketing materials promote the significant financial profits that can be obtained through performance of PDs, and describe how the Discocare business model facilitates these profits.  Specifically, the materials advertise that: "Discocare will be able to provide the Spine Wand to your facility at no charge in a large percentage of these cases.  The increased profitability per procedure, and an increase in the number of patients who have access to this procedure is likely to make [PDs] one of the most profitable procedures performed in your facility."  *See* Template marketing letter sent by Discocare to surgery centers, attached as Exhibit K.

114.    Discocare's marketing letters to doctors also represent that "Discocare has been extremely successful in increasing the percentage of [PD] cases that are approved by [insurers]. . . [and has also] had a great deal of success in optimizing reimbursement" for PDs.  *See* Template marketing letter sent by Discocare to doctors, attached as Exhibit L.   Indeed, Discocare's marketing letters boast that "Discocare . . . routinely negotiates separate payment for the Spine

Wand resulting in greater profitability for the facilities where [PDs] are performed. . . . Discocare routinely negotiates a guarantee of payment for the physicians [who perform PDs] which, in some cases, is higher than the amount previously received based on local fee schedules. . . We hope that you will take advantage of the opportunity to partner with Discocare and experience the benefits of an increase in satisfied patients, practice profitability and practice efficiency." *Id.*

115.    Marketing materials address how Discocare's sales representatives can explain the benefits of PDs to doctors and surgery centers. *See* Key Talking Points document, attached as Exhibit M. That document states: "I tell them we have a great new program in place. (I sound really excited at this point). We [Arthrocare] have partnered with a distributor [Discocare] that is billing directly to the patients' insurance for the cost of the Spine Wand when possible. . . . I let them know that for [personal injury] and Worker's Compensation, Discocare has about a 100% success rate of getting the Spine Wand authorized so there is no charge to the [surgical] facility. Regular insurance is about 50%, depending on the insurance. (then we bond over how crappy insurance like Humana is)." *Id.*

116.    The same document explains how Discocare and Arthrocare launched their joint activities with the co-defendants in this case. In that regard, the document states:

> If they ask why, I tell them "It started with one of my accounts in Palm Beach [no doubt referring to Kugler, Gomez, Bistline, Cutler, Carroll, Izydore and the Palm Beach Lakes Surgery Center]. They were doing a lot of personal injury business. They started with a few cases a month, which is fine, but then they got busy, suddenly they were doing 25 [PDs] a month, and owed Arthrocare a lot of money, and hadn't settled any cases yet. The physician owners (who weren't doing the [PDs]) in the Surgery Center were about to cut off the surgeon from doing the [PDs] because they were going to go bankrupt. We found a distributor [Discocare and Dr. Cutler] who has deep pockets, and was able to carry the cost of the [Spine Wand], so now we can bring the wand in at no charge to the facility, and the distributor waits for the money. It worked so well, we expanded to Work Comp and now regular insurance . . . I then let them know in the future we can do the

entire authorization process for them (they like that part).  I find out how much the doctor's reimbursement, and offer to get a guarantee of payment in future cases. . . The only feedback I've had is positive from the facilities that we are taking some of the costs away from.

117.    A document titled "Key Talking Points" suggests that the sales representatives tell doctors about the importance of developing referral relationships with attorneys who represent people who are in auto accidents.  The document explains: "Then I would move on to [personal injury].  In my territory, most of the docs will have to have their own relationships with [personal injury] attorneys . . .I try to get the names of the 3 top attorneys they work with and request the doc's approval to follow up on his behalf with the attorneys.  I always ask for the potential for a follow-up meeting with myself, the doc and the attorney if necessary."  *See* Exhibit N.

118.    The same Key Talking Points document emphasizes to the sales representatives the importance of using a purportedly legitimate study by Drs. Kugler and Bistline regarding the efficacy of PDs to close the deal with doctors and surgical centers.  In that regard the document states: "I discuss and then leave behind a copy of the Bistline/Kugler study, a patient animation and small inventory of [patient] and physician brochures."  *See* Ex. N.  The above-described Bistline/Kugler study is a sham.  The study was designed and done, if at all, to promote the over utilization of PDs using the Spine Wand.  It has never been published in any peer-reviewed journal, and lacks indicia of reliability or validity.

119.    Other joint marketing materials created and used by Arthrocare and Discocare make the following claims to doctors and surgical facilities:

        a)        PDs offer a "new opportunity that can significantly increase the profitability of your practice";

        b)        PDs "can also be the most profitable procedure you perform per hour of [operating room] time";

> c)   "Because [PDs are] a relatively quick procedure, many experienced surgeons report that they consistently perform eight or more procedures by noon on an [operating room] day";
>
> d)   "[T]he benefits of [PDs] include . . . quick outpatient procedure—fast operating room turnover";
>
> e)   "[PDs] can be performed quickly in [surgical centers] and. . . offers respectable professional reimbursement"; and,
>
> f)   "Discocare will be able to provide the Spine Wand to your facility at no charge."

*See* Template letters, attached as Exhibits O, P and Q.

120.   Arthrocare and Discocare also created and distributed a form letter for doctors who are interested in PDs to send to personal injury attorneys to generate referrals.  One such letter states that "We will require the following from you in order to treat the patient . . .the liability limits on your client's auto policy or the responsible party's auto policy. . .Our average cost for the course of conservative treatment [preceding the PDs] is $23,000, . . . The [PDs] range[] from $44,000 to $60,000, depending on the number of [disc] levels affected. . ."  *See* Template letter, attached as Exhibit R.

121.   To increase the potential financial incentives for attorneys, doctors and surgery centers, Discocare and Arthrocare, in conjunction with the defendants, encouraged the use of CPT Code 63056 by doctors and surgery centers when billing for PDs.  As discussed in paragraphs 64-69 above, CPT Code 63056 is fraudulent because it materially misrepresents the PD procedure.

122.   In 2002, Arthrocare collaborated with Rheinisch Medical Management, Inc., a consulting firm for medical reimbursement, to prepare a Coding and Billing Tool Kit.  That Kit identified CPT Code 62287 as the proper code for PDs.  Rheinisch even inquired of the

American Medical Association and was advised that the appropriate code was 62287. *See* Letter from American Medical Association dated January 28, 2002, attached as Exhibit S.

123. By 2006, however, after the creation of Discocare, marketing materials described CPT Code 63056 as an alternative code to be used "[i]f a surgeon prefers an open surgical approach" to PDs. Such materials would remind surgeons that coding for the procedures was their responsibility, but go on to list the significantly greater amounts that could be earned through use of CPT Code 63056. *See* Exhibit T.

124. A marketing document titled Key Talking Points, used to train marketers, explains how Arthrocare, Discocare and the defendants together came up with the idea of using the fraudulent CPT Code 63056 to support significantly higher charges for PDs than the appropriate CPT Code, 62287, which had been used for years. In that regard, the document states: "I discuss [CPT Codes] 63056. I tell the story of how the docs in Florida uncovered the ability to reduce infection with an incision versus the previous method. We discuss how the HCA Administration and other coding experts, after having reviewed numerous procedures, then provided their insight. Incision = open [surgical procedure which would support the use of CPT Code 63056], other = percutaneous [which would support only CPT Code 62287]." It continues: "I discuss reimbursement to the physician and provide general examples of other surgeons that work with and their reimbursement. I always carry a [worker's compensation] authorization form that indicates the $7500 professional fee [paid to a doctor who performed a PD]. . .(They tend not to believe me when I say we can often times get between $5000 and $7500.)." *See* Key Talking Points attached as Ex. N.

125. In addition to the above-described marketing functions, from at least the third quarter of 2006 through the first quarter of 2008, Discocare also facilitated Arthrocare's scheme

to fraudulently inflate its reported sales and profits from Spine Wands to drive up its stock price. Specifically, during those periods, Arthrocare falsely booked sales of Spine Wands to Discocare as if they were transactions between independent entities, which they were not. Arthrocare also booked each such sale to Discocare as if it were for $7,500, when in fact there was never any expectation that Discocare would pay that amount for a Spine Wand. The sole purpose of this arrangement was to enable Arthrocare to create the facade of significant growth in its Spinal Unit.

126.    In late 2007, storm clouds began to gather over Arthrocare, Discocare and the co-defendants. State Farm and other insurers were challenging the validity of the relationships and activities of Arthrocare, Discocare and the defendants. In addition, analysts and investors were raising questions on the internet and in articles. As a result, to eliminate questions about the independence of Arthrocare and Discocare, on December 31, 2007, Arthrocare purported to purchase Discocare from Cutler for $25 million in cash.

127.    On February 19, 2008, Cutler knowingly testified falsely in a deposition about the relationship between Discocare and Arthrocare. Specifically, among other things, he testified falsely that: (a) the reason Arthrocare bought Discocare for $25 million was because Arthrocare "wanted to buy it," when in fact Cutler knew Arthrocare bought Discocare to thwart investigations of their relationship by insurers, investors and analyst; (b) Arthrocare charged Discocare $7,454 for Spine Wands, when in fact Cutler knew that there was no expectation that Discocare would pay Arthrocare that amount for Spine Wands; (c) Discocare never employed a sales representative, when in fact Cutler knew that PI Attorney Iscoe's brother, Matthew Iscoe, had been a sales representative for Discocare; and (d) Discocare did not market the Spine Wand

and PDs to law firms, when in fact Cutler knew that Discocare specifically targeted personal injury law firms in its marketing efforts.

128.    The above described actions of Arthrocare and Discocare, along with the defendants, have lead to a series of class action lawsuits against Arthrocare, as well as a restatement of earnings by Arthrocare for the third quarter of 2006 through the first quarter of 2008.

129.    Specifically, on July 21, 2008, Arthrocare filed a Form 8-K in which it restated its earnings for the years ended December 31, 2006 and 2007, the quarters ended September 30, 2006, December 31, 2006, each of the quarters of 2007 and the quarter ended March 31, 2008. Arthrocare's press release acknowledged that the relationship between Arthrocare and Discocare was a "sales agent relationship, rather than that of a traditional distributor" and that revenue should not have been recognized at the time Discocare acquires the Spine Wands but only "after the surgery is performed or a subsequent sale to another customer occurs."

130.    Furthermore, on February 18, 2009, Arthrocare announced that its Audit Committee had identified improper practices in the insurance billing and healthcare compliance practices of the company's Spinal Unit.  Arthrocare's announcement included disclosure that there was evidence that, at least as early as 2006, the Spinal Unit had engaged in and caused others to engage in various improper activities including "(3) providing physicians and insurers with descriptions of Company technologies which had the effect of circumventing payor policies that did not cover such technologies; and (4) recommending and advocating to physicians the use of a Current Procedural Terminology code to identify its [Spine Wand] technology that was not approved by the American Medical Association and may have not properly described the procedure that was performed."  Furthermore, the Audit Committee concluded that Arthrocare

"personnel at all levels lacked adequate healthcare compliance training and that Company billing personnel lacked adequate training and supervision in insurance reimbursement requirements." *See* Exhibit U.

131.    In connection with Arthrocare's review of these improper practices, on February 18, 2009, Michael A. Baker left his position as the Company's President and Chief Executive Officer, Michael Moehring left his position as Vice President and General Manager of the Spine Business Unit, and Michael Denker left his position as Director of Sales Development and Training.

#### F.    State Farm's Justifiable Reliance on the Fraudulent Submissions

132.    State Farm was induced to pay at least $13,000,000 based on the defendants' fraudulent claims.

133.    The facially valid documents submitted to State Farm in support of the fraudulent charges at issue represented falsely that the discograms and PDs were medically necessary and, in many instances, that CPT Codes 63056 and 63057 accurately described the PDs they had performed.  These material misrepresentations were designed to and did cause State Farm to justifiably rely on them.

134.    Based upon the defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this complaint.

135.    In addition, despite State Farm's diligence in uncovering the fraud engaged in by defendants, their material misrepresentations, fraudulent concealment and other affirmative and passive acts described above prevented State Farm from uncovering the fraud, thereby equitably tolling the statute of limitations period in this action.

136.    The scheme began at least as early as 2004 and has continued uninterrupted since that time.  As a result of the scheme, State Farm has incurred damages of at least $13 million.

## IV.    CLAIMS FOR RELIEF

### First Cause of Action
### (Against Jane E. Bistline, M.D., P.A., Jeffrey L. Kugler, M.D., P.A., Heldo Gomez, M.D., P.A., North Palm Neurosurgery, P.L., and the Palm Beach Lakes Surgery Center Under 28 U.S.C. § 2201)

137.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 133 above.

138.    There is an actual case and controversy between State Farm, Jane E. Bistline, M.D., P.A., Jeffrey L. Kugler, M.D., P.A., Heldo Gomez, M.D., P.A., North Palm Neurosurgery, P.L., and the Palm Beach Lakes Surgery Center as to all charges for discograms and PDs that have not been paid.

139.    In each and every claim submitted to State Farm, these defendants have materially misrepresented, and caused to be misrepresented, that the discograms and PDs were medically necessary, when in fact, they knew they were not.  In certain claims submitted to State Farm, these defendants have also misrepresented, and caused to be misrepresented, that PDs were correctly billed under CPT Codes 63056 and 63057, when in fact, they knew that these codes materially misrepresent the PDs that were performed.

140.    Because these defendants have knowingly made, and caused to be made, false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that they have submitted to State Farm, they are not entitled to any payments for any of the charges at issue.

141.    Accordingly, State Farm seeks a judgment declaring that Jane E. Bistline, M.D., P.A., Jeffrey L. Kugler, M.D., P.A., Heldo Gomez, M.D., P.A., North Palm Neurosurgery, P.L., and the Palm Beach Lakes Surgery Center are not entitled to collect any charge for any discogram or PD which has not been paid, declaring that any liens these defendants have seeking recovery from State Farm based on the provision of discograms or PDs are void and unenforceable, and granting such other relief as the Court deems just and proper.

### Second Cause of Action
### (Against All Defendants for Violation of 18 U.S.C. § 1962(c))

142.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 133 above.

143.    All defendants formed an association-in-fact "enterprise" ("the Fraudulent PD Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

144.    The members of the Fraudulent PD Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose.   The defendants forged symbiotic relationships and each defendant needed and depended upon the participation of the other defendants to accomplish their common purpose of defrauding State Farm and other insurers through fraudulent personal injury claims.   Specifically, (a) Dr. Bistline knowingly performs medically unnecessary discograms and arrives at pre-determined positive results to justify medically unnecessary PDs, (b) Drs. Gomez and Kugler knowingly perform medically unnecessary PDs based upon the pre-determined positive results of Dr. Bistline's discograms, (c) Jane E. Bistline, M.D., P.A., Jeffrey L. Kugler, M.D., P.A., Heldo Gomez, M.D., P.A., and the North Palm Neurosurgery, P.L. knowingly submit fraudulent charges and related documentation

for the professional fees relating to the medically unnecessary discograms and PDs, (d) the Palm Beach Lakes Surgery Center knowingly submits fraudulent charges and related documentation for the facility fees relating to the medically unnecessary discograms and PDs, (e) Dr. Cutler knowingly profits from the medically unnecessary PDs through his ownership interest in the Palm Beach Lakes Surgery Center and by submitting fraudulent bills for the Spine Wands used to perform the medically unnecessary PDs, and (f) Carroll, Izydore and Palm Beach Practice Management, Inc. have coordinated and controlled the activities of and relationships between all defendants to knowingly profit from the medically unnecessary discograms and PDs.

145.   Each defendant has been employed by and/or associated with the Fraudulent PD Enterprise.

146.   Each defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Fraudulent PD Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, involving the use of the United States mails to submit fraudulent claims to State Farm and other insurance companies based upon medically unnecessary discograms and PDs, which are described in part, in RICO Events 1-198 of Ex. A attached hereto.  These claims included the following misrepresentations: (a) that the discograms and PDs were medically necessary, when in fact, the defendants knew they were not; and (b) that certain PDs were correctly billed under CPT Codes 63056 and 63057, when in fact, the defendants knew that these codes materially misrepresent the PDs that were performed.

147.   State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $13 million based upon the fraudulent charges.

148.     By reason of its injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### Third Cause of Action
(Against All Defendants for Violation of 18 U.S.C. § 1962(d))

149.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 133 and 139 through 145 above.

150.     The Fraudulent PD Enterprise is an association-in-fact "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

151.     The defendants have willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c), that is to conduct and/or participate, directly or indirectly, in the conduct of the Fraudulent PD Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, involving the use of the United States mails to submit fraudulent claims to State Farm and other insurance companies based upon medically unnecessary discograms and PDs, which are described, in part, in RICO Events 1-198 of Ex. A attached hereto.  These claims included the following misrepresentations: (a) that the discograms and PDs were medically necessary, when in fact, the defendants knew they were not; and (b) that certain PDs were correctly billed under CPT Code 63056 and 63057, when in fact, the defendants knew that these codes materially misrepresent the PDs that were performed.

152.     Each defendant knew of, agreed to and acted in furtherance of the overall objective of the conspiracy by facilitating the submission to State Farm and other insurance companies of fraudulent claims based upon medically unnecessary discograms and PDs.

153.    State Farm has been injured in its business and property by reason of the defendants' above-described conduct because it has paid more than $13 million based upon the fraudulent charges.

154.    By reason of its injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## Fourth Cause of Action
### (Against All Defendants for Common Law Fraud)

155.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 133 above.

156.    In each claim submitted to State Farm including those set forth in Ex. A, defendants intentionally and knowingly made, and caused to be made, false and fraudulent statements of material fact to State Farm including: (a) that the discograms and PDs were medically necessary, when in fact, the defendants knew they were not; and (b) that certain PDs were correctly billed under CPT Codes 63056 and 63057, when in fact, the defendants knew that these codes materially misrepresent the PDs that were performed.

157.    The defendants made, and caused to be made, these false and fraudulent statements to induce State Farm to pay claims based upon medically unnecessary discograms and PDs

158.    State Farm justifiably relied on the defendants' false and fraudulent representations, and as a proximate result of the fraud has incurred damages of more than $13 million.

159.    The defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty which entitles State Farm to recover punitive damages.

160.    Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**Fifth Cause of Action**
(Against All Defendants for violations of Florida Deceptive and Unfair Trade Practices Act)

161.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 133 above.

162.    In each claim submitted to State Farm, including those set forth in Ex. A, the defendants engaged in unfair and deceptive acts and practices in the conduct of their trade and commerce.   Such acts and practices have offended public policy and were unconscionable, immoral, unethical, oppressive, and unscrupulous.   These acts and practices included intentionally and knowingly making, and causing to be made, false and fraudulent statements of material fact to State Farm in fraudulent submissions concerning discograms and PDs in which it is represented (a) that the discograms and PDs were medically necessary, when in fact, they knew they were not; and (b) that certain PDs were correctly billed under CPT Codes 63056 and 63057, when in fact, they knew that these codes materially misrepresent the PDs that were performed.

163.    Such unfair and deceptive acts and practices have caused State Farm to sustain damages based upon payments that it was fraudulently induced to make to resolve PIP Claims, BI Claims and UM Claims.

164.    Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory damages of more than $13 million, plus attorneys' fees and costs and any other relief the Court deems just and proper.

**Sixth Cause of Action**
(Against All Defendants for Unjust Enrichment)

165.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 133 above.

166.    When State Farm paid PIP Claims, BI Claims and UM Claims that the defendants submitted, and caused to be submitted, it reasonably believed that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions, including: (a) that the discograms and PDs were medically necessary, when in fact, the defendants knew they were not; and (b) that certain PDs were correctly billed under CPT Codes 63056 and 63057, when in fact, the defendants knew that these codes materially misrepresent the PDs that were performed.

167.    State Farm's payments constitute a benefit of which the defendants are aware.

168.    The defendants voluntarily accepted and have retained the payments conferred by State Farm.

169.    Under these circumstances, as described in paragraphs 1 - 133, retention of those benefits by the defendants would be inequitable.

170.    Accordingly, by virtue of the foregoing, State Farm is entitled to disgorgement of State Farm's payments of more than $13 million which have been improperly retained by the defendants, and any other relief the Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

Dated:   February 22, 2011

By: */s/ David I. Spector*_____
    DAVID I. SPECTOR
    Fla. Bar No. 086540
    david.spector@akerman.com
    SCOTT W. ATHERTON
    Fla. Bar No. 0749591
    scott.atherton@akerman.com
    **AKERMAN SENTERFITT**
    222 Lakeview Avenue, Suite 400
    West Palm Beach, Florida  33401
    Telephone:  (561) 653-5000
    Facsimile:   (561) 659-6313

    --and--

    ROSS O. SILVERMAN
    ross.silverman@kattenlaw.com
    (*pro hac vice to be filed*)
    CHARLES CHEJFEC
    charles.chejfec@kattenlaw.com
    (*pro hac vice to be filed*)
    JOHN W. REALE
    john.reale@kattenlaw.com
    (*pro hac vice to be filed*)
    EMILY J. PRENTICE
    emily.prentice@kattenlaw.com
    (*pro hac vice to be filed*)
    **KATTEN MUCHIN ROSENMAN LLP**
    525 West Monroe Street
    Chicago, IL 60661-3693
    Telephone:  (312) 902-5200
    Facsimile:   (312) 902-1061

    Attorneys for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 22, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ David I. Spector* 
DAVID I. SPECTOR 
Fla. Bar No. 086540

<u>**SERVICE LIST**</u>
**State Farm Mutual Automobile Insurance Company, et al.,**
**v. Jeffrey Kugler, M.D., et al.**
**Case No. 11-80051-Civ-Hurley/Hopkins**
**United States District Court, Southern District of Florida**

Robert W. Wilkins, Esq.
rwilkins@jones-foster.com
Jones, Foster, Johnston & Stubbs, P.A.
505 South Flagler Drive
Suite 1100
West Palm Beach, FL 33401
Telephone:  561-659-3000
Facsimile:  561-650-0412
Attorneys for Defendants

Service by CM/ECF