**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**CASE No. 11-CV-80051-HURLEY/HOPKINS**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and STATE FARM
FIRE & CASUALTY COMPANY,

Plaintiffs,

        vs.

JEFFREY KUGLER, MD, JANE BISTLINE, MD,
and HELDO GOMEZ, MD,

JEFFREY L. KUGLER, M.D., P.A. n/k/a
NATIONAL ORTHOPEDICS AND
NEUROSURGERY, P.A., JANE E. BISTLINE, M.D.,
P.A., HELDO GOMEZ, M.D., P.A., and
NORTH PALM NEUROSURGERY, P.L.

2047 PALM BEACH LAKES PARTNERS, LLC,
a/k/a Palm Beach Lakes Surgery Center,

GARY CARROLL, MARK IZYDORE, and PALM
BEACH PRACTICE MANAGEMENT, INC., and

JONATHAN CUTLER, D.P.M.,

Defendants.

_____/

**PLAINTIFFS STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S**
**AND STATE FARM FIRE & CASUALTY COMPANY'S RESPONSE IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT**

## I.    INTRODUCTION
### A.    The Complaint
#### 1.    State Farm's Claims

This case involves a scheme to defraud State Farm and other insurers through the submission of fraudulent personal injury claims based upon medically unnecessary diagnostic procedures known as provocative discograms ("discograms") and surgical procedures known as percutaneous discectomies ("PDs") performed with the Spine Wand.  (Docket Entry No. ("DE") 19, ¶ 1.)  The procedures were performed at the Palm Beach Lakes Surgery Center ("PBLSC") on at least 181 patients who were involved in auto accidents and made claims against State Farm or a State Farm insured.  (*Id.*; *see also id.*, Ex. A.)[1]  As a result of these claims, State Farm was fraudulently induced to incur damages of more than $13 million.  (*Id.*, ¶ 4.)

State Farm asserts six causes of action: a declaratory judgment that unpaid claims are not owed (First Cause of Action); violations of 18 U.S.C. §§ 1962(c) and (d) ("RICO") (Second and Third Causes of Action); common law fraud (Fourth Cause of Action); violation of the Fla. Stat. § 501.201 *et seq.* (Florida Deceptive and Unfair Trade Practices Act or "FDUTPA") (Fifth Cause of Action); and unjust enrichment (Sixth Cause of Action).  Although State Farm does not seek any relief as a result of similarly fraudulent claims submitted to other insurers, the Complaint alleges and State Farm intends to prove at trial in connection with its RICO claims that the fraudulent claims were part of a pattern of a larger mail fraud scheme.[2]  In fact, the Complaint alleges that from 2005-2008, Drs. Bistline, Gomez, and Kugler and other doctors performed more than 1,550 PDs at PBLSC and that these represented almost 30% of all PDs performed at every ambulatory surgery center in Florida during the same period.  (*Id.*, ¶¶ 31, 94.)

#### 2.    The Defendants' Roles

As in all schemes, each Defendant had a different role and each depended upon the others to accomplish their common purpose of defrauding State Farm and other insurers.  (*Id.*, ¶¶ 2(a)-

---

1 The chart attached as Ex. A to the Complaint provides specifics regarding discograms and PDs for which Defendants caused fraudulent charges to be submitted to State Farm.

2 *See, e.g.*, *Aetna Cas. Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1565-66 (1st Cir. 1994) (upholding trial court's admission of evidence regarding fraudulent claims made to insurers other than the plaintiff because it tended to support a finding of a pattern of mail fraud); *State Farm Mut. Auto. Ins. Co. v. Policherla*, 2009 WL 2170183, *4-5 (E.D. Mich. July 20, 2009) (compelling defendant physician to produce documents related to claims submitted to other non-party insurers for procedures at issue in RICO action where plaintiff submission of fraudulent bills to plaintiff and other insurers for unnecessary medical procedures).

(g), 9-20, 27, 144.)  In fact, the Complaint provides overwhelming detail about each Defendant's vital role in the scheme and their symbiotic relationships.

a.      Dr. Jane Bistline and Jane Bistline, M.D., P.A.

Dr Bistline's primary role was to purport to perform at least 182 discograms, and falsely report positive results to justify the need for the medically unnecessary PDs.  (DE 19, ¶ 11, Ex. A.)  Every time Dr. Bistline created a report representing that the discogram was positive, which meant that at least one disc or more were the cause of the patient's pain.  (*Id*., ¶ 49, Ex. A.)  When viewed in isolation, in the context of one report for one patient, the purportedly positive result may appear credible.  However, when viewed in the context of the pattern that emerges from 182 reports relating to more than 167 patients, it becomes clear that her purportedly positive results were not valid, reliable, or credible.  (*Id*., ¶ 49.)  They had to be false.

Dr. Bistline's false discogram results were material misrepresentations essential to the success of the scheme because they served as the basis for Drs. Gomez and Kugler to perform at least 182 medically unnecessary PDs.  (*Id*., ¶¶ 47, 56, Ex. A.)  The Complaint, however, does not rest upon conclusory allegations regarding the falsity of Dr. Bistline's purportedly positive discogram results.  Instead, the Complaint lays out in detail why her purportedly positive discogram results cannot be credible.  Specifically, the Complaint explains that: (1) Dr. Bistline interpreted the discograms as positive for virtually every patient, and that this percentage deviates grossly from clinical norms (*id*., ¶ 43)[3]; (2) in many instances, other records make it obvious that the cause of the patient's pain was not disc related (*id*., ¶ 44); (3) Dr. Bistline always reported that the pain that patients experienced during discograms was the same pain as their usual pain (*id*., ¶ 45); and (4) for the majority of patients, Dr. Bistline reported positive discogram results for multiple discs, when in fact it is unlikely that multiple discs were the causes of their pain (*id*., ¶¶ 46, 49).

In addition to the above reasons, the Complaint also explains that Dr. Bistline performed discograms for the purpose of and in a manner designed to lead to a predetermined positive result to justify the medical necessity of PDs.  (*Id*., ¶¶ 50, 56.)  Specifically, the Complaint alleges that: (1) Dr. Bistline performed the discograms on patients who were involved in injury claims and therefore would be prone to over-report pain, which is a significant risk factor for a false positive

---

3 In fact, remarkably, State Farm is aware of only one instance in which Dr. Bistline purportedly performed a discogram on an auto accident patient and did not report a positive result.

discogram (*id*., ¶ 40), (2) she did not make a negative finding in a control level disc for almost half the patients at issue, (*id*., ¶ 41), and (3) she did not take other simple steps that may have validated or invalidated the purportedly positive discogram results (*id*., ¶ 42).

Here, it is important to note that State Farm is not alleging that Dr. Bistline failed to comply with any mandatory protocol governing the performance of discograms.  Rather, State Farm's position is that compelling evidence exists to believe that Dr. Bistline's purportedly positive discogram results are false, and that she deliberately failed to take several basic steps that may have validated or invalidated her purported results.  Furthermore, State Farm's position is that Dr. Bistline chose not to take any of those basic steps because the results of her discograms were predetermined to justify the medically unnecessary PDs that were then immediately performed by Drs. Gomez, Kugler, or other doctors at PBLSC.  (*Id*., ¶¶ 32, 39, 50.)

Although Dr. Bistline was not an owner of PBLSC, she was the Medical Director of the facility.  (*Id*., ¶ 12.)  By reporting false positives, Dr. Bistline stood to benefit financially through her continued employment at PBLSC and by submitting thousands of dollars in charges for each disc she tested (*id*., ¶ 59), and thousands of dollars more for "assisting" with the PDs and related anesthesia services (*id*., ¶ 62), through her medical practice, Jane E. Bistline, M.D., P.A.  In addition, Dr. Bistline participated with several other Defendants in Discocare's marketing efforts regarding the Spine Wand.  (*Id.*, ¶ 110.)  She also authored a "sham" study with Dr. Kugler supporting the efficacy of PDs and to support Discocare's efforts to recruit other doctors to use Spine Wands to perform PDs across the country.  (*Id.*, ¶ 118.)

   b.   Dr. Jeffrey Kugler and Jeffrey L. Kugler, M.D., P.A.

Dr. Kugler's primary role was to purport to perform at least 113 of the PDs at issue.  (*Id.*, ¶ 9, Ex. A.)  Dr. Kugler justified the need for all of these PDs based upon Dr. Bistline's false positive discogram results.  (*Id*., ¶¶ 32, 47, 56, Ex. A.)  Dr. Kugler substantially profited in several ways based upon the medically unnecessary PDs.  First, he profited by submitting charges of $19,800 for a PD performed on one disc, and $7,500 for each additional disc, through his medical practice Jeffrey L. Kugler, M.D., P.A..  (*Id*., ¶ 60.)  Second, as an owner of PBLSC, he profited through the facility fees, which virtually always exceeded $12,000, associated with each PD that he and other doctors performed.  (*Id*., ¶¶ 63, 71, Ex. A.)  Furthermore, in about August 2006, Dr. Kugler and PBLSC began using CPT Codes 63056 and 63057 on bills submitted to State Farm for PDs performed on lumbar discs.  (*Id.*, ¶¶ 67-69, 71.)  These codes

materially misrepresented the nature of these procedures, and inflated the value of the fraudulent claims. (*Id.*)

Even if Dr. Bistline's positive discogram results were true (which they were not), the Complaint sets forth several facts to support the allegation that Dr. Kugler knew the PDs were not medically necessary, and this goes well beyond a disagreement of medical opinion. There is not a single randomized controlled study published in the peer-reviewed literature supporting the efficacy of the PDs that Dr. Kugler performed. To the contrary, on September 29, 2008, Medicare issued a national noncoverage determination for various thermal intradiscal procedures, including PDs performed with the Spine Wand. (*Id.*, ¶ 52.) Medicare performed a meta-analysis and concluded that there was no evidence that PDs performed with the Spine Wand and similar devices improve health or are effective for low back pain.[4] (*Id.*) In fact, there is only one randomized controlled study in the peer-reviewed literature supporting the efficacy of the Spine Wand for any purpose at all, and that study was sponsored by Arthrocare, the manufacturer of the Spine Wind ("the Arthrocare Study"). (*Id.,* ¶ 53.) Even if the Arthrocare Study were valid, however, every patient in the present case would have been excluded from that study for one or more reasons, and very few would have met the very limited inclusion criteria. (*Id.*, ¶¶ 53-55.) Given the complete absence of any evidence supporting the efficacy of PDs, Dr. Kugler authored a "sham" study with Dr. Bistline supposedly supporting the efficacy of PDs. (*Id.*, ¶ 118.) They did this to support the medically unnecessary PDs at PBLSC, and to support Discocare's efforts to recruit other doctors to use Spine Wands to perform PDs across the country. (*Id.*) Dr. Kugler also participated with several other Defendants in Discocare's marketing efforts regarding the Spine Wand. (*Id.*, ¶ 110.)

c.      Dr. Heldo Gomez, Heldo Gomez, M.D., P.A.

Dr. Gomez's primary role was to perform at least 61 of the PDs at issue. (*Id.*, ¶ 13, Ex. A.) Dr. Gomez justified the need for all of these PDs based upon Dr. Bistline's false positive discogram results. (*Id.*, ¶¶ 32, 47, 56, Ex. A.) Like Dr. Kugler, Dr. Gomez substantially profited from the medically unnecessary PDs. First, he profited by submitting charges of $25,621 for a PD performed on one disc, and $14,448 for each additional disc, through his medical practices.

---

4 Dr. Bistline states that the non-coverage determination only applies to the Medicare population, which is technically true. (DE 28, p. 3 n.1.) However, it is also misleading because the Medicare determination was a meta-analysis based upon all available evidence, regardless of whether it involved the Medicare population.

(*Id.*, ¶ 61.)  Second, as an owner of PBLSC, he profited through the facility fees, which virtually always exceeded $12,000, associated with each PD that he and other doctors performed.  (*Id.*, ¶¶ 63, 71, Ex. A.)  Furthermore, in about August 2006, Dr. Gomez and PBLSC began using CPT Codes 63056 and 63057 on bills submitted to State Farm for PDs performed on lumbar discs.  (*Id.*, ¶¶ 67-69, 71.)  These codes materially misrepresented the nature of these procedures, and inflated the value of the fraudulent injury claims.  (*Id.*)

Even if Dr. Bistline's positive discogram results were true (which they were not), the Complaint sets forth several facts to support the allegation that Dr. Gomez knew the PDs were not medically necessary.  There is not a single randomized controlled study in the peer-reviewed literature that supports the efficacy of the PDs that Dr. Gomez performed.  To the contrary, Medicare's national noncoverage determination concluded that there is no evidence that PDs performed with the Spine Wand and similar devices improve health or are an effective treatment for low back pain and the Arthrocare Study does not support the efficacy of any of the PDs performed by Dr. Gomez.  (*Id.*, ¶¶ 52-55.)

d.      Dr. Jonathan Cutler

Dr. Cutler had two primary roles in the scheme.  As an owner of PBLSC, he profited through facility fees, which virtually always exceeded $12,000 for each PD performed.  (DE 19, ¶¶ 63, 71, Ex. A.)  Furthermore, in about August 2006, PBLSC began to use CPT Codes 63056 and 63057 on bills submitted to State Farm for PDs performed on lumbar discs.  (*Id.*, ¶¶ 67-69, 71.)  These codes materially misrepresented the nature of these procedures, and inflated the value of the fraudulent injury claims.  (*Id.*)

Dr. Cutler also solely owned Discocare, through which he supplied and billed $7,454 for the Spine Wand used in each PD performed at PBLSC.  (*Id.*, ¶¶ 20, 111.)  This was yet another way in which Dr. Cutler profited from the PDs performed at PBLSC.  To encourage State Farm and other insurers to pay Discocare's $7,454 bills for each Spine Wand, Dr. Cutler would often submit invoices stating that Discocare purchased the Spine Wand from Arthrocare for $7,500.  (*Id.*, ¶ 112.)   These invoices were fraudulent because there was no real expectation that Discocare would pay that amount to Arthrocare.[5]  (*Id.*)  Dr. Cutler's profits from these bills was

---

5 In 2008, Arthrocare's Form 8-K confirmed this fact, acknowledging the improper accounting of transactions between Arthrocare and Discocare.  (DE 19, ¶ 129.)

likely substantial given that between 2005 and 2008 more than 1,550 PDs were performed at PBLSC using Spine Wands.  (*Id*., ¶¶ 31, 94.)

When Dr. Cutler formed Discocare, it pretended to be Arthrocare's exclusive independent distributor for Spine Wands.  (*Id., ¶* 109.)  In fact, Arthrocare and Discocare were full-fledged partners.  (*Id.*)  Working under the guise of an independent distributor, Dr. Cutler and Discocare aggressively marketed the Spine Wand to doctors, surgery centers, and attorneys across the country, stressing the enormous financial benefits of PD procedures, (*id., ¶¶* 113-15), and using the sham study authored by Drs. Kugler and Bistline.  (*Id*., ¶¶ 116, 118.)  Therefore, Dr. Cutler stood to gain from the purported volume and financial success of the medically unnecessary discograms and PDs at PBLSC.  Dr. Cutler, working together with Arthrocare and the Defendants, also advocated using CPT Code 63056 to materially misrepresent the nature of the PDs performed with the Spine Wand.  (*Id*., ¶¶ 121-24.)

In addition to the above-described marketing efforts, Dr. Cutler and Discocare also knowingly facilitated Arthrocare's scheme to fraudulently inflate its reported sales and profits from Spine Wands to manipulate an increase in its stock price.  (*Id.*, ¶ 125.)  On December 31, 2007, when insurers and investors were aggressively questioning the relationship between Dr. Cutler, Discocare, Arthrocare, and the other Defendants, Arthrocare suddenly purchased Discocare from Dr. Cutler for $25 million.  (*Id.*, ¶ 126.)  Less than two months later, on February 19, 2008, Dr. Cutler testified falsely regarding several matters relating to the Arthrocare-Discocare relationship.  (*Id.*, ¶ 127.)

         e.     Gary Carrroll, Mark Izydore, and Palm Beach Practice Management.

Gary Carroll and Mark Izydore are laypeople who played an essential role in coordinating the activities of and relationships among all Defendants, as well as their relationships with personal injury attorneys, which were critical to the success of the scheme.  (*Id*., ¶¶ 17-18.)  Carroll and Izydore formed Palm Beach Practice Management ("PBPM") to funnel profits to themselves from the medically unnecessary PDs and other services performed by Dr. Kugler.[6]  (*Id*., ¶ 19.)

---

6 PBPM argues that this Court has no jurisdiction over it because it was formally dissolved in September 2007.  (PBPM Br. at 6.)  However, pursuant to Florida Statute § 607.1405(2)(e), "[d]issolution of a corporation does not . . . (e) [p]revent commencement of a proceeding by or against the corporation in its corporate name."

In 2001, shortly after serving five years in prison for bankruptcy and wire fraud, Izydore began working with Carroll, managing the office of a doctor who treated auto accident patients. (*Id.*, ¶ 73.)  They managed that practice through 2005 and built relationships with personal injury attorneys including Mark Steinger and Gary Iscoe.  (*Id.*, ¶ 74.)  In 2004, Carroll and Izydore formed relationships with Drs. Bistline, Kugler, and the other Defendants and those relationships quickly led to the scheme in this case.  Specifically, in 2004, Carroll and Izydore recruited Dr. Bistline to act as the sponsor for the doctor whose practice they were managing and was then the subject of disciplinary proceedings.  (*Id.*, ¶ 75.)  At about the same time, Carroll and Izydore recruited Dr. Kugler to form a new practice focusing on car accident patients.  (*Id.*, ¶¶ 81, 83.)  To siphon profits from Dr. Kugler's new practice under the guise of "management fees," Carroll and Izydore formed PBPM.  (*Id.*, ¶ 84.)  From at least 2004 through 2007, a contract between Dr. Kugler's practice and PBPM provided for Carroll and Izydore to manage Dr. Kugler's practice and to receive 45% to 50% of the profits.  (*Id.*, ¶ 86, Ex. B.)  Although Carroll appears to have left in about May 2007, Izydore currently manages the affairs of Dr. Kugler's practice.  (*Id.*, ¶¶ 17, 89-90(a)-(d), Exs. E-G.)

In 2004, Carroll, along with Drs. Kugler and Cutler, as well as others formed PBLSC.  (*Id.*, ¶ 91.)  Dr. Bistline was named and remains the Medical Director of the facility.  (*Id.*)  Between 2005 and 2008, more than 1,550 discograms and PDs were performed at PBLSC.  (*Id.*, ¶¶ 31, 94.)  According to affidavits of several of Dr. Kugler's employees from 2007 through 2009: (1) Izydore constantly monitored the number of new patients, surgical procedures, and daily receipts of Dr. Kugler's practice; (2) Izydore instructed at least one doctor to perform more PDs because of their higher reimbursement rates; (3) an employee was required to maintain logs of potential surgeries for patients referred by personal injuries which had to be approved by Izydore or attorney Mark Steinger's brother-in-law; (4) Izydore constantly complained that the practice was not treating enough patients and needed to see 700 new patients a month; and (5) Izydore told a doctor in the practice that they would not get new patients if they did not do more spine surgeries, implying that personal injury attorneys would not refer patients if they felt it was unlikely that PDs would be performed on them.  (*Id.*, ¶ 90.)

Furthermore, Izydore has substantial ties to attorneys Steinger and Iscoe who represented approximately one-third of the patients at issue.  (*Id.*, ¶ 98.)  For example, (1) two individuals who were incarcerated with Izydore worked as "investigators" for Steinger and Iscoe; (2)

Steinger's brother-in law, Mark Nathanson, worked for Carroll and Izydore; (3) Izydore taught employees of Steinger and Iscoe the personal injury business; (4) Izydore often attended meetings at Steinger and Iscoe's office to review their files and discuss the handling of claims with attorneys and staff; (5) Izydore directed Steinger and Iscoe attorneys and staff which medical services their clients should have based upon insurance policy limits; and (6) Izydore traveled with Iscoe and other Defendants to recruit doctors to perform PDs with the Spine Wand. (*Id.* ¶ 99.)

3.   The Particulars Regarding The Date, Content and Manner Of The Material Misrepresentations.

The material misrepresentations at the heart of this case relate to the discograms and PDs.

a.   Material Misrepresentations Regarding the Discograms.

Dr. Bistline materially misrepresented that the discograms were medically necessary when, in fact, they were not. Dr. Bistline did not perform legitimate discograms to truly diagnose whether a disc was a primary or sole cause of a patients' pain. Instead, she performed discograms solely for the purpose of and in a manner designed to lead to a predetermined positive result that would justify a medically unnecessary PD performed with a Spine Wand. (*Id.,* ¶¶ 39, 50.) Furthermore, her operative reports regarding the discograms were false because they materially misrepresented that she had performed and legitimately obtained positive results every time. (*Id.,* ¶ 43.) The positive results reflected in her reports, when viewed in the context of the pattern of 182 reports, are simply not credible.

b.   Material Misrepresentations Regarding The PDs.

Drs. Kugler and Gomez materially misrepresented that every PD they performed was based upon a legitimately positive discogram result from Dr. Bistline when, in fact, they were not. Furthermore, even if Dr. Bistline's discograms were credible, Drs. Kugler and Gomez materially misrepresented that the PDs that they performed were medically necessary when, in fact, they knew that they were not.

In addition, Drs. Gomez, Kugler, and PBLSC used CPT Codes 63056 and 63057 on many bills for PDs, and each time they did so it was a material misrepresentation regarding the nature of the PDs that were performed.

c.   Defendants Claim That They Did Not Represent The Discograms And PDs Were Medically Necessary.

Any suggestion by Defendants that they never represented that the discograms and PDs were medically necessary ignores explicit and implicit representations in their bills and reports.

Defendants know, and it is indisputable, that State Farm and other insurers are obligated to pay only for medical services that are reasonably, necessary, and related to the accident.  § 627.736 (for personal injury protection claims insurers are responsible only for "reasonable expenses for medically necessary medical . . . services"); *USAA Cas. Ins. Co. v. Shelton*, 932 So. 2d 605, (Fla. 2nd DCA 2006) (for uninsured motorist claims "the insured bears the entire burden to prove that her claimed damages were reasonable, necessary, and related to the accident."); *Cameron v. Sconiers*, 393 So. 2d 11, 12 (Fla. 5th DCA 1980) (for bodily injury claims, plaintiffs entitled to recover only necessary medical expenses related to accident)**.**   Accordingly, implicit in the submission of the reports and bills at issue was a representation that the discograms and PDs were necessary and related to the accident.  *See U.S. ex rel. Fahner v. Alaska*, 591 F. Supp. 794, 801 (N.D. Ill. 1984) (optometrist made "implicit representations," including that the provider "actually performed the services upon which . . . claims for payment are based"); *U.S. ex rel. Kinney v. Stoltz*, 2001 WL 964011, *10 (D. Minn. Aug. 22, 2001) (use of HCPCS and revenue codes on bills for ambulance services "implicitly represented that the ambulance services were medically necessary").

Furthermore, Defendants' reports were deliberately designed to falsely represent that the discograms and PDs would be performed to benefit the patient.  In fact, the reports attached to Dr. Kugler's motion to dismiss prove the point.  (*See* DE 22-1, Ex. A.)  Specifically, a January 17, 2006 report by Dr. Bistline states that "[t]he patient may be found to be a candidate for . . . dis[c]ogram/[PD]."  (*Id.*, Ex. A, at D040583.)  Dr. Kugler's report from the very next day, January 18, 2006, for the same patient, states that if various treatments fail "the patient . . . may be considered a candidate . . . for dis[c]ogram and a [PD] versus a possible need for an open microdiscectomy and a possible fusion."  (*Id.*, Ex. A, at D040645.)  Dr. Kugler's report three months later, on April 3, 2006, states that the same patient has agreed to a discogram and PD, after being advised of the potential risks and benefits of PDs, including that "there is approximately 85% to 90% success rate."  (*Id.*, Ex. A, at D040652.)  These reports culminate in a discogram that was then performed on this patient, followed immediately by a PD based upon the purported positive discogram results on August 28, 2006.  (*Id.*, Ex. A, at D040660, D040661-62.)  These reports, along with corresponding bills, were then submitted to State Farm through a demand letter from Steinger & Iscoe, stating that the patient "had no choice but to result to surgery [*i.e.*, PDs] after all attempts of conservative treatment failed."  (*Id.*, Ex. A, at D040530.)

       d.     The Dates And Manner In Which The Material Misrepresentations Were Made To State Farm.

Defendants created the false reports and bills and, in most instances, gave them to personal injury attorneys to submit to State Farm.  (*Id.*, ¶ 25, Ex. A.)  For each of the 198 claims at issue, the chart attached as Exhibit A to the Complaint identifies the claim number, date of service, involved doctors, number of disc levels subjected to discograms and PDs, the charges, the CPT Codes used to describe the PDs, the involved personal injury attorneys, whether the policy limits were $100,000 or more, State Farm's payments, whether the payments were for a bodily injury, uninsured motorist, or personal injury protection claim, and the date that the false reports and bills were mailed to State Farm, along with a demand letter from a personal injury attorney.  The attorney demand letters were simply the vehicle through which those fraudulent bills and reports were submitted to State Farm.  Defendants purposefully designed their scheme to have most of their reports and bills submitted to State Farm through attorney demand letters to maximize the potential success of their scheme by limiting the time in which State Farm had to decide whether to pay the claims or face exposure to the costs and risks of bad faith lawsuits.

       4.     How State Farm Was Misled By The Material Misrepresentations.

State Farm was misled into believing that patients had conditions in their discs that indicated a need for discograms, that the discograms were legitimately performed and interpreted in a manner that confirmed that one or more discs were causing the patients' pain, that PDs performed with the Spine Wand were done to benefit the patients, and that CPT Codes 63056-57 accurately described the PDs.  This is exactly how Defendants intended to mislead State Farm.

       5.     The Defendants' Motive and Opportunity For Making The Material Misrepresentations, and The Consciousness of Their Behavior.

Defendants' ultimate motive to make material misrepresentations is to personally profit by millions of dollars by inducing State Farm to make payments for personal injury claims that are not owed.  Based upon their status as licensed providers who have unique relationships to the patients and are legally and ethically responsible for acting in their best interests, and the fact that discograms are performed under sedation and anesthesia, Defendants have enormous opportunities to exploit the patients by subjecting them to the medically unnecessary discograms, reporting false positive results, and then using those false positive results to justify medically unnecessary PDs performed with the Spine Wand.

## II.    ARGUMENT

    **A.    The Complaint Satisfies Federal Rules of Civil Procedure 8(a) and 9(b).**

Defendants contend that the Complaint fails to satisfy Rules 8(a) and 9(b).  If the Court were to ignore "conclusory" allegations regarding Defendants' knowledge, they argue, the Complaint simply alleges that the doctors billed for medical services performed on people who were in accidents and State Farm paid the bills.  This would be akin to John Dillinger asserting that the government's allegations, stripped of "conclusory" allegations, amounted to nothing more than he walked into a bank, requested cash, and the teller gave it to him.  Defendants' argument is equally absurd, as the Complaint easily satisfies Rules 8(a) and 9(b).

To satisfy Rule 8(a), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007.)  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009.)  For a motion to dismiss, the Court should eliminate legal conclusions, assume the veracity of well-pleaded factual allegations, and then determine if they plausibly give rise to an entitlement to relief.  *Iqbal* at 1950.  The issue is not whether the plaintiff is likely to prevail but whether the claimant is entitled to offer evidence to support the claims, and all reasonable inferences are to be drawn in plaintiff's favor.  *Coquina Invs. v. Rothstein*, 2011 WL 197241, *1 (S.D. Fla. 2011) (citing *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008)).  The Complaint's well-pleaded facts, summarized above, easily meet this standard.

Furthermore, Rule 9(b) requires plaintiffs to "state with particularity" the circumstances constituting fraud.  For fraud claims, plaintiffs must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the fraud. *Brooks v. Blue Shield of Florida, Inc.*, 116 F. 3d 1364, 1380-81 (11th Cir. 1997).  Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Here, the detailed allegations satisfy these requirements.

As an initial matter, defendants rely heavily on *Allstate Ins. Co. v. Advanced Health Prof., P.C.*, 256 F.R.D 49 (D. Conn. 2008) where the court dismissed a RICO and fraud complaint brought by Allstate against a clinic and related parties because the "complaint contain[ed] no actual facts, which, if proven true, could lead either to the conclusion that Defendants representations – that is, the statements submitted to Allstate – were untrue, or that Defendants

intended those who read the documents to misapprehend the information they contained. *Id.* at 61. That is the critical distinction between *Advanced Health* and the present case, because here the Complaint sets forth detailed facts that identify the material misrepresentations of fact made to State Farm in 198 claims, why they constitute material misrepresentations in each claim, the dates of and people involved directly in each claim, and many other details of each claim.

Indeed, the court in *Advanced Health* spent three pages comparing the lack of details in the complaint that did not satisfy Rule 9(b) and the detailed factual allegations that easily satisfied Rule 9(b) in *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005). *Advanced Health*, 256 F.R.D at 64-66. The contrast between those two complaints is instructive here, because State Farm's detailed allegations in this case are very similar to the detailed allegations in *Olmecs*. In fact, the complaint in *Olmecs* was filed by the same counsel who represents State Farm in this case.

As in *Olmecs*, the Complaint in this case provides a detailed chart at Ex. A, which describes each allegedly fraudulent event, including which Defendant was directly involved in each claim, the claim number, the services billed, and the dates of the mailings. *See Olmecs*, 2005 WL 3710370, *12. For each event in this case, the detailed chart also provides the number of discs that were purportedly subjected to the discograms, the number of discs that were reported as "positive," the number of discs that were subjected to PDs, the involved attorneys, whether the policy limits were $100,000 or more, the amount State Farm paid, and the type of coverage under which State Farm made such payments. (DE 19, Ex. A.)

Furthermore, as in *Olmecs*, the Complaint here identifies the precise misrepresentations that were submitted to State Farm, namely the necessity for and positive results of the discograms, the necessity for the PDs, and the use of CPT Codes 63056 and 63057 to describe the PDs. Courts have uniformly approved of RICO and fraud claims based upon intentional misrepresentations regarding the medical necessity of services.[7] Moreover, courts recognize that when a medical provider submits a bill to a third party payor, the provider makes implicit

---

[7] *See, e.g., State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F. Supp. 2d 1146, 1156-58 (M.D. Fla. 2006) (denying physician's motion for summary judgment on RICO claim based on scheme to bill for unnecessary medical tests); *Allstate Ins. Co. v. Halima*, 2009 WL 750199, *1, 4-6 (E.D.N.Y. Mar. 19, 2009) (denying motion to dismiss RICO claim based on bills for medically unnecessary diagnostic tests); *State Farm Mut. Auto. Ins. Co. v. CPT Medical Services, P.C.*, 2008 WL 4146190, *4-5, 10-13 (E.D.N.Y. Sept. 5, 2008) (similar); *State Farm Mut. Auto. Ins. Co. v. Makris*, 2003 WL 924615, *1 (E.D. Pa. Mar. 4, 2003) (similar).

representations, such as that the services were rendered by a licensed professional, that they were actually rendered, and importantly, that they were medically necessary.  *See, e.g.*, *Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1319 (S.D. Fla. 2009) (accepting RICO allegations that medically unnecessary services were provided as part of fraudulent protocol); *Fahner*, 591 F. Supp. at 801; *Stoltz*, 2001 WL 964011, *10.

Similarly, as in *Olmecs*, the Complaint describes the facts supporting the allegations that Defendants made material misrepresentations.  The Complaint alleges that the purported positive results reflected in Dr. Bistline's operative discogram reports are not credible based upon several inexplicable patterns which are revealed in detail for each of the 198 claims set forth in Ex. A to the Complaint.  (DE 19, ¶¶ 43-46, 49.)[8]  The Complaint also alleges that Dr. Bistline's positive findings are not credible because of the manner in which she performed the discograms, such as failing to make negative findings for control-level discs (DE 19, ¶ 41)[9], and failing to take simple steps that may have tended to validate or invalidate the purportedly positive results (DE 19, ¶ 42).  Furthermore, the Complaint provides detailed factual allegations to explain why the PDs performed with the Spine Wand were not medically necessary.  In that regard, the Complaint explains that the PDs were justified based upon the results of Dr. Bistline's discograms, which are not credible.  (DE 19, ¶¶ 32, 50, 56.)  Moreover, the Complaint alleges that no peer-reviewed study supports the efficacy of the PDs that Defendants performed, and that a 2008 Medicare meta-analysis determined that there was no evidence that PDs performed with the Spine Wand for the treatment of low back pain improved outcomes.  (DE 19, ¶¶ 52-55.)  In addition, the

---

[8] *See, e.g.*, *Aetna Cas. Surety Co. v. P & B Autobody*, 43 F.3d 1456, 1994 WL 717998, *36 (1st Cir. Dec. 29, 1994) (jury was entitled to consider evidence of unusual claim history to infer that co-defendants participated in the affairs of the RICO enterprise); *U.S. v. LaSpesa*, 956 F.2d 1027, 1033 (11th Cir. 1992) (a jury could easily infer fraudulent intent from the defendant's pattern of conduct); *U.S. v. MacPherson*, 424 F.3d 183, 191 (2d Cir. 2005) (pattern evidence could support a reasonable inference of intent); *U.S. v. Widergren*, 8 F.3d 33, *1 (9th Cir. 1993) (documents "reveal[ed] a pervasive pattern of fraud and misrepresentation and omission"); *Enzo Biochem, Inc. v. Johnson & Johnson*, 1992 WL 309613, *13 (S.D.N.Y. Oct. 15, 1992) (similar); *McCrae Assoc. v. Universal Capital Man., Inc.*, 554 F. Supp. 2d 249, 252 (D. Conn. 2008) *U.S. v. Daniels*, 117 F. Supp. 2d 1040, 1041 (D. Kan. 2000) (similar); *In re Matus*, 303 B.R. 660, 679 (Bankr. N.D. Ga. 2004).

[9] On this point, Defendants cite *Hough v. State Farm Ins. Co.*, 2007 WL 1500181 (E.D. Mich. May 22, 2007), which actually supports State Farm's claims.  (*See* DE 33, p. 3.)  The *Hough* court noted that discograms should be performed using a control disc.  *Id.* *3.

Complaint provides detailed factual allegations to explain why the use of CPT Codes 63056 and 63057 constitutes a material misrepresentation.  (DE 19, ¶¶ 68-70, 122.)[10]

Finally, as in *Olmecs*, the complaint in this case sets forth substantial facts regarding Defendants' motive and opportunity to commit fraud and the consciousness of their behavior. Specifically, the Complaint describes the importance of each Defendant's role in carrying out the scheme (DE 19, ¶¶ 2(a)-(g), 27), their common financial motives for doing so (*id.*, ¶¶ 58-72), their strategic relationships with personal injury attorneys (*id.*, ¶¶ 28, 96-99), other health care providers (*id.*, ¶ 29) and Arthrocare and Discocare (*id.*, ¶¶ 3, 30, 97-128), the incredible patterns in their documentation (*id.*, ¶¶ 40-47, 49), the creation of a "sham" study supporting the efficacy of PDs (*id.*, ¶ 118) and the affirmative steps that they have taken to thwart inquiries into their relationships and activities (*id.*, ¶¶ 88, 126-27).  Taken together, these detailed factual allegations are more than sufficient to support a strong inference that the defendants acted with the requisite knowledge and intent.  *See Olmecs*, 2005 WL 3710370.

B.       **Defendants' False Statements Constitute Material Misrepresentations Of Fact.**

Defendants argue that the alleged false representations regarding the medical necessity of the discograms and PDs at issue cannot be considered misrepresentations of fact.  Defendants are wrong.

First, Defendants argue that the Complaint cannot allege fraud-based claims because the decision to subject the patients to these procedures constituted an expression of opinion, not fact. As an initial matter, the Complaint clearly alleges that this case is not about a mere difference of medical opinion.  To the contrary, State Farm alleges specific facts that Defendants made material misrepresentations of fact regarding the medical necessity for and positive results of the discograms, the necessity for the PDs, and the use of CPT Codes 63056 and 63057 to describe the PDs.  Under these circumstances, Defendants made actionable misrepresentations of fact. *See Olmecs*, 2005 WL 3710370, *3 (concluding the plaintiffs satisfied pleading requirements for fraud where they alleged that in each claim submitted to the plaintiffs, the defendants knowingly misrepresented that the supplies prescribed were medically necessary when, in fact, they were

---

[10] It is well settled that false CPT codes constitute actionable misrepresentations.  *See e.g., Hill v. Morehouse Medical Assocs., Inc.*, 2003 WL 22019936, *4-5 (11th Cir. Aug. 15, 2003) (reversing dismissal of complaint alleging the use of false CPT Codes); *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 3-5 (D. D.C. 2003) (denying motion to dismiss complaint alleging false CPT Codes); *U.S. v. Markoll*, 2001 WL 173763, * 5 (D. Conn. Jan. 24, 2001) (denying motion to dismiss mail fraud indictment based on false CPT Codes).

not); *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376-77 (5th Cir. 2004) (reversing district court's dismissal of claim under the False Claims Act where relator alleged that defendant knowingly misrepresented medical necessity).

Second, Defendants rely on *U.S. v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006) to argue that their representations regarding the medical necessity of their procedures cannot be challenged as a misrepresentation of fact unless they violated some rule, regulation, or protocol establishing a standard of care for such procedures.  (*See* DE 28, pp. 15-16.)  This argument is baseless.  In *Prabhu,* the government alleged, *inter alia*, that the defendant had submitted false claims to Medicare because he had billed Medicare for services that were not "medically necessary."  442 F. Supp. 2d at 1020.  Defendants suggest that *Prabhu* stands for the proposition that where the term "medically necessary" remains undefined no finding of falsity can lie.  (DE 28, p. 15.)  To the contrary, the *Prabhu* court granted summary judgment for the defendant because it found that the doctor had submitted claims *for medically necessary services*, not because the medical necessity standard was too vague.  *See Prabhu*, 442 F. Supp. 2d at 1033.  Thus, unlike *Prabhu*, where the government did not dispute that the defendant's services "were clinically and medically necessary," State Farm here alleges that the discograms were done solely for the purpose of and in a manner designed to lead to a predetermined positive result to justify the medical necessity of PDs, not because they were medically necessary.  (*Id.*, ¶¶ 32, 39, 50.)  Furthermore, *Prabhu* was decided in the context of summary judgment based upon a full evidentiary record.  Thus, *Prabhu* provides no support to Defendants.

Third, Defendants contend that the representations that they made regarding the medical necessity of discograms and PDs cannot constitute material misrepresentations of fact because "[t]hese same allegations of medically unnecessary discograms and [PDs] were the subject of a complaint made by State Farm in 2008 against [Drs.] Kugler and Bistline with the Florida Board of Medicine ("BOM")."  (DE 28, p. 16)  According to Dr. Bistline, because the BOM purportedly "rendered a decision that [Drs. Bistline and Kugler's] performance of the PD and discography procedures was consistent with the prevailing standard of care," there can be no actionable fraud.  (*Id.*, pp. 17-18.)  For the reasons set forth in State Farm's separately filed Response to the Request to Take Judicial Notice, the BOM materials are irrelevant and inadmissible, and do not remotely support Dr. Bistline's characterization of the BOM's

purported decision.  Thus, the BOM's purported decision has no bearing on whether the Complaint adequately alleges material misrepresentations of fact.

        **C.**      **The Complaint Adequately Pleads RICO Claims.**

                1.      <u>The Complaint Adequately Pleads An Association-In-Fact Enterprise.</u>

      Defendants contend that State Farm's RICO enterprise allegations are inadequate because they purportedly fail to properly allege: (1) an association-in-fact enterprise among the defendants, (2) that the enterprise functioned for some other purpose than for the defendants to engage in racketeering, and (3) that the enterprise had an existence distinct from the racketeering. (DE 20, pp. 14-19.)  As discussed below, based upon *Boyle v. U.S.*, 129 S. Ct. 2237 (2009), these arguments should be flatly rejected.

      RICO makes it "unlawful for any person employed by or associated with any enterprise. . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).  The RICO statute defines the term "enterprise" to "include . . . any . . . group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The pleading requirements for an association-in-fact enterprise have been the subject of several United States Supreme Court decisions.  In *U.S. v. Turkette*, 452 U.S. 576 (1981), the Court explained that an association-in-fact enterprise reaches "a group of persons associated together for a common purpose of engaging in a course of conduct" and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  452 U.S. at 580, 583.  After *Turkette*, there was conflict among the courts regarding the nature of the enterprises that met this definition, the level of structure required of an association-in-fact enterprise, and the extent to which the enterprise must have some purpose other than to serve as the vehicle through which the defendants committed racketeering activities.  In *Boyle*, the Supreme Court granted certiorari to resolve conflicts among the courts concerning the meaning of enterprise and, in so doing, squarely addressed each issue raised by Defendants in this case.  229 S. Ct. at 2243.

      In *Boyle*, the defendant was convicted of violations of 18 U.S.C. §§ 1962(c) and (d) for participating with others in several bank thefts.  *Id.* at 2241-42.  The participants included a core group, and others who were recruited from time to time.  *Id.*  Each theft was typically carried out by a group who would plan the crime and assign roles that each participant would play (such as lookout and driver).  *Id.*  The trial court in *Boyle* instructed the jury that, to establish the existence of an enterprise, the Government had to prove that: "'(1) There [was] an ongoing

organization with some sort of framework, formal or informal, for carrying out its objectives; and (2) the various members and associates of the association function[ed] as a continuing unit to achieve a common purpose.'" *Id.* at 2242  Over the defendant's objection, the trial court also told the jury that it could find an "enterprise where an association of individuals, without structural hierarchy, form[ed] solely for the purpose of carrying out a pattern of racketeering acts" and that "[c]ommon sense suggests the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id.*  The trial court refused the defendant's request for an instruction that the Government was required to prove that the enterprise "had an ongoing organization, a core membership that functioned as a continuing unit and an ascertainable structural hierarchy distinct from the charged predicate acts." *Id.*

In *Boyle*, the Supreme Court began its analysis of the term enterprise by noting that the definition in § 1961(4) "is obviously broad encompassing '*any* . . . group of individuals associated in fact.'" *Id.* at 2243 (emphasis in original).  The Court recognized that "[t]he term 'any' ensures the definition has a wide reach . . . and the very concept of an association in fact is expansive." *Id.* (citation omitted).  Moreover, "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Id.* (citation omitted).  The Court then proceeded to address the specific question on which it granted certiorari, namely whether an association-in-fact enterprise must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages.  *Id.* at 2244.  To answer this question, the Court broke it into three parts, each of which is discussed next.

The Court first addressed whether an association-in-fact must have structure, and held that an enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.  *Id.*  Second, the Court indicated that the structure of the enterprise must be "ascertainable" because it is an element of a RICO violation.  *Id.* at 2244-45.  Finally, the Court addressed whether the structure of the enterprise must be "beyond that inherent in the pattern of racketeering activity."  *Id.* at 2245.  The Court indicated that the answer to this question depended on how it was interpreted.  *Id.*  Specifically, the Court noted that "[i]f the phrase is interpreted to mean that the existence of an enterprise is a separate element that must be proved, it is of course correct."  *Id.*  However, if it were interpreted to mean that the existence of an

enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering, that would be incorrect. *Id.* Indeed, in *Turkette*, the Court had recognized that the evidence used to prove the pattern of racketeering activity and the evidence establishing the enterprise "may in particular cases coalesce." *Id.* (citing *Turkette*, 452 U.S. at 583).

The Court then applied the above principles to the facts of the case. Specifically, the Court rejected a slew of structural features that the defendant suggested should be required to prove an enterprise, and stated that "[a]s we said in *Turkette*, an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis . . . . Members of the group need not have fixed roles; different members may perform different roles at different times. . . . Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.* at 2245-46.

Based upon the above analysis, the Court in *Boyle* affirmed the defendants' conviction and held that the trial court's instructions to the jury were proper. *Id.* at 2247. Specifically, the trial court had properly instructed the jury that the enterprise must have structure, namely an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives" and that "the various members . . . functioned as a continuing unit to achieve a common purpose." *Id.* Furthermore, the Court held that the trial court properly instructed the jury that "the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id.* According to the Court, "[t]his instruction properly conveyed the point we made in *Turkette* that proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id.*

Based upon *Boyle* and *Turkette*, State Farm's allegations are more than sufficient to meet the necessarily "broad" and "expansive" interpretation of enterprise intended by the statute. Specifically, the Complaint alleges that the defendants formed an association-in-fact enterprise (DE 19, ¶ 143), and:

The members . . . are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose. The defendants forged symbiotic relationships and each defendant needed and depended upon the participation of the other defendants to accomplish their common purpose of defrauding State Farm and other insurers through fraudulent personal injury claims. Specifically, (a) Dr. Bistline knowingly performs medically unnecessary discograms and arrives at pre-determined positive results to justify medically unnecessary PDs, (b) Drs. Gomez and Kugler knowingly perform medically unnecessary PDs based upon the pre-determined positive results of Dr. Bistline's discograms, (c) Jane E. Bistline, M.D., P.A., Jeffrey L. Kugler, M.D., P.A., Heldo Gomez, M.D., P.A., and the North Palm Neurosurgery, P.L. knowingly submit fraudulent charges and related documentation for the professional fees relating to the medically unnecessary discograms and PDs, (d) the Palm Beach Lakes Surgery Center knowingly submits fraudulent charges and related documentation for the facility fees relating to the medically unnecessary discograms and PDs, (e) Dr. Cutler knowingly profits from the medically unnecessary PDs through his ownership interest in the Palm Beach Lakes Surgery Center and by submitting fraudulent bills for the Spine Wands used to perform the medically unnecessary PDs, and (f) Carroll, Izydore and Palm Beach Practice Management, Inc. have coordinated and controlled the activities of and relationships between all defendants to knowingly profit from the medically unnecessary discograms and PDs. (DE 19, ¶ 144)

In addition to these allegations, the Complaint provides detailed facts regarding each defendant's role in paragraphs 1-131. Furthermore, these factual allegations clearly satisfy the three requirements set forth in *Boyle* for the enterprise element. First, the allegations explain the enterprise's common purpose, namely to defraud State Farm and other insurers through fraudulent personal injury claims. (DE 19, ¶ 144.) Second, the allegations describe in detail the relationships among its members, which include: performing the discograms and reporting the predetermined positive results; performing the PDs based upon those results; submitting fraudulent charges for the professional fees, facility fees, and Spine Wands relating to those procedures; and coordinating and controlling the relationships among the members. Finally, the allegations establish that the enterprise has functioned as a continuing unit with longevity sufficient to permit the members to pursue their common purpose. While the racketeering acts set forth in Ex. A of the Complaint offer evidence of these structural features, and may be all that is required to infer the existence of the enterprise based upon *Turkette* and *Boyle*, the allegations

of the Complaint go far beyond a description of the racketeering acts in describing the structure of the Defendants' enterprise.[11]

Finally, *Turkette* and *Boyle* establish that an enterprise had purpose other than to serve as the vehicle through which defendants commit racketeering activities.  In fact, the enterprises in both *Turkette* and *Boyle* were purely criminal enterprises with no other purpose.  *Turkette*, 452 U.S. at 591 (enterprise was group of individuals associated for the purpose of illegally trafficking in narcotics, committing arson, using the mails to defraud insurance companies through arson, and other crimes); *Boyle*, 229 S. Ct. at 2246-47 (group of individuals associated for the purpose of committing bank thefts met the definition of an enterprise); *see also Coquina, Inv. V. Rothstein*, 2011 WL 197241, *3 (S.D. Fla. Jan. 10, 2011) (an enterprise need not possess an "ascertainable structure" distinct from the associations necessary to conduct the pattern of racketeering activity[.]") (quoting *U.S. v. Goldin Indus., Inc.*, 219 F. 3d 1271, 1274-75 (11th Cir. 2000)).[12]  Accordingly, State Farm has adequately pleaded an enterprise.

> 2.   The Complaint Adequately Pleads That The Defendants Have Conducted Or Participated, Directly Or Indirectly, In The Enterprise's Affairs.

Defendants contend that the Complaint fails to adequately allege that they conducted or participated, directly or indirectly, in the enterprise's affairs.  (DE 20, pp. 12-13.)  In *Reves v. Ernst & Young,* the Supreme Court held that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  507 U.S. 170, 179 (1993) (emphasis in original) (citation omitted.)   "Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but ***some*** part in directing the enterprise's affairs is required."  *Id.  See also Williams v. Mohawk Indus., Inc.,* 465 F.3d

---

11 Indeed, several other courts in similar cases have denied motions to dismiss RICO claims based upon similar allegations.  *See, e.g.*, *AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 WL 3710370, *6-7 (E.D.N.Y. Feb. 22, 2005) (allegations of enterprise are adequate where they allege defendants shared a common purpose to defraud plaintiffs by submitting fraudulent claims, and they worked together to achieve this purpose); *State Farm Mut. Auto Ins. Co. v. CPT Med. Servs.*, 2008 WL 4146190, *10 (E.D.N.Y. Sept. 5, 2008) (same).

12 Defendants' reliance on *State Farm Mut. Auto Ins. Co v. Giventer*, 212 F. Supp. 2d 639 (N.D. Tex. 2002) is irrelevant because that case was decided based upon its unique facts and its premise – that State Farm failed to prove that there was nothing to bind the members of the enterprise together other than the racketeering acts – has been squarely rejected by *Boyle*.

1277, 1285 (11th Cir. 2006) (citation omitted) ("the Supreme Court has cautioned that 'RICO liability is not limited to those with primary responsibility for the enterprise's affairs").

Here, the Complaint alleges the vital roles played by each Defendant in carrying out the enterprise's affairs.  (DE 19, ¶ 144.)  Detailed allegations such as these are more than sufficient to satisfy the *Reves* test.  *See, e.g.*, *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1285 (11th Cir. 2006) (allegations showing "some direction over the recruiters" were sufficient to satisfy operation and management requirement of Reeves); *Coquina Invs. v. Rothstein*, 2011 WL 197241, *3 (S.D. Fla. Jan. 20, 2011) (complaint satisfied *Reeves* where plaintiffs alleged that banks prepared misleading letters to investors and assured them that their investments were safe); *State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F. Supp. 2d 1146, 1158 (M.D. Fla. 2006) (denying summary judgment where plaintiffs satisfied Reeves by alleging that defendant physician decided what fraudulent diagnostic tests to perform, marketed fraudulent tests to chiropractors, taught lay people how to read test results and prepare reports, and created boilerplate language for test reports submitted to insurance companies); *Al-Rayes v. Willingham*, 2007 WL 788401, *2-3 (M.D. Fla. Mar. 14, 2007) (denying motion to dismiss where plaintiff meet operation and management requirements by alleging that lawyer defendant misrepresented that  he was a fiduciary, created entities to buy and sell real estate at inflated prices, and concealed the true purchase price of real estate)

   3.   <u>The Complaint Adequately Pleads That State Farm's Damages Were Proximately Caused By the Pattern Of Racketeering Activity.</u>
       a.   State Farm's Damages Were Proximately Caused By Defendants.

Defendants argue that the Complaint does not "sufficiently allege that the behavior complained of proximately caused the Plaintiffs an injury."  (DE 22, p. 13; DE 33, p. 16-17)  Defendants' argument raises two points: (1) State Farm is not the "directly injur[ed] victim" because it is the patients who were subjected to the medically unnecessary procedures (DE 22, p. 14; DE 33, p. 17), and (2) it is too difficult to calculate damages (DE 22, p. 15-16; DE 33, p. 17).  Neither argument has merit.

In a RICO action, a plaintiff must show that it was "injured in [its] business or property ***by reason of a*** violation of section 1962 . . . ."  18 USC § 1964(c) (emphasis added).  The "by reason of" language requires a RICO plaintiff to establish that a defendant's violation was the proximate cause of his injury.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008).  The proximate cause inquiry focuses on whether there is a sufficiently "direct relation between

the injury asserted and the injurious conduct alleged" such that it is appropriate to hold the defendant liable. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). RICO does not, however, require a plaintiff to show that the injurious conduct is the sole cause of the injury. Rather, there must only be some direct relation between the injury and the injurious conduct to show proximate cause. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1287 (11th Cir. 2006).

Defendants purport to rely on several Supreme Court cases addressing proximate causation in the RICO context, but those cases support State Farm's direct injury in this case. In *Holmes*, for example, the Court examined whether a RICO claim based upon a stock-manipulation scheme sufficiently alleged causation where it was undisputed that the plaintiff, the Securities Investor Protection Corporation ("SIPC"), did not rely on the purported misrepresentations and did not buy any of the stock that was fraudulently peddled. *Holmes*, 503 U.S. at 261-63. Rather, the SIPC alleged that, as a result of the defendants' stock manipulation, a domino effect caused the SIPC to sustain damages: (1) due to the defendants' fraud, many broker-dealers invested in the manipulated stock, (2) once the manipulation was discovered, the broker-dealers lost money and could not meet their financial obligations to customers, and (3) because the broker-dealers could not meet their financial obligations, the SIPC had to compensate those customers. *Id.* at 262-63. SIPC's payments to the broker-dealers' customers were the SIPC's purported RICO damages. *Id.* Under these facts, the Court found the link was "too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271 (emphasis added).

The Court similarly found proximate cause lacking in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). There, two competing corporations operated in the same area in New York. The plaintiff alleged that the other was not charging required sales tax to customers, which resulted in the defendant submitting fraudulent tax returns constituting wire fraud. The plaintiff further alleged that it sustained damages as a result of the defendant's tax fraud because it enabled the defendant to offer low prices, thereby causing the plaintiff to lose unidentified customers. *Id.* at 454-44. The Court held that the *Anza* plaintiff's damages were too remote because they were based on "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. As the Court explained, "[t]he direct victim of this conduct was the State of New York, not [the plaintiff]." *Id.* at 457-58. Thus, the common theme of *Holmes* and *Anza* is that the plaintiffs were not the target of the fraud, and the

damages sought by the plaintiffs were contingent upon the harm suffered by third parties who were, in fact, the direct victims of the fraud.

Unlike those cases, State Farm was the initial target of Defendants' fraudulent scheme and its damages are not contingent on injuries suffered by third parties.  (DE 19, ¶¶ 4, 132-36).  The cause and effect of Defendants' conduct and State Farm's injuries could not be clearer.  Defendants caused fraudulent medical bills to be submitted to State Farm and the direct effect of that fraud was to induce State Farm to pay at least $13 million (DE 19, ¶¶ 29-30, 96-99, 132-36, 147, 153.)  As several other federal courts have found, these allegations are more than sufficient to satisfy the proximate cause requirements of *Holmes*, *Anza*, and their progeny.  *See, e.g.*, *Grafman*, 655 F. Supp. 2d at 229 (factually similar RICO case asserted "[t]he situation in *Anza* is inapposite, indeed, almost opposite, to the allegations here"); *CPT Medical Services, P.C.*, 2008 WL 4146190, *13 (expressly distinguishing *Holmes* and *Anza* in a similar RICO claim asserted by State Farm); *Abrams*, 2000 WL 152143, *2 ("Under the proximate cause analysis in *Holmes*, *Teamsters* and *Marshfield Clinic*, this court is inclined to find RICO standing [for State Farm] here.").

Nonetheless, Defendants argue that it was the patients themselves who were subjected to "bogus medical procedures at substantial risk to [their] health" are the true victims, and they "can certainly be expected to pursue their own claims."  (DE 22, p. 14; *see also* DE 33, p. 17).  Under these circumstances, Defendants suggest that there would be a "double recovery" – one for the patients and one for State Farm.  (DE 33, p. 17.)  Actually, there can be no double recovery.  Any suits by State Farm and the patients would sue for distinct injuries.  Specifically, the patients could sue for personal injuries that they have directly suffered as a result of Defendants' conduct.  These personal injury damages are different than State Farm's economic damages and the former are not recoverable under RICO while the latter are.  The bottom line is that State Farm has been directly injured by reason of paying more than $13 million as a result of Defendants' pattern of racketeering activity.  As other federal courts have recognized in rejecting similar arguments, "[a]lthough the State Farm insureds may also seek recovery from Defendants, the injuries the insureds may have sustained are distinct from the pecuniary damages sustained by State Farm."  *Abrams*, 2000 WL 152143, *3.

    b.  Defendants' Arguments That Other "Factors" *May Have* Impacted State Farm's Damages Are Unavailing.

Defendants next challenge allegations regarding proximate cause, arguing that additional "factors" "may" have caused State Farm to settle inflated personal injury claims.  (DE 22, p. 17.) These speculative "factors" were not alleged in the Complaint, and therefore cannot be considered at the dismissal stage.  *Sabghir v. Eagle Trace Cmty. Ass'n, Inc.*, 1997 WL 33635315, *1 (S.D. Fla. 1997) (holding that "[c]onsideration of matters beyond the four corners of the complaint is improper").  Even if they could be considered, however, they would still not warrant dismissal.  "In both federal RICO and federal antitrust cases, *'proximate cause is not ... the same thing as a sole cause*,' and it is enough for the plaintiff to plead and prove that the defendant's tortious or injurious conduct was a 'substantial factor in the sequence of responsible causation.'"  *See Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1288-89 (11th Cir. 2006) (rejecting the argument that a RICO plaintiff failed to allege proximate cause because the predicate acts "were just one of myriad factors" that ultimately caused plaintiff's damages) (quotation omitted) (emphasis added).

Moreover, the burden of proving intervening or superseding causes in RICO actions is on defendants, not State Farm.  *See, e.g., BCS Servs., Inc. v. Heartwood 88, LLC*, --- F.3d ---, 2011 WL 1045853, *6 (7th Cir. Mar. 24, 2011) (holding that "the burden of proving an 'intervening cause'–something which snaps the 'causal chain' . . . is on the defendant").  At the pleading stage, State Farm must only allege a *probable* "causal relation between a defendant's act and a plaintiff's injury," *see id.* *8, which the Complaint more than adequately does here.  As the *BCS Servs.* court recognized, a RICO plaintiff "doesn't have to prove [nor allege] a series of negatives; he doesn't have to offer evidence which positively excludes every other possible cause of the accident."  *Id.* *6 (quotations and citations omitted).  In fact, "[o]nce a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to *withstand summary judgment* on the ground of absence of causation."  *Id.* *8 (citations omitted, emphasis added).  And, once causation is established, the RICO "plaintiff has a more relaxed burden of proof," especially if "the defendants' conduct has made it difficult for the plaintiff to prove the precise extent of his damages."  *Id.* *9 (citations omitted).

Defendants reliance on *Allstate v. Receivable Finance Co.*, 501 F.3d 398 (5th Cir. 2007) is misplaced.  *Receivable Finance* reversed a *jury verdict* in favor of AllState's medically unnecessary procedures.  This case actually supports State Farm's claims in several respects.

First, the complaint in *Receivable Finance* was not dismissed as Defendants request here; rather, it proceeded to trial, which is the same result the Court should reach in this case. Second, although the court did find that Allstate failed to sufficiently prove reliance or damages *at trial*, the court did not hold that Allstate could not have done so as a matter of law. To the contrary, it merely held that Allstate failed to "introduce the testimony of adjusters (or other similar agent or employee) who in fact worked on some significant number of the 1,800-plus claim files at issue," and also failed to present proof on "what the defendants-appellants obtained through fraud as opposed to their legitimate provision of health care…." *Id.* 410-12. These evidentiary matters have no application to a motion to dismiss and cannot be grounds for dismissal as Defendants suggest.

c.   The Complaint Sufficiently Alleges "Economic Injury" Arising From Defendants' Conduct.

Defendants argue that *Ironworkers Local Union 68 et al. v. Astrazeneca Pharmaceuticals, LP et al.*, No. 08-16851, 2011 WL 83322 (11th Cir. Mar. 11, 1011) defeats State Farm's claims because State Farm supposedly has not and cannot plead economic injury to support its claims. As discussed below, *Ironworkers* is easily distinguishable from the present case for several reasons, and Defendants' interpretation would mean that no insurance company could ever recover damages suffered in a fraud scheme. Such a result would be squarely inconsistent with countless cases over decades in which insurance companies have proceeded with claims arising out of a fraud scheme.

In *Ironworkers*, the plaintiffs were health benefit plans who brought RICO claims against the manufacturer and marketer of a drug called Seroquel. *Id.* at *3 The plaintiffs complained that the defendants engaged in a scheme to market Seroquel by falsely representing to physicians that Seroquel was safer and more effective in treating certain off-label conditions than less expensive drugs used to treat those same conditions. *Id.* at 4. The plaintiffs alleged that physicians relied on these false representations, and as a result prescribed Seroquel instead of other cheaper, but still effective, drugs for patients. *Id.* at *4-5. As a result, the plaintiffs claimed that they paid more for the Seroquel, and sought to recover the difference between what they paid for the Seroquel and what they would have paid for the cheaper drugs. *Id.* at *5.

The district court dismissed the plaintiffs' claims and the Eleventh Circuit affirmed, but on different grounds. *Id.* at *11. Specifically, based upon the unique facts of the case, the court held that plaintiffs failed to allege that they suffered any economic injury. *Id.* at *12. The court

began its analysis by recognizing that economic injury in the prescription drug context must be based upon prescriptions for drugs that are "medically unnecessary or inappropriate according to sound medical practice." *Id.* at *11.  Based on this aspect of the court's analysis, State Farm clearly alleges an economic injury by setting forth facts that it was fraudulently induced to pay claims based upon procedures that were "medically unnecessary and inappropriate according to sound medical practice."

The court also concluded that, by listing Seroquel on their formularies (i.e., lists of drugs approved for coverage) without any qualification or condition, the plaintiffs had consciously agreed to be contractually obligated to pay for all prescriptions of Seroquel, regardless of whether they were medically necessary, inappropriate or even birthed by fraud.  *Id.* at *25, 29-30.  This fact was the necessary lynchpin for the court's ruling that the plaintiffs had not suffered an economic injury.  Because plaintiffs consciously agreed to provide coverage for and pay for all Seroquel prescriptions under any circumstances, the court inferred that the insurers must have factored all costs for such prescriptions into their premiums.  *Id.* at *30-32.  If the insurers failed to correctly factor all such costs into their premiums, their "own business mistakes caused their loss." *Id.* at *32.

*Ironworkers* is distinguishable from the present case for several reasons.  First and foremost, the dispositive distinction is that, unlike the plaintiffs in *Ironworkers*, State Farm has never agreed to be contractually obligated to pay for discograms and PDs regardless of whether they were medically necessary, inappropriate or birthed by fraud.  Defendants have not and cannot point to any evidence to the contrary.  Therefore, unlike the plaintiffs in *Ironworkers*, there is no basis to infer that State Farm factored the costs for medically unnecessary and fraudulent discograms or PDs into its premiums, or to hold State Farm responsible for any losses it has incurred by not factoring such losses into its premiums.  Second, the scheme in *Ironworkers* involved alleged misrepresentations to physicians, not the plaintiffs.  Here, State Farm has alleged that the scheme involved misrepresentations to State Farm.  Third, the scheme in *Ironworkers* did not involve prescriptions that were medically unnecessary, inappropriate, or birthed by fraud.  Here, the scheme involves bills and reports relating to procedures that that Defendants knew were not medically necessary.  Finally, the alleged damages in *Ironworkers* would have required an analysis of the extent to which third parties, namely physicians, relied upon the defendants' misrepresentations in prescribing Seroquel.  Here, State Farm's damages

were caused by reason of its reliance on Defendants' misrepresentation.   Accordingly, *Ironworkers* has no applicability to this case.[13]

### D. State Farm Has Sufficiently Pled Its Claim For RICO Conspiracy Against The Defendants.

Defendants argue that for three reasons State Farm fails to sufficiently allege a claim for a RICO conspiracy: (1) because State Farm's substantive RICO claim fails, so too must its RICO conspiracy claim; (2) State Farm fails to allege an "agreement" by Defendants to engage in the fraudulent enterprise; and (3) the Complaint alleges no facts that dispel the inference that Defendants engaged in lawful conduct.  (DE 22, pp. 18-20; DE 20, pp. 19-20.)  Each of these arguments fails.

First, because the Complaint adequately sets forth allegations for the primary RICO violation, it also adequately alleges facts that Defendants conspired to submit fraudulent claims to State Farm and other insurers based upon medically unnecessary discograms and PDs.  (*See* DE 19, ¶¶ 151-52.)  *See also Acciard v. Whitney*, 2008 WL 5120898, *8 (M.D. Fla. Dec. 8, 2008) (concluding "because the Court has found that Plaintiffs have sufficiently alleged their RICO claim, the Court rejects [the defendant]'s argument that the RICO conspiracy claim necessarily fails").  Second, with respect to Defendants' argument that the Complaint fails to plead facts evincing an "agreement" (DE 22, p. 19), Defendants ignore that RICO plaintiffs can establish a conspiracy claim under § 1962(d) in one of two ways: "(1) by showing an agreement on an overall objective, or (2) . . . by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a 'single objective' conspiracy." *U.S. v. Starett*, 55 F. 3d 1525, 1544 (11th Cir. 1995) (quotation omitted, alteration in original); *U.S. v. Church*, 955 F.2d 688, 694-95 (11th Cir. 1992) (same).  Moreover, plaintiffs need not offer direct evidence of a RICO agreement; the existence of conspiracy "may be inferred from the conduct of the

---

13 These are critical distinctions between the present case and other cases cited by Defendants involving "off label" prescriptions and tobacco companies.  (DE 22, p. 18 (citing, *inter alia*, *Southeast Laborers Health and Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270 (S.D. Fla. Jul 30, 2009); *Int'l Broth. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.*, 196 F. 3d 818 (7th Cir. 1999)).)  Those cases are irrelevant because, as in *Ironworkers:* (1) the schemes involved misrepresentations to third parties – physicians in the "off label" prescription cases and consumers in the tobacco cases – not to the plaintiffs; (2) the insurance company plaintiffs did not allege that they relied upon the misrepresentations; and (3) a determination of the amount of damages proximately caused by the defendants conduct would have required an analysis of the extent to which third parties, not the plaintiffs, relied upon the misrepresentations, as opposed to other factors.

participants." *Magnifico v. Villanueva*, 2011 WL 1565469, *8 (S.D. Fla. April 20, 2011) (quotation omitted); *see also Liquidation Com'n of Banco Int'l, S.A. v. Renta*, 530 F.3d 1339, 1353 (11th Cir. 2008). Here, the detailed allegations regarding Defendants' conduct are more than sufficient at this stage to infer an agreement among Defendants. (*See, e.g.*, DE 19, ¶¶ 2, 9-20, 73-99, 105-127, 151-52.); *see Coquina Invs.*, 2011 WL 197241, *5 (complaint sufficiently alleged RICO conspiracy where it detailed allegedly fraudulent letters signed by two defendants, which the court found "sufficient to infer the existence of a RICO conspiracy"); *U.S. v. Al-Arian*, 308 F. Supp. 2d 1322, 1350 (M.D. Fla. 2004) (motion to dismiss denied where allegations were provided defendants with factual support and the legal theory as to each of the defendants' role and involvement in the conspiracy).[14]

## III.   THE ALLEGED MAILINGS ARE SUFFICIENT TO SUPPORT MAIL FRAUD VIOLATIONS.

Defendants argue that the mailings of the fraudulent bills and reports along with the attorney demand letters cannot form the basis for a mail fraud violation. (DE 21, pp. 10-13.) For this argument, Defendants rely on *U.S. v. Pendergraft*, 297 F. 3d 1198 (11th Cir. 2002). However, Defendants completely misapply *Pendergraft*.

The defendants in *Pendergraft* were convicted of mail fraud and conspiracy to commit mail fraud based on affidavits they gave falsely accusing the Chairman of the Marion County Board of Commissioners of threatening them if their abortion clinic remained open. *Id*. at 1200. The affidavits were used in support of a summary judgment motion and were mailed to other parties involved in the case. *Id.* at 1201-02. The Eleventh Circuit reversed the convictions for mail fraud and conspiracy to commit mail fraud, because the Chairman knew that he had not made the alleged threat and thus the Chairman and County could not be deceived by the false affidavits. *Id.* at 1209. Therefore, the sole basis upon which the court reversed the convictions was that the defendants could not have intended to deceive the County when they mailed the false affidavits.

In *U.S. v. Lee*, 427 F. 3d 881 (11th Cir. 2005) the Eleventh Circuit took the opportunity to explain the limited holding in *Pendergraft*. There, the defendants were convicted of mail fraud based on, among other things, a false affidavit submitted in response to a foreclosure action filed

---

[14] Defendants' final argument that State Farm's conspiracy allegations describe lawful, parallel conduct that does not suggest that any of the Defendants "acted in any way inconsistent with the independent pursuit of their own economic self-interest" is ridiculous. (*See* DE 20, p. 19.)

by a lender.  *Id.* at 888-89.  The affidavit falsely stated that no debt existed.  *Id.* at 889.  In challenging the conviction, the defendants relied on *Pendergraft* to argue that the mailing of documents in connection with litigation cannot serve as the basis of a mail fraud violation.  *Id.* The Eleventh Circuit rejected such a bright line rule and noted that the language in *Pendergraft* – that serving a motion by mail was a common litigation practice and prosecuting litigation activities would tend to inhibit policies promoting access to the courts – was simply dicta.  *Id.* at 890.  The Court also found that unlike *Pendergraft*, the defendants "had the necessary intent to deceive" because their mailings were intended to deceive banks, not the court, by knowingly writing checks on closed accounts and using the mails to confuse and avoid creditors.  *Id.* at 890-91.

Based upon *Lee*, the mailings here are sufficient to support a violation of the mail fraud statute.  State Farm adequately pleads that Defendants acted with the requisite intent to defraud State Farm.  Indeed, the mailings in the present case are similar to those approved in *Lee* in that they were intended to influence and deceive, State Farm, as opposed to the courts, and they were made in furtherance of a scheme that was designed to induce State Farm and other insurers to pay fraudulent claims, rather than to deceive the courts.  Accordingly, the mailings in the present case are sufficient to support mail fraud violations.  *See also U.S. v Marabella,* 73 F. 3d 1508 (9th Cir. 1995) (mailing of fraudulent injury claims by attorney and office manager were sufficient to support mail fraud conviction violations).

## IV. DEFENDANTS' TORTIOUS CONDUCT IS NOT PROTECTED BY FLORIDA'S LITIGATION PRIVILEGE AND, EVEN IF IT WERE, IT WOULD BE A QUALIFIED PRIVILEGE THAT CANNOT BE RESOLVED ON A MOTION TO DISMISS.

Defendants contend that their conduct is absolutely privileged under Florida's litigation privilege.  (DE 21, pp. 10-13.)  Relying primarily on *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d. 380 (Fla. 2007), Defendants contend that Florida's litigation privilege "provides legal immunity for actions that occur in judicial proceedings."  (DE 21, p. 10.)  For at least two reasons, Defendants are wrong.

As discussed below, Florida's litigation privilege does not apply to Defendants' conduct and, even if it did, it would provide only a qualified privilege for State Farm's state law claims to which they would be entitled only upon a showing they met certain criteria including that their actions were "necessarily preliminary to" judicial proceedings and were undertaken in a good

faith attempt at pre-litigation settlement as opposed to with an intent to injure State Farm. At this stage of the proceedings, it would be premature to determine whether Defendants' actions fall within the criteria for qualified privilege that may attach to good faith settlement negotiations because such determinations present factual issues, which must be determined by the trier-of-fact.

First, Florida's litigation privilege cannot bar State Farm's RICO claims because it would violate the Supremacy Clause. *See e.g.*, *Pescatrice v. Orovitz*, 539 F. Supp. 2d 1375, 1379 n. 4 (S.D. Fla. Mar. 25, 2008) (concluding Florida's litigation privilege "would only apply to state court claims," not federal statutory claims); *see also Hill Lazarou Enterprises, Inc.*, 2011 WL 860526, *6 (S.D. Fla. Feb. 18, 2011) (same). Therefore, State Farm states valid RICO claims.

Second, the litigation privilege does not bar any claims because the attorney demand letters, which enclosed and relied upon Defendants' fraudulent bills and reports, were not made during a judicial proceeding, nor were they "necessarily preliminary to" such a proceeding. However, even if a privilege is extended to the mailings, at most, a qualified privilege would arise and its validity would turn on whether the mailings were a good faith attempt to settle legitimate claims, or whether the mailings were sent to defraud State Farm.

In *Ange v. State*, 98 Fla. 538, 123 So. 916 (1929), the Florida Supreme Court explained that the litigation privilege "extends to the protection of the parties, counsel, and witnesses, and arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceedings or as necessarily preliminary thereto." *Id*. at 917. Although the majority opinion *Echevarria v. Cole*, 950 So. 2d 380 (Fla. 2007) did not address the point at which the litigation privilege may first attach,[15] Justice Wells did discuss the "necessarily preliminary thereto" language in his concurring in part and dissenting in part opinion. Specifically, Justice Wells clarified that he did not believe that any litigation privilege extended to a law firm's presuit letters threatening foreclosure actions because they were not made in the course of judicial proceedings or "necessarily preliminary thereto" as required by *Ange*. *Id*. at 385  Justice Wells recognized that presuit communications must be required by statute or contract as a condition precedent to suit to be considered "necessarily preliminary" to a lawsuit. *Id*. at 386,

---

[15] Defendants claim that *Echevarria* extends the litigation privilege to pre-suit demand letters. However, the sole issue addressed by the Florida Supreme Court was whether Florida's litigation privilege extended to statutory causes of action, in addition to common law tort actions, and the court held that it did. *Id*. at 384.

(citing *Pledger v. Burnup & Sims, Inc.*, 432 So. 2d 1323 (Fla. 4th DCA 1983)).   Therefore, Justice Wells concluded that the litigation privilege would not apply to the presuit letters and would not bar civil actions based upon them.  *Id.* at 387 (citing *Fridovich v. Fridovich*, 598 So. 2d 65, 69 fn. 8 (Fla. 1992), and stating "this Court has emphasized that the litigation privilege does not apply to voluntary presuit statements made by private individuals to private individuals.")); *see also*, *Trent v. Mortgage Elec. Registration Systems, Inc.* 618 F. Supp. 2d 1356, 1361 (M.D. Fla. 2007) (holding that Florida's litigation privilege would not apply to presuit communications that were not required by law).  Here, Defendants do not and cannot cite any statute or contract obligating them to send the demand letters.  As such, the communications are not "necessarily preliminary to" a judicial proceeding.  Thus, no litigation privilege attaches.

Defendants also cite to *Kelly v. Palmer, Reifler & Associates, P.A.*, 681 F. Supp. 2d 1356 (S.D. Fla. 2011), but this case actually supports State Farm.  In *Kelly*, the defendant law firm sent demand letters threatening litigation unless plaintiffs paid for losses as a result of theft.  *Id.* at 1361.  The law firm moved for summary judgment, arguing that all of the plaintiffs' claims were barred by Florida's litigation privilege.  *Id.* at 1367.  Relying heavily on *Pledger v. Burnup & Sims, Inc.*, 432 So. 2d 1323 (Fla. 4th DCA 1983), which recognized that presuit settlement communications might constitute acts "necessarily preliminary to" judicial proceedings, the court noted that the litigation privilege is "not without limitations."  *Id*. at 1367.  Instead, such acts should have the benefit of only a qualified privilege, which would depend on whether the defendant sent its demand letters in a good faith attempt at settlement negotiations or with the express intent to injure the plaintiff.  *Id.*  Although the civil theft demand letters in *Kelly* were a statutory condition precedent to filing suit, the court held that the plaintiffs had presented sufficient evidence to raise a genuine issue of material fact as to whether they were truly intended as a condition precedent to filing suit as required by relevant statute, or were merely sent as a "scare tactic."  *Id.* at 1369.  Thus, the court declined to grant summary judgment to the defendants based on the litigation privilege.  *Id.*; *see also Silver v. Levinson*, 648 So. 2d. 240, 244 (Fla. 3rd DCA 1995) (affirming denial of motion to dismiss because it was premature to determine if the defendant's actions fall within the criteria for qualified privilege that could attach to good faith settlement negotiations and whether the plaintiff can overcome the privilege); *Axelrod v. Califano*, 357 So. 2d 1048, 1052 (Fla. 1st DCA 1978) (holding that

application of qualified privilege is question of fact for the jury).  Accordingly, the Court should reject Defendants' litigation privilege argument.

Finally, although Defendants also rely on *Jackson v. Bellsouth Telecomms*., 372 F.3d 1250 (11th Cir. 2004), the decision is irrelevant because all of the allegedly tortious acts underlying those plaintiffs' claims occurred during the pendency of a lawsuit.  As such, the court properly recognized that the acts were privileged.  In the present case, all the mailings at issue occurred before suits were filed.[16]

## V.     STATE FARM HAS STATED A CLAIM UNDER FDUTPA.

Defendants argue that State Farm's FDUTPA claim fails because: (1) State Farm's activities are regulated by the Office of Insurance Regulation and it is therefore precluded from bringing a FDUTPA claim under Fla. Stat. § 501.212(4)(a), (DE 33, pp. 18-19); and (2) State Farm's FDUTPA claim against Defendants Carroll, Izydore, and PBPM fails because State Farm never bought products or services from these Defendants (DE 25, pp. 7-8.)  These arguments must be rejected.

In relevant part, section 501.212(4)(a) provides that "FDUTPA does not apply to '[a]ny person or activity regulated under laws administered by [] the Office of Insurance Regulation ["OIR"] of the Financial Services Commission.'"  The plain language of this statute reflects that § 501.212(4)(a) precludes FDUTPA claims only if the person who allegedly violated FDUTPA is regulated by the OIR.  State Farm alleges that *Defendants* violated FDUTPA, and the OIR does not regulate their conduct.  Thus, § 501.212(4)(a) does not bar State Farm's FDUTPA claim.  *See Orthopedic Rehab Specialty Clinics, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 3:02-cv-00824 (M.D. Fla. May 27, 2003) ("the conduct that is at the center of the [claim] involves the allegedly fraudulent billing practices of the [plaintiff-providers], and as such this conduct is not specifically regulated by the Department of Insurance") (DE 81) (attached hereto Exhibit 1; *see also State Farm Mut. Auto. Ins. Co. v. Phys. Injury Care Ctr., Inc.*, 6:06-cv-01757-DAB (M.D.

---

16 Defendants also suggest that they are immune from liability based upon the Noerr Pennington doctrine, citing *Sosa v. DirectTV, Inc.*, 437 F. 3d 923 (9th Cir. 2006).  This argument is baseless because regardless whether the Noerr Pennington doctrine applies outside the antitrust context, the Florida Supreme Court has expressly rejected the argument that petitioning activity protected by the Florida and Federal Constitutions is absolutely privileged.  *See Londono v. Turkey Creek, Inc.* 609 So. 2d 14, 18-19 (Fla. 1992) (trial court erred in dismissing claims for tortious interference and civil conspiracy based upon defendants' false statements to local government officials because the complaint makes a facially sufficient claim that the defendants abused their constitutional privileges).

Fla. Nov. 17, 2009) (DE 1062) (rejecting the defendants' argument that FDUTPA precluded State Farm from asserting fraud claims against medical providers).[17]

Second, defendants Carroll, Izydore, and PBPM argue without any support that because FDUTPA allows for the recovery of economic damages related to the purchase of products or services, the FDUTPA claim must be dismissed because State Farm did not buy products or services from, or make direct payments to, these Defendants. (Dkt. 25 at 7-8.) This argument ignores the fact that where multiple defendants are engaged in a fraud scheme, they are jointly and severally liable for the damages caused by such conduct. *See Allstate Ins. Co. v. Palterovich,* 653 F. Supp. 2d 1306, 1334 (S.D. Fla. 2009) (where defendants each fill a defined role in an ongoing fraudulent enterprise that contributed to the damages incurred by the plaintiff, it is appropriate to impose joint and several liability.) Thus, the fact that Defendants Carroll, Izydore, and PBPM did not sell products or services directly to State Farm, or receive direct payments from State Farm, is of no moment. Accordingly, Defendants' arguments regarding State Farm's FDUTPA claim should be rejected.

## VI.    STATE FARM'S CLAIMS ARE NOT TIME-BARRED.

Defendants argue that dismissal is appropriate because "it is apparent from the face of the Complaint that claim[s are] time-barred . . . ." (DE 25, 10.) Although Defendants do not identify which claims, if any, are time-barred, they nonetheless suggest the Court must dismiss all claims. Their argument fails.

A "Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (reversing district court's grant of motion to dismiss on the statute of limitations). *See also Reisman v. General Motors Corp.*, 845 F.2d 289, 291 (11th Cir. 1988) (reversing dismissal because the complaint "did not conclusively show" that plaintiffs "knew or should have known" of the engines' defect.) As a result, courts universally recognize that statute of limitation arguments cannot properly be decided on a motion

---

[17] The sole authority cited by Defendants in support of their position is a conclusory two-page decision from Florida's 17th Judicial Circuit Court, *Direct Gen. Ins. Co. v. Cazeau*, Case No. 08-048385, Fla. 17th Jud. Cir., June 15, 2010 (attached hereto as Exhibit 2.) The *Cazeau* court does not offer any reasoning for excluding the FDUTPA "under section 501.212(4)(a) and (d), Florida Statutes . . . ." *Id.* at 1. In any event, because the court decided the issue at the summary judgment stage, where allegations are no longer presumed to be true, its applicability to the issues before this Court, if any, is suspect.

to dismiss.  *Morton's Mk't, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 825 (11th Cir. 1999) ("The commencement of the statute of limitations is a question of fact.")

State Farm's civil RICO and state law claims are subject to four-year statutes of limitations.  (DE 25, p. 10 (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987); Fla. Stat. § 95.11).)  Additionally, these claims do not accrue until the plaintiff knew or reasonably should have known of the injury.  *See Rotella v. Wood*, 528 U.S. 549, 551 (2000) ("Federal courts . . . generally apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is here."); *see also Hearndon v. Graham*, 767 So. 2d 1179, 1184 (Fla. 2000) (recognizing that the delayed discovery doctrine postponed accrual of, *inter alia*, fraud claims); Fla. Stat. § 95.031.  Here, most of the acts of fraud occurred within four years of the filing of the Complaint.  (DE 19, Ex. A.)  Furthermore, where a defendant fraudulently conceals the existence of a cause of action, the statute of limitations is tolled during the time of the fraudulent concealment.  (*See* DE 19, ¶ 134.)  *See Grossman v. Greenberg*, 619 So. 2d 406, 408 (Fla. 3rd DCA 1993) ("[t]he statute of limitations does not begin to run where there has been a fraud or fraudulent concealment"); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 2008 WL 4146190, (E.D.N.Y. Sept. 5, 2008) (RICO claim would not be dismissed on statute of limitations grounds because "whether defendants concealed their fraud from [the] [p]laintiff is a factual issue which would allow this court to toll the statute of limitations"); *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 227 (E.D.N.Y. Sept. 21, 2009) (same).  In short, the resolution of these issues cannot be resolved on a motion to dismiss.[18]

## VII.    THE COMPLAINT ALLEGES A CLAIM FOR UNJUST ENRICHMENT.

Defendants next argue that State Farm's unjust enrichment claim should be dismissed because State Farm never paid Defendants directly.  (*See* DE 25, p. 7, ¶ 15; DE 20, p. 21.)  This argument must be rejected.  In order for State Farm to state a claim for unjust enrichment, it need only assert: (1) that it conferred a benefit upon defendants; (2) of which defendants were aware and accepted; and (3) that it would be inequitable for defendants to retain the benefits.  *See Ascentium Corp. v. Terremark N. Am., Inc.*, 2011 WL 1233256, *2 (S.D. Fla. Mar. 30, 2011)

---

[18] Moreover, although outside the four corners of the Complaint, it is worth noting that State Farm and Defendants Carroll, Izydore, and PBMI, the three defendants who raise the statute of limitations issues, entered into a tolling agreement on January 9, 2009, which was not terminated until January 18, 2011, attached hereto as Exhibit 3.  Thus, the agreement tolled the statutes of limitations on State Farm's claim from January 9, 2009 to January 18, 2011.

(citation omitted).  In *MetraHealth Ins. Co. v. Anclote Psyc. Hosp., Ltd.*, the defendant claimed that the plaintiffs failed to state a claim for unjust enrichment because the complaint did not allege that the defendant personally received anything of value from plaintiffs.  1997 WL 728084, *8 (M.D. Fla. Oct. 23, 1997) ("[p]ersonal involvement is not required after a defendant involves himself in a fraudulent scheme; he may be liable for the acts of his co-schemers").  The *MetraHealth* court rejected this argument because the defendant "was a central participant" in defendants' fraudulent scheme it can reasonably be inferred that defendant accepted and retained at least some portion of the proceeds received from the claims.  *Id.*  The court, in denying the defendant's motion to dismiss, held "the cause of action for unjust enrichment does not require that [d]efendant individually receive payments directly from [p]laintiffs."  *Id.*; *Romano v. Motorola, Inc.*, 2007 WL 4199781, *2 (S.D. Fla. Nov. 26, 2007); *Citadel Commerce Corp. v. Cook Systems, LLC*, 2009 WL 1230067, *3 (M.D. Fla. May 5, 2009).  Here, the Complaint alleges that each Defendant participated in the scheme and acted in concert with each other.  (DE 19, ¶¶ 2, 3, 27-31, 73-99, 152, 165-170.)  The unjust enrichment count alleges that Defendants received benefits (i.e., money) from State Farm of which they were aware, and that it would be inequitable for them to retain those benefits.  (*See, e.g., id.*, ¶¶ 165-170.)  Just as in *MetraHealth*, it is reasonable to infer at this stage of the proceedings that Defendants received "at least some portion" of the $13 million dollars that State Farm has paid.[19]

## VIII.   CONCLUSION

For all these reasons, State Farm respectfully requests that this Court deny Defendants' Motions to Dismiss.

---

[19] Without citing any authority, Carroll and Izydore contend that State Farm's claims are barred by waiver and estoppel.  (DE 25, p. 11.)  These arguments are baseless because State Farm did not voluntarily pay the claims at issue "possessing all the information of which it now complains" and these issues must be decided by the trier-of-fact.

Date:  May 3, 2011                    Respectfully Submitted,

                                  AKERMAN SENTERFITT


                           By: _/s/David I. Spector_____
                                  DAVID I. SPECTOR
                                  Fla. Bar No. 086540
                                  david.spector@akerman.com
                                  SCOTT W. ATHERTON
                                  Fla. Bar No. 0749591
                                  scott.atherton@akerman.com
                                  **AKERMAN SENTERFITT**
                                  222 Lakeview Avenue, Suite 400
                                  West Palm Beach, Florida  33401
                                  Telephone:  (561) 653-5000
                                  Facsimile:   (561) 659-6313

                                     --and--

                                  ROSS O. SILVERMAN
                                  ross.silverman@kattenlaw.com
                                  (*admitted pro hac vice*)
                                  CHARLES CHEJFEC
                                  charles.chejfec@kattenlaw.com
                                  (*admitted pro hac vice*)
                                  JOHN W. REALE
                                  john.reale@kattenlaw.com
                                  (*admitted pro hac vice*)
                                  EMILY J. PRENTICE
                                  emily.prentice@kattenlaw.com
                                  (*pro hac vice to be filed*)
                                  **KATTEN MUCHIN ROSENMAN LLP**
                                  525 West Monroe Street
                                  Chicago, IL 60661-3693
                                  Telephone:  (312) 902-5200
                                  Facsimile:   (312) 902-1061
                                  Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ David I. Spector*
DAVID I. SPECTOR
Fla. Bar No. 086540

## SERVICE LIST

| | |
|---|---|
| **Robert William Wilkins**<br>Jones, Foster, Johnston & Stubbs, P.A.<br>505 South Flagler Drive<br>Suite 1100<br>West Palm Beach, FL 33401<br>561-650-0400<br>Fax: 561-650-0490<br>Email: rwilkins@jones-foster.com<br><br>**Cristopher Stephen Rapp**<br>Jones Foster Johnston & Stubbs<br>505 S Flagler Drive<br>Suite 1100 PO Box 3475<br>West Palm Beach, FL 33401<br>561-659-3000<br>Fax: 650-0412<br>Email: csrapp@jones-foster.com<br><br>*Attorneys for Jeffrey Kugler, MD and Jeffrey L. Kugler, M.D., P.A.*<br><br>*Service Via CM/ECF* | **Anthony Conrad Vitale**<br>The Health Law Office of Anthony C. Vitale, P.A.<br>2333 Brickell Avenue<br>Suite A-1<br>Miami, FL 33129<br>305-358-4500<br>Fax: 305-358-5113<br>Email: avitale@vitalehealthlaw.com<br><br>*Attorneys or Jane Bistline, MD and Jane E. Bistline, M.D., P.A.*<br><br>*Service via CM/ECF* |
| **Robert N. Nicholson**<br>**Parker D. Eastin**<br>Nicholson Law Group<br>200 S Andrews Avenue<br>Suite 100<br>Fort Lauderdale, FL 33301<br>954-351-7474<br>Fax: 954-351-7475<br>Email: robert@nicholsonlawgroup.com<br>Email: parker@nicholsonlawgroup.com<br><br>*Attorneys for 2047 Palm Beach Lakes Partners, LLC and Jonathan Cutler, MD*<br><br>*Service Via CM/ECF* | **Bruce David Green**<br>1313 S Andrews Avenue<br>Fort Lauderdale, FL 33316<br>954-522-8554<br>Fax: 522-8555<br>Email: bgreen@bdgreenpa.com<br><br>**Steven L. Robbins**<br>2047 Palm Beach Lakes Boulevard<br>Suite 250<br>West Palm Beach, FL 33409<br>561-686-0990<br>Fax: 686-0990<br>Email: counsel62@hotmail.com<br><br>*Attorneys for Gary Carroll, Mark Izydore, and Palm Beach Practice Management, Inc.*<br><br>*Service via CM/ECF* |

| | |
|---|---|
| **William Leon Richey**<br>**Catherine Shannon Christie**<br>2 South Biscayne Boulevard<br>One Biscayne Tower - 34th Floor<br>Miami, FL 33131<br>305-372-8808<br>Fax: 305-372-3669<br>Email: wlr@richeylaw.com<br>Email: csc@richeylaw.com<br><br>*Attorneys for Heldo Gomez, MD, Heldo Gomez, M.D., P.A., and North Palm Neurosurgery, P.L.*<br><br>*Service Via CM/ECF* | |