UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-80051-HURLEY

STATE FARM  MUTUAL AUTOMOBILE
INSURANCE COMPANY and
STATE FARM FIRE & CASUALTY COMPANY,
      plaintiffs,
vs.
JEFFREY KUGLER, M.D.,
JANE BISTLINE, M.D., and
HELDO GOMEZ, M.D.,

JEFFREY L. KUGLER,  M.D., P.A. a/k/a
NATIONAL ORTHOPEDICS AND NEUROSURGERY, P.A.,
JANE E. BISTLINE, M.D., P.A., HELDO GOMEZ, M.D., P.A. and
NORTH PALM NEUROSURGERY, P.L.,

2047 PALM BEACH LAKES PARTNERS, LLC,
a/k/a Palm Beach Lakes Surgery Center,

GARY CARROLL, MARK IZYDORE,
PALM BEACH PRACTICE MANAGEMENT, INC., and

JONATHAN CUTLER, M.D.,
      defendants.
_____/

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTIONS TO DISMISS

    **THIS CAUSE is** before the court on the defendants' motions to dismiss the plaintiffs'

amended complaint [DE # 20, 21, 25, 27, 33], the plaintiffs' response in opposition, and the

defendants' reply.  For reasons which follow, the court has determined to deny the motions.

**I.  Background[1]**

    Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire &

---

    [1]The recited facts are drawn from the plaintiffs' operative amended complaint, the
allegations of which are accepted as true for purposes of passing upon this motion. *Florida
Family Policy Council v. Freeman*, 561 F.3d 1246 (11th Cir. 2009).

Casualty Company (cumulatively "State Farm") allege that the twelve defendants participated in a conspiracy to defraud them, and other insurers like them, by performing medically unnecessary diagnostic tests and surgical procedures on persons involved in automobile accidents who are covered by State Farm insurance.[2]  The diagnostic procedures in question are known as provocative discograms ("discograms") and the surgical procedures are known as percutaneous discectomies ("PDs").[3]  The total cost of a discogram and PD procedure, including professional and facility fees, typically exceeds $50,000.00.

The procedures were performed at the Palm Beach Lakes Surgery Center in West Palm Beach, Florida, on at least 181 patients who were involved in auto accidents and made claims

---

[2]

The persons involved are either State Farm insureds filing medical payment claims under their own personal injury protection (PIP) insurance (first party claims); persons not at fault/third parties seeking recovery for pain and suffering and other forms of non-economic damages, in addition to medical expenses and wage loss on bodily injury (BI) liability claims against State Farm as the insurance company for the at- fault driver (third party claims); or persons not at fault/State Farm insureds seeking to recover tangible and intangible damages pursuant to personal injury claims asserted against State Farm under their own uninsured/underinsured motorist insurance(UM)(where recovery on the BI claim against the at-fault driver is insufficient).

[3]

A discogram is a diagnostic procedure used to identify discs that may be causing pain due to pathology in the disc. In this procedure, the doctor inserts a needle into the nucleus of the suspect disc and injects radiographic contrast. While injecting contrast, the doctor monitors the pressure building in the disc in pounds per square inch (psi). If the patient reports concordant pain, i.e. reproduction of usual pain, during pressurization of the disc up to a certain level of psi, that particular disc is considered positive (contributing to the patient's pain). If the patient does not report concordant pain during pressurization of the disc, that disc is considered negative (not contributing to the patient's pain). [Amended Complaint ¶¶ 34, 35].

If the discogram produces positive results, the patient is referred for percutaneous discectomy, a surgical procedure performed with the "Spine Wand," a long probe that is inserted into the nucleus of the disc. Radio frequency waves are emitted from the tip of the probe to dissolve a small amount of tissue from the nucleus, and thermal energy is used to stabilize the remaining disc material. The Spine Wand is then withdrawn from the disc. In theory, this procedure decompresses the disc, thereby removing unwanted pressure which a contained protrusion in the disc exerts on nerve roots. [Amended Complaint ¶ 51].

against State Farm or State Farm insureds. The defendants' scheme allegedly began in early 2004, and involved two levels of fraud. The first part involved the submission of fraudulent billings and supporting documentation for medically unnecessary discograms and PDs to State Farm through the patient's attorney, either in support of a direct claim for reimbursement by a State Farm insured (PIP), or a policy limits demand on behalf of an injured insured or third party claimant (UM or BI) [Amended Complaint, ¶ 58]. The second part of the scheme, beginning in approximately August, 2006, involved the use of false billing codes (CPT Codes) which materially misrepresented and exaggerated the seriousness of the PD procedures in order to justify imposition of higher fees collected by the defendants, while at the same time artificially inflating the value of the patient's corresponding PIP, UM or BI claim against State Farm for the benefit of the patient and the patient's attorney [Amended Complaint, ¶¶ 59-72]. State Farm alleges that the defendants' scheme has operated without interruption since 2004, fraudulently inducing it to pay in excess of $13 million dollars on various PIP, BI and UM insurance claims.

The operative amended complaint groups the defendants into five categories: (1) Dr. Jane Bistline, the doctor who performed at least 182 discograms and allegedly falsely reported positive results on virtually every patient to justify the need for medically unnecessary PDs, and Drs. Heldo Gomez (61 PDs) and Jeffrey Kugler (113 PDs), the physicians who allegedly performed medically unnecessary PDs based on Bistline's reports. Bistline also performed "surgery assists" and provided anesthesia services for PD patients of Drs. Gomez and Kugler at the Surgery Center, where she was employed as Medical Director; (2) 2047 Palm Beach Lakes Partners, LLC a/k/a Palm Beach Lakes Surgery Center ("the Surgery Center"), the out-patient surgery center which allegedly submitted fraudulent bills and related medical documentation for facility fees charged in connection with

3

medically unnecessary discograms and PDs, which was owned in part by Drs. Gomez, Kugler and Dr. Jonathan Cutler; (3) Gary Carroll and Mark Izydore, two non-physicians who allegedly coordinated and exerted control over the activities and relationships among all of the defendants, as well as their relationships with the non-party personal injury attorneys who referred patients to the defendants, and Palm Beach Practice Management, Inc., a Florida corporation formed by Carroll and Izydore to funnel profits to themselves generated by the medically unnecessary PDs under the guise of "management fees" collected under their marketing contract with Dr. Kugler;[4]

(4) Dr. Jonathan Cutler, a podiatrist and part owner of defendant Surgery Center who profited from substantial facility fees (typically in excess of $12,000) and material fees ($7500 per single use "Spine Wand") charged for each medically unnecessary PD performed at the Surgery Center. Cutler allegedly joined with non-parties Arthocare Corporation and Discocare to promote and market the "Spine Wand" as a fast and easy way to boost profits from personal injury claims to personal injury attorneys, doctors and surgery centers around the country. As sole owner of Discocare from December 2005 to December 2007 (when Arthocare purchased it for $25 million), he was allegedly responsible for generating misleading material bills for the Spine Wand,[5] and

---

[4]Under the "Executive Management Agreement" between Palm Beach Pain Management Inc. (PBPM) and Dr. Kugler, PBPM was required to use its "best efforts" to market and sell the services of Jeffrey Kugler, M.D., P.A. in exchange for collecting 45-50% of the profits generated by Jeffrey L. Kugler, M.D., P.A. [Amended Complaint, ¶¶ 84-86].

[5]State Farm alleges that Cutler used Discocare as vehicle to bill $7454 for each Spine Wand used in each PD performed at the Surgery Center. To encourage State Farm and other insurers to pay this cost, Discocare allegedly submitted its bill to the insurer along with an invoice from Arthocare purporting to show that Discocare paid $7500 for the unit, when in reality there was no real expectation of payment on the part of Arthocare. Discocare also secured letters of protection from Surgery Center PD patients, creating a lien a lien in favor of Discocare against any recovery on the patient's personal injury claim [Amended Complaint ¶¶ 111-112].

advocating  false use of CPT Code 63056 to materially misrepresent  the nature of PDs  performed with the Spine Wand  in order to fraudulently inflate the insurance reimbursement value of the procedure; (5)  the professional associations employing  the several physicians involved in the scheme  which  generated  fraudulent   bills  and  related  medical  documentation  for  medically unnecessary  discograms and PDs performed by Drs. Bistline, Kugler and Gomez.

As a result of the coordinated efforts between these groups, Drs. Bistline, Gomez and Kugler performed over  1550 discograms and PDs  at the Surgery Center between 2005-2008 – representing almost 30% of all  percutaneous lumbar discectomies of any kind performed at every ambulatory surgery center in  Florida during this period [Amended Complaint ¶ 31].

Through the coordination and oversight of  Carroll and Izydore, who supplied ongoing patient referrals through favored personal injury attorneys,  these five groups pursued the common purpose of facilitating the submission to State Farm of fraudulent bills for medical diagnostic tests and procedures that were not medically necessary.  To accomplish this goal, they conducted the affairs of the defendant  professional associations and medical corporations through a pattern of racketeering activity consisting of multiple violations of  the federal mail fraud statute, using the patient's attorney as conduit to pass hundreds of  fraudulent bills and related medical documentation to State Farm.  On BI and UM claims, the attorney typically sent a demand letter to State Farm demanding full policy limits to avoid the risk and cost of a bad faith claim, and attached the defendants' medical bills and related medical documentation to substantiate those claims.  On  PIP claims,  a request for medical payments coverage was supported by medical bills and  related documentation generated by the defendants.

Relying on the defendants' bills and documentation submitted through this conduit,  State

Farm alleges it was fraudulently induced to pay over $13 million on PIP, UM and BI claims artificially inflated by the cost of the defendants' medically unnecessary medical diagnostic tests and procedures.[6]  In an attachment to its amended complaint, State Farm lists 198 individual claims which it claims it was fraudulently induced to pay as a consequence of this scheme.  [Amended Complaint, Exhibit A, RICO Events 1-198][DE# 19-1].[7]

Against this backdrop, State Farm seeks damages against all defendants under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1964(c) and (d) (Counts 2 and 3), the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 (Count 4), and state common law fraud and unjust enrichment causes of action (Counts 5 and 6). Additionally, State Farm seeks a declaration that it is not liable for payment on any as yet unpaid claims generated by the scheme under the Declaratory Judgment Act, 28 U.S.C. §2201 (Count 1).

## II. Standard of Review

Under Fed. R. Civ. P. 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Under *Bell Atlantic Corporation v. Twombly*,

---

[6]Although the complaint does not specify the manner in which State Farm channeled payments on the various claims, presumably State Farm issued payment directly to the medical providers on first party (PIP) medical payment claims, while it issued a lump sum settlement check on third party claims to the patient's attorney, who was then responsible for channeling reimbursement to the medical providers for outstanding medical bills.

[7]
The 198 individual claims are identified on this exhibit by claim number; date of service; discogram statistics (name of doctor; number of levels tested; number of positive levels reported; amount of professional charges); PD statistics (name of doctor; number of levels performed; CPT Code employed to describe the PD; amount of professional charges); amount of facility fee; name of patient's attorney; available policy limits; amount of insurance payment and type of coverage under which payment was made (BI, UM or PIP) and date that bills and related medical reports were mailed to State Farm with attorney demand letter.

550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), a complaint "does not need detailed factual allegations," but must state enough facts to state a claim to relief that is plausible on its face. In *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1949-50, 173 L. Ed.2d 868 (2009), the Supreme Court clarified that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id* at 1949.

In ruling on a motion to dismiss, the court generally accepts all factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Harris v. United Auto. Ins. Group, Inc.,* 579 F.3d 1227, 1230 (11th Cir. 2009); *Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998). However, this tenet is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Thus, in considering a motion to dismiss, a court should (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Kivisto v Miller, Canfield, Paddock and Stone, PLC*, 413 Fed. Appx. 136 (11th Cir. 2011), quoting *Iqbal*, 129 S. Ct. at 1950. Further, the court may infer from the factual allegations in the complaint other "obvious alternative explanation[s]," which suggest lawful conduct rather than the unlawful conduct urged by the plaintiff. *Id.*

Finally, where a claim is grounded in fraud, such as State Farm's RICO and common law fraud claims, the complaint must also comply with the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 Fed. Appx.

487 (11ᵗʰ Cir. 2009)(unpub).

### III. Discussion

### A.  Civil RICO Claims

### 1.  Substantive RICO claim under 1964(c)(Count 2)

Under 18 U.S.C. § 1962(c), it is  "unlawful for any person employed by or associated with any enterprise  engaged in, or the activities of which affect,  interstate or foreign commerce,  to conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs through  a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

Any person injured in his business or property by such racketeering activity has a civil cause of action for the recovery compensatory damages,  treble damages and attorneys' fees. 18 U.S.C. §1964(c).  To establish a prima facie civil RICO claim, a plaintiff must allege: (1) a substantive predicate violation of §1962;  (2) injury to his or her business or property, and (3) a causal connection between the racketeering activity and the injury.  *Avigan v. Hull*,  932  F.2d 1572 (11ᵗʰ Cir. 1991); *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 154 (6ᵗʰ Cir. 1990).

To  establish a substantive violation of  § 1962, the plaintiff must allege:  (1)  the conduct (2) of an enterprise (3) through a  pattern of  (4)  racketeering activity.  *Williams v. Mohawk Indus. Inc*. 465 F. 3d 1277 (11ᵗʰ Cir. 2006)*; RAO v BP Products North America, Inc*., 589 F.3d 389 (7ᵗʰ Cir. 2009).

"Racketeering activity"  includes specified predicate acts such as mail fraud or wire fraud. 18 U.S.C. §1961(1).  "Mail fraud"  or   "wire fraud"  occurs when a  person (1) intentionally participates in a scheme to defraud another of money or property and  (2) uses the mails or wires in furtherance of that scheme.  *American Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283 (11ᵗʰ Cir. 2010).

In order to successfully allege a "pattern" of racketeering activity, plaintiff must charge the commission of two or more predicate acts within a ten year time span that are related to each other and which amount to or pose a threat of continued criminal activity. *Jackson v Bellsouth Telecommunications,* 372 F.3d 1250, 1264 (11th Cir. 2004); *American Dental* at 1290-91.

To plead "fraud" with particularity, as prescribed by Rule 9(b), a civil RICO plaintiff must allege, as to each defendant: (1) the precise statements, documents or misrepresentations made; (2) the time, place and person responsible for the statements; (3) the content and manner in which these statements misled the plaintiffs, and (4) what the defendants gained by the alleged fraud. *American Dental,* 605 F.3d at 1291. *See generally Brooks v Blue Shield of Florida, Inc*., 116 F.3d 1364 (11th Cir. 1997). Where multiple defendants are involved, the complaint must not lump together all defendants, but rather must inform each defendant of the nature of his or her alleged participation in the fraud. *Ambrosia Coal & Construction Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007).

Under 18 U.S.C. § 1962(d), it is also illegal for anyone to conspire to violate one of the substantive provisions of RICO, including §1962(c). A plaintiff can establish a RICO conspiracy in one of two ways: (1) by showing that the defendant agreed to the overall objection of the conspiracy or (2) by showing that the defendant agreed to commit two predicate acts. *American Dental*, 605 F.3d at 1293.

In this case, at Count 2 of its amended complaint, State Farm charges a substantive violation of § 1962(c) against all defendants based on their coordinated roles in causing the submission of false and misleading medical bills and reports for medically unnecessary services allegedly rendered to patients pursuing personal injury (BI/UM) claims or medical payment insurance claims

(PIP) against State Farm via an association-in-fact enterprise made up of all defendants. As to this substantive RICO claim, defendants argue that State Farm has failed to adequately plead:

(a) sufficient facts to state a claim to relief that is plausible on its face as required under Rule 8(a), or to state with particularity the circumstances constituting fraud as required by Rule 9(b);

(b) the existence of an "association in fact" enterprise among the defendants which functions for some purpose other than for defendants to engage in racketeering activity and that has an existence distinct from that of the racketeering activity;

(c) each defendant's participation, direct or indirect, in the enterprise's affairs;

(d) economic damages to State Farm;

(e) proximately caused by the pattern of racketeering activity;

(5) economic injury to State Farm.

### a. Rule 8(a) and Rule 9(b) Pleading Requirements

State Farm's amended complaint, including the attached claim chart, describes each allegedly fraudulent claim in detail, providing (1) the precise misrepresentation at issue (i.e. the necessity for and positive results of discograms, the necessity for PDs and false use of CPT Codes to describe the PDs; (2) the identity of the defendant(s) allegedly involved in each particular claim and misrepresentation; (3) the claim number; (4) the amounts billed and the dates the bills and reports were mailed to State Farm; (5) the number/level of discs tested by discogram and number/level of discs subjected to the PD procedure based on those tests; (6) the name of the patient's attorney; (7) the relevant policy limits; (8) the amount which State Farm actually paid on the claim and the type of coverage under which the claim was paid and (9) unusual medical reporting patterns from which fraudulent intent may be inferred. These allegations are sufficient

to satisfy the plausibility and particularity requirements of Rule 8(a) and Rule 9(b).  *See e.g.  AIU Insurance Co. v. Olmecs Medical Supply, Inc.*, 2005 WL 3710370 (E.D.N.Y. 2005);  *State Farm Mutual Auto Ins. Co. v. Weiss,*  410 F. Supp. 2d 1146 (M.D. Fla. 2006);  *Allstate Ins. Co v. Halima*, 2009 WL 750199 (E. D. N. Y. 2009); *State Farm Mut Auto Ins. Co v. CPT Medical Services, PC*, 2008 WL 4146190 (E. D. N. Y. 2008); *State Farm Mutual Auto Ins. Co. v. Makris*, 2003 WL 924615 (E.D. Pa. 2003). *See also Hill v. Morehouse Medical Associates, Inc.,* 2003 WL  22019936 * 4-5 (11th Cir. 2003); *United States  ex rel. Harris v Bernad*, 275 F. Supp. 2d 1 (D. D. C. 2003).

### b. Existence of an "Association-in-Fact" Enterprise

RICO defines an "enterprise" to include "any individual, partnership, corporation association or other legal entity, and any  union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  *United States v Turkette,*  452  U.S. 576, 101 S. Ct. 2524, 69 L. Ed.2d 246 (1981). An association in fact enterprise reaches a group of persons associated together for the common purpose of engaging in a course of conduct, and is proved by evidence of "an ongoing organization, formal or informal," as well as evidence "that the various associates function as a continuing unit." *Turkette* 452 U.S. at 580,  583;  101 S. Ct. 2524.

An  association  in  fact  enterprise  must  have  three  structural  features – a  purpose, relationships among those associated  with the enterprise, and longevity sufficient to permit those associates to  pursue  the enterprise's purpose.  *Boyle v United States,*  ___ U.S. ___ 129 S. Ct. 2237, 2244-45; 173 L. Ed.2d 1265 (2009)(association-in- fact enterprise under RICO must have structure, but not necessarily a hierarchical structure, chain of command or other business-like attributes).

In this case, the overarching RICO enterprise  described in State Farm's  amended complaint is an  association-in-fact enterprise consisting of the individually  named  physicians responsible for

performing the diagnostic tests and procedures in question, the corresponding professional associations which employed these physicians and billed for their services, the corporation which owned the out-patient surgery center where the discograms and PDs were performed, the physician who held an ownership interest in that entity, encouraged false use of CPT Codes to inflate billings generated at that facility and generated false or misleading bills on behalf of Discocare relating to Spine Wand charges payable to that corporation; the two non-physicians (Carroll and Izydore) responsible for supplying a steady chain of insured patients to Drs. Bistline, Kugler and Gomez via a network of referring personal injury attorneys and Palm Beach Pain Management Inc., the corporation through which Carroll and Izydore funneled the ill-begotten gains of the enterprise as profit to themselves.

All defendants, individually and collectively, fulfilled a role in the enterprise and depended on the participation of the others to pursue the common goal of committing insurance fraud: Dr. Bistline knowingly performed medically unnecessary discograms to produce predetermined positive results; Drs. Kugler and Gomez knowingly performed the medically unnecessary PDs, relying on the predetermined positive results of discograms generated by Dr. Bistline; Jane Bistline PA, Jeffrey Kugler PA, Heldo Gomez PA, and North Palm Neurosurgery LLC knowingly created fraudulent bills for professional medical services for the unnecessary tests and procedures for submission to State Farm; the Surgery Center generated fraudulent bills for facility fees for the medically unnecessary procedures performed by Drs. Kugler and Gomez for submission to State Farm; Dr. Cutler knowingly encouraged and participated in false and misleading billing practices which promoted the goals of the enterprise and knowingly profited from the medically unnecessary PDs through his ownership interest in the Surgery Center and Discocare; the two non- physicians,

Carroll and Izydore, coordinated the activities and relationships between all defendants and used Palm Beach Pain Management Inc. to siphon profits from the Surgery Center under guise of "management fees" charged to Jeffrey Kugler P.A.

The association described in plaintiff's amended complaint qualifies as an association- in- fact RICO enterprise because it consisted of a group of individuals and entities that associated together for the common purpose of engaging in a course of fraudulent conduct that included defrauding State Farm into paying bills for medical testing and services that were not necessary. *Boyle.* The complaint describes the interrelationships between each set of defendants and their respective roles in the scheme; it also shows how the enterprise has functioned as a continuing unit since 2004 with longevity sufficient to permit its members to pursue the illicit purpose of the enterprise. These allegations are sufficient to describe the structure of an association-in- fact enterprise under *Boyle. AIU Insurance Co. v. Olmecs Medical Supply, Inc.,* 2005 WL 3710370 (S. D. N. Y. 2005); *State Farm Automobile Insurance Co. v. Lincow*, 715 F. Supp. 2d 617 (E.D. Pa. 2010).

### c.  Individual Defendant Participation in Affairs of Enterprise

In order to "participate, directly or indirectly, in conduct of [an] enterprise's affairs," within the meaning of the RICO statute, one must have some part in either the management or the operation of the affairs of the enterprise itself. *Reeves v Ernst & Young*, 507 U.S. 170, 179, 113 S. Ct. 1163, 122 L. Ed.2d 525 (1993). While it is not necessary for any given defendant to have primary responsibility over the enterprises's affairs, or even hold a formal position in the enterprise, the plaintiff must show that the defendant took "some part" in directing those affairs. *Id.* at 179. Lower level participants under the direction of upper management may be found to satisfy this test

where they "knowingly implement[]" and "make decisions" under the direction of upper management. *United States v Browne*, 505 F.3d 1229 (11th Cir. 2007).

In this case, State Farm alleges that Drs Bistline, Kugler and Gomez each knowingly participated in the rendition of unnecessary medical testing and surgical procedures, and themselves submitted fraudulent bills for professional fees to State Farm through the professional medical associations by which they were employed; that Dr. Cutler participated through his ownership interest in the Surgery Center and Discocare, promotion of use of false CPT Codes to inflate billing for PDs and generation of fraudulent "Spine Wand" bills for submission to State Farm under guise of an out-of-pocket material fee which did not exist; and that Carroll and Izydore coordinated the activities of all defendants and siphoned off profits to themselves under guise of "management fees" billed to Jeffrey Kugler P.A.

These allegations sufficiently explain how each individual defendant participated in either the operation or management of the enterprise for purpose of satisfying *Reeves. See e.g. State Farm Mut. Auto Ins. Co v. Weiss*, 410 F. Supp. 2d 1146 (M.D. Fla. 2006)(*Reeves* satisfied where plaintiffs alleged that defendant physician decided what fraudulent diagnostic test to perform, marketed fraudulent tests to chiropractors, taught lay people how to read test results and prepare reports, and created boilerplate language for test reports submitted to insurance companies); *Allstate Ins. Co. v. Ahmed Halima, M.D.*, 2009 WL 750199 *1, 4-6 (E. D. N. Y. 2009); *State Farm Mut. Auto Ins. Co v. CPT Medical Services, PC,* 2008 WL 4146190 *4-5, 10-13 (E. D. N. Y. 2008); *State Farm Mutual Auto Ins. Co. v. Makris*, 2003 WL 924615 (E.D. Pa. 2003). *See also Williams v Mohawk Indus., Inc.*, 465 F.3d 1277 (11th Cir. 2006)(allegations showing "some direction over recruiters" held sufficient to satisfy operation or management requirement of *Reeves*); *Coquina Investments v.*

14

*Rothstein*, 2011 WL 197241 *3 (S.D. Fla. 2011)(allegation that bank prepared misleading letters to investors assuring them that their accounts were irrevocably "locked" and therefore safe when in fact co-defendant had access to accounts held sufficient to satisfy *Reeves)*.

### d. Proximate Cause

A civil RICO plaintiff must also show he or she is a person injured "by reason of" a defendant's racketeering activity. 18 U.S.C. § 1964(c). This is a proximate cause requirement, which, in the RICO context, requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed.2d 532 (1992); *Anza v Ideal Steel Supply Corp.,* 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed.2d 720 (2006)(the "central question" in analyzing a RICO claim for proximate cause is "whether the alleged violation led directly to the plaintiff's injuries"). A link between the injury asserted and the injurious conduct which is too remote, purely contingent or indirect is insufficient to establish proximate cause under RICO. *Hemi Group, LLC v. City of New York, N.Y.,* ____U.S. ___, 130 S. Ct. 983, 175 L.Ed.2d 943 (2010).

*Anza* requires an evaluation of the "motivating principle[s]" behind the directness component of the proximate cause requirement in the RICO context. *Williams v Mohawk Industries, Inc.*, 465 F.3d 1277 (11th Dir. 2006), citing *Anza* 126 S. Ct. at 1997. One motivating principle underpinning the proximate cause requirement derives from concerns over the difficulty of trying to ascertain damages caused by some remote action. A second motivating factor is the risk of duplicate recoveries. *Id* citing *Holmes,* 503 U.S. at 269-70.

Finding neither of these concerns implicated here, the court concludes that the allegations of State Farm's complaint supporting proximate cause are sufficient to withstand the current motion

to dismiss.  State Farm alleges that it paid over $13 million in settlement of PIP, UM and BI insurance claims  in accordance with its contractual  obligations to its insureds, making  settlement decisions in direct reliance on fraudulent bills and medical documentation submitted by the defendants which had the effect of artificially  inflating the value of the patient's personal injury claims.  According to its complaint, the defendants' widespread scheme of knowingly subjecting automobile accident patients to unnecessary medical testing and surgical procedures  had the purpose and direct result of increasing the amount of money State Farm was induced to pay under time sensitive demand notices in order to settle insurance claims by or on behalf of its insureds.   Thus, there is a direct and easily identifiable connection between the fraud at issue (submission of bills for unnecessary medical tests and procedures) and the plaintiff's injury (overpayment on first and third party insurance claims (PIP, UM, BI) based on fraudulent medical bills and reports).

Unlike the plaintiffs in *Anza, Holmes* and *Hemi Group*, in this case State Farm is the direct target of the defendants' alleged fraud, and the financial loss asserted is a direct consequence of the alleged fraudulent conduct.  The allegations of the complaint demonstrating these factors  are sufficient  to satisfy RICO  proximate cause requirements. *See e.g.  Williams v Mohawk  Industries, Inc.,*  465 F.3d 1277 (11th Cir. 2006)(employer's widespread scheme of knowingly hiring and harboring illegal workers  had purpose and direct result of depressing wages paid to legal workers, who alleged a deprivation of  individual and collective bargaining power and injury  by direct and proximate reason of the employer's illegal conduct); *State Farm Mutual Automobile Ins. Co. v Lincow*, 715 F. Supp. 2d 617, 634 n. 14 (E.D. Pa. 2010); *Allstate v St. Anthony Spine & Joint Medical Center*, 691 F. Supp. 2d 722 (N.D. Ill. 2010);  *State Farm Mutual Automobile Ins. Co. v. Grafman*,  655 F. Supp. 2d 212, 229 (E.D.N.Y. 2009); *State Farm Mutual Automobile Ins. Co. v.*

16

*Abrams*, 2000 WL 152143 (N.D. Ill. 2000). The amended complaint alleges that State Farm was fraudulently induced to pay over $13 million dollars on first and third party insurance claims presented by the patient's attorney. To the extent those claims were made in reliance on the defendants' alleged fraudulent billing and medical reports, State Farm has suffered a direct and cognizable injury for which it may seek redress under the federal RICO statute.

There is no more directly injured party who could bring suit.  The defendants posit that the affected patients are the ones most directly affected by the  rendition of unnecessary and intrusive medical testing and surgical procedures.  While  the affected patients could theoretically sue for personal injuries suffered as a result of  being subjected to unnecessary diagnostic testing and medical procedures, they could not sue to recover insurance benefits previously collected by defendants via the patient's State Farm PIP insurance or via  third party UM/BI settlement proceeds paid by State Farm and distributed to defendants through the  patient's attorney.  *See e.g. Steele v. Hospital Corp. of America*, 36 F.3d 69, 70 (9th Cir. 1994)(insurance companies, not patients themselves, suffered financial loss from allegedly fraudulent health care billings; patients lacked standing under RICO if they paid none of the allegedly excessive charges out-of- pocket).  As the party directly  injured by  the alleged fraudulent conduct, State Farm is  entitled to recover to the extent its  settlement decision making  was influenced and distorted by  false billings generated by the defendants.  *See e.g. State Farm Mutual Auto. Ins. Co. v. Lincow,*  715 F. Supp. 2d 617 (E.D. Pa. 2010);  *State Farm Mutual Auto. Ins. Co. v Abrams*, 2000 WL 152143 (N.D. Ill. 2000).

The court accordingly concludes that complaint adequately alleges a causal relation between the defendants' conduct and State Farm's injuries which satisfies the RICO proximate cause pleading requirement at this juncture. *See Williams v Mohawk Industries, Inc.*, 465 F.3d 1277, 1288-89 (11th

Cir. 2006). *See also BCS Services, Inc. v Heartwood 88, LLC,* 637  F.3d 750  (7th Cir. 2011).

### e. Economic Injury

A civil RICO plaintiff under  §§1964(c) must show that the racketeering activity alleged caused him to suffer an economic injury.  *Beck v Prupis,* 62 F.3d 1090 (11th Cir. 1998); *Sedima, S.P.R.L  v.  Imrex Co.,*  473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87 L.Ed.2d 346  (1985). This limitation on RICO standing has a "restrictive significance," *Reiter v Sonotone Corp*., 442 U.S. 330, 339, 99 S. Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) which helps to assure that RICO is not expanded to provide "a federal cause of action and treble damages to every tort plaintiff." *Oscar v University Students Co-op Ass'n,* 965 F.2d 783, 786 (9th Cir.)(en banc), *cert. den.,* 506 U.S. 1020 (1992).

In this case, defendants argue that there are insufficient allegations of  "economic injury " under the Eleventh Circuit's recent refinement of this RICO standing limitation set forth in *Ironworkers Local Union 68 et al. v AstraZeneca Pharmaceuticals, LP,* 634 F.3d 1352 (11th Cir. 2011).  In *Ironworkers*, the plaintiffs were health benefit plans who filed RICO claims against the manufacturer of a drug called "Seroquel,"  alleging that the manufacturer  falsely represented  to prescribing physicians that it was  safer and more effective in treating certain off- label conditions than less expensive drugs used to treat the same conditions.  Plaintiffs alleged that the physicians relied on those false representations in prescribing the drug, and, as a result, routinely prescribed Seroquel instead of cheaper alternatives for  their patients.  The plaintiff insurers  alleged that they paid more for the Seroquel  as a result of that scheme, and sought to recover the difference between what they paid for  Seroquel and the cost of the cheaper alternative drugs.

In affirming the dismissal of the claim, the Eleventh Circuit found that plaintiffs failed to allege that they suffered any cognizable economic injury as a result of the defendants' conduct.  It

noted that Seroquel was listed on plaintiff's "drug formularies" or  lists of drugs approved for coverage, thereby contractually obligating plaintiff to pay for all prescriptions of the drug under all circumstances.  The court explained:

> The insurers, under the terms of the insurance policies, consciously exposed themselves to pay for all prescriptions of Seroquel, including those that were medically unnecessary or inappropriate - even if such prescription were birthed by fraud.  In light of such broad exposure, conventionally a rational insurer would have charged its enrollees higher premiums than  it would have if  its policies offered more limited prescription drug coverage These higher premiums, in turn, would compensate the insurer for this increased number of prescription payments, including payments for prescriptions that were medically unnecessary or inappropriate. Moreover, to the extent the insurer's payments for medically unnecessary or inappropriate prescriptions exceeded the premiums charged, only actuarial errors would be to blame.  Here, the insurers pled no facts to suggest that they somehow established premiums in a manner distinct from this conventional understanding; consequently, the district court had to dismiss their claims because they failed to allege plausibly that Astrazeneca's false representations caused them to suffer economic injury.

*Ironworkers,* 634 F. 3d at 1360.  Because the  insurers pled no facts suggesting that they established their rates in a manner inconsistent  with the  insurance industry's conventional rate-making procedures, the court inferred that it followed those procedures; because the insurers  also listed Seroquel on a  policy formulary, instead of requiring preauthorization  review for off- label Seroquel use, the court further inferred that the insurers consciously chose to assume the risk of paying for all medically unnecessary or inappropriate prescriptions of formulary listed drugs - like Seroquel - and that it adjusted its premiums upward to reflect the projected inflated value of claims likely to result from medically unnecessary or inappropriate prescriptions.   On this twin predicate, the court concluded that the allegations of the complaint were insufficient so show a plausible economic injury caused by the manufacturer's false misrepresentations, and that  plaintiffs  therefore failed to  meet their pleading burden under *Twombly* and *Iqbal.*

  This case is distinguishable from  *Ironworkers*, because, as State Farm notes, it did not

unconditionally agree to pay for discograms and PDs regardless of medical necessity or fraud under its contractual obligation to its insureds; accordingly, there is no basis for inferring that State Farm factored the cost of medically unnecessary discograms or PDs into the premiums it charged its subscribers for PIP, UM or BI insurance.

In addition, unlike the plaintiffs in *Ironworkers,* in this case State Farm was the target of the alleged fraud and party to whom the defendants' misrepresentations were directed. While a determination of the alleged damages in *Ironworkers,* in contrast, would have required an analysis of the extent to which third parties (prescribing doctors) relied on the drug manufacturer's alleged misrepresentations when they prescribed Seroquel for their patients, with myriad other external forces potentially at play in that decision making process, in this case, the analysis would focus simply on the extent to which State Farm itself relied on the defendants' alleged fraudulent misrepresentations when it engaged in the settlement making decision process which resulted in its payment on the 198 BI, UM and PIP claims at issue in this suit.

In this situation, where the directly defrauded party presses a RICO claim against the alleged wrongdoer, there is no viable "pass on" defense, i.e. defendants cannot argue that plaintiffs not entitled to recover damages for costs which it has theoretically already passed on to its subscribers in the form of premium adjustments. *See e.g. Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985)(county was correct party to bring RICO claim for lost tax revenue against individual who fraudulently obtained lower tax assessment for property, even though county may have recouped the loss by raising the tax rate), citing and comparing *Hanover Shoe, Inc. v. United Shoe Machinery Corp,* 392 U.S. 481, 488-95, 88 S. Ct. 2224, 2228-32, 20 L.Ed.2d 1231 (1968)(direct purchaser may recover full overcharge from wrongdoer, trebled, for antitrust violation, even if it also recovered

whole overcharge by raising its own prices) with *Illinois Brick Co.  v Illinois*, 431 U.S. 720, 97 S. Ct. 2061, 52 L.Ed. 2d 707 (1977)(indirect purchaser recovers nothing, even if it bore the whole overcharge and even if direct purchaser did not sue). *See also  County of Oakland v City of Detroit*, 866 F.2d 839 (6th Cir. 1989)(where county contracted with city, county was person injured in business or property with standing to bring RICO claim against city for alleged overcharges on sewage services allegedly  resulting from price fixing conspiracy between city and others, despite fact that county may have passed overcharges on to municipal customers), *cert. den.*, 497 U.S. 1003, 110 S. Ct. 3235, 111 L.Ed.2d 747 (1990).

Because State Farm alleges it was the direct target and  recipient of fraudulent bills and related medical documentation submitted by defendants in connection with  unnecessary diagnostic tests and medical procedures allegedly performed by defendants throughout course of the fraudulent scheme alleged in the complaint, and that it was injured in its business or property when it paid first and third party insurance claims on behalf of its insureds in reliance on those bills and reports, the court finds the allegation of a cognizable economic injury which supports  its standing to sue under RICO.

## B.  RICO Conspiracy Claim under § 1964(d)(Count 3)

To state a  RICO conspiracy claim under Section 1962(d), a plaintiff must allege, in addition to the substantive elements of a RICO claim, that each defendant "by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of a RICO enterprise." *Nasik Breeding & Research Farm Ltd v.  Merck & Co.*, 165 F. Supp. 2d 514 (S.D.N.Y. 2001).   An agreement may be manifested in one of two ways: (1) by showing an agreement on an overall objective, or (2) by showing that a defendant agreed personally to commit two predicate acts

21

and therefore to participate in a "single objective " conspiracy. *United States v Starrett*, 55 F.3d 1525 (11th Cr. 1995). Where there is no direct evidence of an agreement on an overall objective, the existence of the agreement may be established by circumstantial evidence of a scheme or inferences from the conduct of the alleged participant. *United States v. Lynch*, 287 Fed. Appx. 66 (11th Cir. 2008); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997).

In this case, State Farm has specifically details multiple instances where defendants Bistline, Gomez and Kugler performed medically unnecessary tests and procedures which resulted in submission of fraudulent insurance claims to State Farm, and the manner in which their conduct was coordinated with that of other defendants who generated and oversaw a complex attorney referral network which funneled patients into the scheme; in addition, the complaint details the manner in which Dr. Cutler promoted use of false billing codes to boost the profitability of the PD procedure for attorneys and doctors, and also generated false and misleading billings for the Spine Wand used in PD procedures performed at the Surgery Center.

State Farm's allegation that all medical defendants participated in the creation and submission of multiple bills to State Farm based on fraudulent unnecessary medical testing and procedures over the 2005- 2008 time period is sufficient to show, at a minimum, that each defendant agreed to commit at least two predicate acts in furtherance of the fraudulent scheme. *Coquina Investments v Rothstein*, 2011 WL 197241 (S.D. Fla. 2011). The further allegation that the two non-physician defendants Carroll and Izydore were instrumental in creating and implementing the scheme, and contributed to its continuity by supplying a steady patient stream, all with full awareness that the scheme would ultimately result in rendition of unnecessary medical diagnostic testing and procedures and related mailing to State Farm of fraudulent medical bills on behalf of

22

automobile accident patients, is sufficient to show their commission of at least two predicate acts of fraud in furtherance of the scheme. *See e.g. United States v Marabella*, 73 F.3d 1508 (9th Cir. 1995)(mail fraud conviction based on mailing of fraudulent personal injury claims via settlement demand letter).

### C. Florida Common Law Fraud

As discussed above**,** State Farm adequately pleads the fraud allegedly committed by defendants, both in describing the alleged misrepresentations and attaching exhibits identifying the author and date of each alleged misrepresentation. Therefore, the court denies the motion to dismiss the common law fraud claims.

### D. Florida Unjust Enrichment

A cause of action for unjust enrichment includes the following elements: (1) plaintiff conferred a benefit on a defendant who has knowledge of that benefit; (2) defendant accepted and retained the benefit and (3) under the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it. *Fito v Attorney's Title Ins. Fund, Inc.*, ___ So.3d ___, 2011 WL 3477019 (Fla. 3d DCA Aug. 10, 2011).

The defendants argue that because the amended complaint does not allege that State Farm paid them directly, they could not have enjoyed the conferral of any benefit, thereby defeating the first element of this claim.

While State Farm may not have disbursed the $13 million paid on allegedly fraudulent PIP, UM and BI claims directly to the medical defendants, it is reasonable to infer that the defendants benefitted from the fraudulent scheme alleged in the complaint when the patient's attorney collected first and third party settlement monies from State Farm and disbursed the proceeds directly to all

23

medical lienors on the patient's behalf. *See e.g. MetraHealth Insurance Co. v. Anclote Psychiatric Hospital, Ltd.*, 1997 WL 728084 *8 (M.D. Fla. 1997)(cause of action for unjust enrichment does not require that defendants individually receive payments directly from plaintiff).

### E. Florida FDUPTA

Section 501.212(4)(a) of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) provides that "FDUTPA does not apply to any person or activity regulated under laws administered by the Office of Insurance Regulation or the Financial Services Commission." In this case, defendants allege that State Farm's activities are regulated by the Office of Insurance Regulation and that FDUTPA therefore has no facial applicability to the claims asserted here.

This argument loses sight of State Farm's status as the plaintiff alleging a violation of the FDUTPA against various medical providers and certain lay intermediaries based on the defendants' participation in an allegedly fraudulent billing scheme. These defendants and fraudulent billing activities are not regulated by the Office of Insurance regulation, and therefore, the FDUTPA potentially applies to the conduct described in State Farm's complaint.

Moreover, that the non-physician defendants (Carroll, Izydore and Palm Beach Pain Management) did not sell products or services directly to State Farm, or receive direct payments directly from State Farm, does not preclude assertion of the FDUTPA claim against them individually. *Allstate Ins. Co. v Palterovich*, 653 F. Supp. 2d 1306 (S.D. Fla. 2009).

### F. Affirmative Defenses

Finally, defendants contend plaintiff's claims are time barred on their face and/or barred by the Florida litigation privilege, warranting dismissal of all claims for failure to state a claim upon which relief may be granted.

24

### 1. Litigation Privilege

As initial matter, it is questionable whether the Florida litigation privilege has any applicability to the plaintiffs' federal RICO claims, *see e.g. Steffes v. Stepan Co.,* 144 F.3d 1070 (7th Cir. 1998)(state absolute litigation privilege purporting to confer immunity from suit cannot defeat federal cause of action under Title VII and ADA); *Gerber v Citigroup Inc*., 2009 WL 248094 (E.D. Cal. 2009)(federal RICO claims preempted California litigation privilege); *Acosta v Campbell*, 2006 WL 146208 (M.D. Fla. 2006); *Pesacrice v Orovitz*, 539 F. Supp. 2d 1375 (S.D. Fla. 2008), or to the presuit claims negotiation activity described in the plaintiff's complaint. *Compare Trent v. Mortgage Electric Registration Systems, Inc*., 618 F. Supp.2d 1356 (M.D. Fla. 2007)(Florida litigation privilege not applicable to presuit communications that are not required by law) *with Pledger v. Burnup Sims, Inc*. 432 So.2d 1323 (Fla. 4th DCA 1983) (presuit settlement communications might sometimes be considered acts "necessarily preliminary to" judicial proceedings).

The court need not resolve these issues here, because even if the privilege attaches, there are material questions of fact attending to its application under the circumstances alleged, making it premature to decide whether defendants' actions satisfy the criteria of a qualified privilege and, if so, whether circumstances exist which allow State Farm to overcome the privilege. *See e.g. Silver v Levinson*, 648 So.2d 240 (Fla. 3d DCA 1995); *Axelrod v Califano*, 357 So.2d 1048 (Fla. 1st DCA 1978).

### 2. Statute of Limitations

A Rule 12(b)(6) dismissal based on the statute of limitations is proper only if it is "apparent from the face of the complaint" that the claim is time barred. *La Grasta v First Union Securities*,

*Inc.*,  358 F.3d 840 (11th Cir. 2004).  State Farm's civil RICO and state law claims are subject to a four year statute of limitation, but the perimeters of this limitations period are  appropriately defined by reference to the  delayed  discovery doctrine,  *Hearndon v Graham*, 767 So.2d 1179 (Fla. 2000)(accrual of fraud claims delayed  until plaintiff knew or reasonably  should have known of injury) and the doctrine of equitable tolling.  *Grossman v Greenberg*, 619 So.2d 406 (Fla. 3d DCA 1993)(statute of limitations is tolled where defendant has engaged in fraudulent concealment).

Both doctrines implicate  factual issues which the court cannot resolve on a motion to dismiss.  Therefore, the court shall deny the motion to dismiss based on these affirmative defenses.

### IV. Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1.      The defendants' motions to dismiss the plaintiffs' amended complaint [DE# 33, 21, 20, 27, 25 ] are **DENIED.**

2.      The defendant Jane Bistline, M.D.'s motion to take judicial notice of certain administrative proceedings filed against Drs. Bistline and Kugler before the Florida Department  of Health [DE# 29] is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach Florida this 21st day of September, 2011.

_____
Daniel T. K. Hurley
United States District Judge

cc. All counsel