**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**CASE NO. 11-CV-80051-HURLEY/HOPKINS**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and STATE FARM
FIRE & CASUALTY COMPANY,

Plaintiffs,

        vs.

JEFFREY KUGLER, MD, *et al*,

Defendants.

_____/

### PLAINTIFFS' MOTION TO COMPEL RESPONSES TO DOCUMENT REQUESTS

      State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company (collectively, "State Farm"), move for an Order compelling defendants to respond to State Farm's First Sets of Document Requests (the "Requests") for the reasons that follow:

**I.**      **INTRODUCTION**

      Ten months ago, State Farm served the Requests on all defendants.  The defendants have raised boilerplate objections to virtually every Request, and produced virtually no documents. Because the Requests to the defendants and their respective responses are nearly identical, and pursuant to the Court's order granting State Farm leave to file excess pages (DE 285), State Farm files this consolidated motion to compel.  Pursuant to Local Rule 26.1(h), State Farm attaches schedules setting forth each of the Requests and the defendants' responses.  *See* Exs. "1" – "8." Complete copies of the State Farm's Requests to the defendants and the defendants' responses are also attached.  *See* Exs. "9" – "24."[1]

      This introduction section provides preliminary information for the resolution of this motion, including a summary of State Farm's Requests, common deficiencies with respect to the defendants' objections, and instances in which the defendants have denied the existence of

---

[1] For ease of reference, State Farm has attached its Requests to, and the responses from, each of the defendants successively in the order the defendants are listed in the case caption.  Although these exhibits are duplicative of the Rule 26.1(h) schedules attached to this motion, they are attached for completeness.

documents which State Farm currently possesses and, therefore, knows to exist.  The sections which follow separate State Farm's Requests into common categories (Section II (pp. 12-14)), state the standard of review (Section III (pp. 14-15)), and provide additional argument in support of each specific document category for which State Farm is seeking an order compelling the defendants to produce documents (Section IV (pp. 15-31)).  As is demonstrated below, State Farm's Requests properly seek discoverable information from the defendants, the defendants objections are without merit, and they should be ordered to produce the documents State Farm seeks, which are undeniably in the defendants' possession, custody, and/or control.

### A.     The Requests

The Requests seek documents that are highly relevant to State Farm's claims and the defendants' defenses, namely: (1) the existence or non-existence of patterns in the documentation and circumstances of discograms or plasma disc decompressions ("PDs") performed at the Palm Beach Lakes Surgery Center ("PBLSC") from 2004 through the present; (2) the extent to which the defendants targeted auto accident patients for discograms and PDs if they had potential access to benefits of $100,000 or more in auto insurance coverage; (3) the extent to which the defendants' performed these supposedly beneficial procedures on patients who were not in auto accidents, where the potential reimbursement would be substantially less because of fee schedules or contractual limitations on charges, or on patients who were in auto accidents but did not have access to $100,000 or more in insurance coverage; (4) the defendants' relationships with each other, and their substantial referral sources, including with certain personal injury firms who stood to profit from the discograms and PDs; (5) the defendants' relationships with Arthrocare and Discocare which manufactured and distributed the SpineWands used in the PDs; and (6) the full extent of the financial relationships and incentives that may have motivated each defendant to participate in the scheme.  As discussed below, these documents go to the heart of the claims and defenses in this case, and the defendants have produced none.

### B.     The Defendants' Responses To The Requests, Or Lack Thereof

The defendants responded to the Requests in November 2011, and in response to more than 80 Requests directed at each defendant, produced basically nothing.  In sum: (1) Gary Carroll, Mark Izydore, and Palm Beach Practice Management ("PBPM") produced no documents, (2) Drs. Kugler and Gomez, and their professional associations, produced only their

respective resumes, (3) Dr. Bistline and her professional association produced her resume, a lease and contract with the Palm Beach Lakes Surgery Center ("PBLSC"), her letter resigning as the sponsor for Dr. Anthony Rogers when she and the other defendants severed their relationships with Dr. Rogers, and materials relating to the FDA's approval of Arthrocare's 510(k) application to market the SpineWand device, and (4) Jonathan Cutler and the PBLSC produced his resume and publications relating to plasma disc decompressions ("PDs").  After 10 months, this is the sum total of defendants' production.[2]

This case is currently set for trial on this Court's January 2013 calendar.  The defendants have taken every opportunity to obstruct State Farm's access to documents and other discovery, which has prejudiced State Farm's ability to prosecute its claims, respond to the defendants' defenses, and defend itself against the defendants' counterclaims.  The primary objections the defendants have relied upon to withhold critical documents from State Farm, and documented instances in which the defendants have denied possession of records that State Farm knows to exist (because State Farm has copies of such documents), are discussed next.

C.     **The Defendants' Boilerplate, Baseless And Incredible Objections**

In response to virtually all Requests, the defendants have asserted the same or similar objections that are boilerplate, baseless and, in many instances, incredible.  These objections are completely inappropriate and should be rejected across the board.

First, the defendants assert boilerplate objections to the relevance and purported burden of having to produce documents in response to virtually every Request.  They also complain that they cannot understand the term "relating to" in any Request.  These objections are without merit.  *See, e.g., Fin. Bus. Equip. Sol., Inc. v. Quality Data Sys.,* 2008 WL 4663277, at *5 (S.D. Fla. 2008) (overruling non-specific boilerplate objections and holding that "[t]he objecting party must do more than intone the familiar litany that the [discovery is] burdensome, oppressive or overly broad"); *Platypus Wear, Inc. v. Clarke Modet & Co., Inc.,* 2007 WL 4557158, at *3 (S.D. Fla. 2007) ("[T]hese Objections [are] worthless for anything beyond delay of discovery…[and] do not constitute objections."); *Walker v. Am. Radiographics, Inc.*, 2010 WL 5437254 (S.D. Fla. Dec. 27, 2010) (overruling defendant's objections stating, without providing any detail, that a

---

[2]  When they responded to the Requests, the defendants also responded to State Farm's interrogatories, and provided virtually no information.  State Farm is simultaneously filing motions to compel responses to its interrogatories.

discovery request is vague, overly broad, unduly burdensome or not relevant); *Powell v. The Home Depot,* Case No.: 07-80435-Civ-HURLEY/HOPKINS (DE 236-1, at p. 5) (S.D. Fla. June 5, 2008) (party opposing discovery based on undue burden must make a specific showing, supported by a detailed affidavit, as to why the production sought would be overly broad or unreasonably burdensome); *Henderson v. Holiday CVS, L.L.C.* 269 F.R.D. 682, 690 (S.D. Fla. 2010) ("there is nothing vague and ambiguous about the terms 'documents relating to.'"); *Powell*, 07-80435-Civ-HURLEY/HOPKINS (DE 236-1, at p. 6) (finding unpersuasive defendant's argument that requests are overly broad because they include the phrase "relating to").

Second, the defendants object to many Requests on the ground that State Farm could obtain the same documents directly from the State Farm insureds or other sources.  This objection is also baseless because "[t]he fact that a discovery item may be available from another source is not a proper objection*." Molinos Valle Del Cibao v. Lama,* 2008 WL 3850807 (S.D. Fla. Aug. 14, 2008) (citing *Cent. Transp. Int'l, Inc. v. Global Advantage Distrib., Inc.,* 2007 WL 3124715, at *2 (M.D. Fla. Sept. 11, 2007)).  In addition to being baseless, this objection is also ironic, because non-party law firms which referred patients to the defendants in this case have similarly objected to producing documents from their files asserting that State Farm can supposedly get the same documents from the defendants.

Third, the defendants object to producing any medical records based upon state and federal medical privacy laws.  Magistrate Judge Hopkins, in a well-reasoned opinion, properly rejected the same objections raised by various third parties in this case  (DE 261).  Defendants' medical privacy objections should be rejected for the same reasons.  Furthermore, as this Court has seemed to suggest, medical privacy issues can be further addressed with an appropriate confidentiality order.  (DE 321).

Fourth, the defendants object to many Requests based upon Florida's constitutional right to privacy, FL. CONST. Art. I, § 23.  The corporate defendants have no such right to privacy. *See Alterra Healthcare Corp. v. Estate of Shelley*, 827 So. 2d 936, 941 (Fla. 2002) ("[E]ven where a constitutional right to privacy is implicated, that right is a personal one, ***inuring solely to individuals***"); *Fla. Ass'n of Prof'l Lobbyists, Inc. v. Div. of Leg. Servs.*, 2006 WL 3826985, at *4 (N.D. Fla. Dec. 28, 2006) (citing *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 65 (1974) ("[C]orporations can claim no equality with individuals in the enjoyment of a right to privacy.").  The individual defendants' privacy objections should also be rejected because their state

constitutional privacy objections do not apply in this federal proceeding.  *See EchoStar Satellite v. Viewtech, Inc.*, 2010 WL 2822109, at *5-6 (S.D. Fla. July 16, 2010) (privacy clause under the Florida constitution did not apply in a federal question case).  Moreover, even if this Court were to conduct a balancing of interests, the documents requested are so critical to this case that they should be produced, subject to a confidentiality order.  *See Adelman v. Boy Scouts of Am.*, 2011 WL 3648573, at *13 (S.D. Fla. Aug. 19, 2011) ("[E]ven when a discovery request seeks comparatively personal and private information for non-litigant third parties, the discovery is still often allowed, notwithstanding the right to privacy in Section 23 of the Florida Constitution, if safeguards are implemented.").

Each of the defendants raised one or more of the foregoing deficient objections in response to State Farm's Requests.  As the foregoing demonstrates, the defendants' objections lack merit, should be overruled, and do not provide legitimate grounds for the defendants to refuse to produce documents in this case.

### D.   The Defendants' Claim That Critical Documents Do Not Exist

Tellingly, the defendants also attempt to avoid production by claiming that they do not have many responsive documents.  For example, the defendants contend they do not have (1) documents evidencing the number of PDs they performed from 2004 to the present; (2) documents which track the insurance carriers and coverage limits for their patients; or (3) responsive emails between themselves or with third parties.  These representations are not credible because the defendants are required to maintain certain of these documents by law, it defies common sense from a medical-legal perspective that they would not have such documents, and State Farm has examples of such documents which were created by the defendants, as well as affidavits and testimony from former employees who confirm the existence and importance of such documents.  Based upon the critical nature of these documents, a brief description of the relevant Requests and the defendants' respective responses are discussed next.

### 1.   The Defendants Have Documents Disclosing The Number Of Patients Who Received Discograms Or PDs From Them.

State Farm has requested documents regarding patients who received discograms or PDs from the defendants at the PBLSC since 2004, whether or not the patients were involved in State

Farm claims.[3]  For patients who were not involved in State Farm claims, State Farm has indicated that all patient identifying information may be redacted.  These documents are extremely relevant because they will establish: (1) the extent to which the incredible patterns in the 199 State Farm claims described in State Farm's amended complaint ("Complaint") extend to all the discograms and PDs performed at the PBLSC during the same period (DE 19, ¶¶25, 28-29, 39-49, Ex. A), (2) the full duration, frequency and scope of the "pattern of racketeering activity" which is an element of State Farm's RICO claims (*i.e.*, "defraud State Farm *and other insurers* through fraudulent personal injury claims") (DE 19, ¶¶144, 151) (emphasis added),[4] (3) the veracity of the defendants' defense that State Farm has "cherry picked" claims to create the false impression of a pattern among their discogram and PD claims (5/16/11 Hr'g Tr., 28), (4) the veracity of the defendants' assertion that only a small percentage of their patients received discograms or PDs (DE 162, Counterclaims ("CC"), ¶ 20; DE 154, CC at ¶ 18; DE 155, CC at ¶ 21), (5) the extent to which they performed and billed for discograms and PDs in non-auto cases where their reimbursement opportunities would have been substantially less (*e.g.*, Medicare would have paid a maximum of $551.82 for a PD at the PBLSC in 2006); and (6) the veracity of their defense that many other insurers, both auto and non-auto, covered and paid them for discograms and PDs (DE 162, CC at ¶¶32-33; DE 154, CC at ¶¶30-31; DE 155, CC at ¶¶33-34).

Defendants contend that they have no reasonable means of identifying patients who received PDs at the PBLSC since 2004, and therefore cannot produce documents relating to such patients.  This cannot be true.  Florida law requires ambulatory surgery centers such as the

---

[3] State Farm's specific Requests seeking these documents are described in document categories 1 and 2 below.  *See infra* at pp. 13-14.

[4] *See, e.g.*, *Aetna Cas. Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1565-66 (1st Cir. 1994) (upholding trial court's admission of evidence regarding fraudulent claims made to insurers other than the plaintiff because it tended to support a finding of a pattern of mail fraud); *State Farm Mut. Auto. Ins. Co. v. Policherla*, 2009 WL 2170183, *4-5 (E.D. Mich. July 20, 2009) (compelling defendant physician to produce documents related to claims submitted to other non-party insurers for procedures at issue in RICO action where plaintiff submission of fraudulent bills to plaintiff and other insurers for unnecessary medical procedures); *see also Columbia Natural Resources, Inc. v. Tatum*, 58 F. 3d 1101, 1111 (6th Cir. 1995) ("a pattern is the sum of various factors including: the length of time the racketeering activity existed; the number of different schemes (the more the better); the number of predicate acts within each scheme (the more the better); the variety of species of predicate acts (the more the better); the distinct types of injury (the more the better); *the number of victims (the more the better)*") (emphasis added).

PBLSC to track and report annually to the Florida Agency for Health Care Administration ("AHCA") the number of procedures performed at the centers, including PDs.  *See* Rule 59B-9.034(1)(a) Fla. Admin. Code (attached hereto as Ex. "25").[5]  Indeed, the PBLSC made such annual reports to the AHCA and reported that more than 1,550 PDs were performed at the center between 2005 and 2008, which is almost a third of all such procedures performed in Florida during those years.  Clearly, the PBLSC has the data from which it should be easily able to identify the  patients who have received PDs at the center.  Drs. Kugler and Gomez, as well as Cutler, are or were owners of the PBLSC, and Dr. Bistline has always been the Medical Director of the PBLSC.  They were all involved in the performance of or billing for these procedures, and they too should have ready access to this information from the PBLSC.

Furthermore, it defies common sense that the defendants would not be able to identify the patients who received discograms or PDs at the PBLSC simply by searching their (1) billing data for each instance in which they submitted bills with the CPT Codes for discograms (CPT Codes 62290-91) or PDs (CPT Codes 62287, 63056-57, 63076-76, or 64999), or (2) their electronic documents for discogram and PD reports.  Absent some explanation, this billing data and their electronic reports should also enable them to easily identify the patients upon whom they performed or billed for discograms or PDs during the relevant period.  Their objections to the contrary should be rejected.

> 2.    **The Defendants' Have Documents Showing They Tracked Referring Attorney, Insurance Carrier, And Policy Limits Information For Their Patients.**

Another particularly important category of documents requested by State Farm consists of documents reflecting the extent of the defendants' patient populations who were represented by certain personal injury law firms that clearly had a substantial cross-referral relationship with the defendants, the services that the defendants provided to those patients and information regarding the potential policy limits for each patient.[6]  These documents are extremely relevant to State Farm's claims regarding the nature and extent of the *quid pro quo* relationships between the defendants and certain personal injury law firms, and the extent to which services rendered to

---

[5] Also included in Exhibit 25 are the predecessor regulations which required ambulatory surgery centers to report patient data to AHCA in 2004, including 59B-9.011 and 59B-9.018.

[6] State Farm's specific Requests seeking these documents are described in document categories 5, 6, and 18 below.  *See infra* at pp. 13-14.

patients of those firms was dictated by the potential insurance policy limits.  Conversely, the documents are relevant to the defendants' defenses, denying such relationships and any notion that their services were dictated by policy limits rather than patient need.

The defendants deny that they have any documents tracking the referring attorneys, insurance carriers, or policy limits information for their patients.  (*See, e.g.*, Kugler Resp. to State Farm's RFP No. 83) ("Defendants do not maintain their patient records such that each patient is identified by their insurance carrier, available coverage, or reason which treatment is sought."). This cannot be true. The attached exemplar computer-generated printouts of Kugler's schedule undeniably demonstrate, Kugler did, in fact, track the referring attorney, insurance carrier, and policy limits for each patient he "treat[ed]," just as State Farm has alleged.  (*See* Exemplar Kugler Schedules, attached as Ex. "26").  As illustrated in rows 1-3 and 6-8 of page 1 of the Exemplar Kugler Schedules, many of these patients were represented by Steinger and Iscoe in matters involving $100,000 or more in policy limits, just as State Farm has alleged.  As illustrated by rows 4 and 6 of page 2 of the Exemplar Kugler Schedules, the defendants actually categorized cases as "good" based upon the available insurance coverage limits, just as State Farm has alleged.  *See id.* at row 4 ("**1M BI GOOD CASE**…"); row 6 ("**500K BI/GOOD CASE**").  Moreover, as illustrated in row 7 of page 3 of the Exemplar Kugler Schedules, attorneys like Steinger and Iscoe actually dictated when patients were required to see the defendant doctors, just as State Farm has alleged.  *See id.* ("**MUST COME IN PER ATTY**"). Furthermore, an affidavit from one of Kugler's former employees which is described in and attached to State Farm's Amended Complaint, confirms that these kinds of documents were required to be reviewed and approved by Mark Izydore or Mark Nathanson (who worked for Kugler, and is attorney Michael Steinger's brother-in-law) before surgeries would be performed at the PBLSC.  (DE 19, ¶90(b)(i), Ex. F).  The defendants' representation that they have no such documents is not credible.

### 3.    The Defendants' Failure To Produce Emails.

The defendants also have not produced a single email.  Clearly, at the very least, Carroll and Izydore use email.  For example, as set forth in State Farm's Motion to Compel Robbins (DE 287, pp. 4-5), Izydore utilized the email account "markizy@msn.com" as early as 2004 to communicate with Robbins about the scheme.  In fact, in a September 17, 2010 affidavit signed and filed by Robbins in another matter, Robbins stated that Izydore worked at Kugler's office

and communicated "countless time every day" by texts and emails with Robbins.  (Robbins 9/17/10 Affidavit at ¶6, attached as Ex. "27").  Yet,  neither Carroll nor Izydore disclosed the existence of any email accounts in their answers to State Farm's interrogatories which Robbins, himself, served upon State Farm in this case on November 7, 2011.  (*See* 11/7/11 Robbins Email, attached as Ex. "28").  It is simply not credible for the defendants to contend they do not have any emails in response to the  Requests.

Unfortunately, the above described objections to State Farm's Requests are consistent with the defendants' steadfast determination to conceal the truth regarding their scheme and their contemptuous attitude toward the judicial process.  To put their responses to State Farm's Request into the context of their scheme, a brief description of some of their affirmative acts of concealment and overt gamesmanship over time are discussed next.

**E.**     **The Defendants' Affirmative Acts of Concealment And Gamesmanship**

A primary defense raised by the defendants is that State Farm knew all the relevant facts when it decided to pay the claims at issue, and therefore cannot prove that its damages were proximately caused by the defendants' fraudulent representations.  State Farm responds, in part, by alleging the defendants have intentionally taken affirmative acts to conceal relevant information from State Farm, including testifying falsely regarding the true nature of their relationships with each other, with their referral sources, and with Arthrocare and Discocare, as well as the veracity of their documentation and charges regarding discograms and PDs.  State Farm also alleges that the defendants' active concealment is proof of their fraudulent intent to engage in the scheme alleged in the Amended Complaint.

Acts taken by the defendants and their counsel to shield Izydore from discovery in other matters provide a useful example of the extent to which the defendants have been willing to go to obstruct discovery regarding their scheme.  The defendants have taken these actions because of the enormously important role that Izydore has played in the success of their scheme. For example, after serving a 60 month prison sentence for bankruptcy and wire fraud,[7] Izydore was hired by Gary Caroll to work as a data entry clerk for $10 an hour.  (*See* Izydore Employment Application, attached as Ex. "29;" Salvation Army Correctional Services Pre-Employment Verification, attached as Ex. "30").  At the time, Carroll was managing the pain management practice of Dr. Anthony Rogers, Palm Beach Pain Management.  (DE 19, ¶73).  Izydore's role

---

[7] *See* Order Affirming Izydore Federal Felony Convictions, attached as Ex. "31."

with Carroll grew into building referral relationships with personal injury attorneys, such as Steinger and Iscoe, and helping Carroll manage Dr. Roger's practice.  (DE 19, ¶74).  In approximately 2004, when Dr. Rogers was the subject of disciplinary proceedings, Carroll and Izydore recruited Bistline to act as Dr. Rogers' sponsor which enabled Dr. Rogers to continue practicing.  (DE 19, ¶75).  In 2004 and 2005, Carroll and Izydore formed relationships with the defendants, and launched the scheme that led to more than 1,550 PDs at the PBLSC over the next few years alone.  (DE 19, ¶¶81-99).

Although Carroll apparently ended his active relationship with the defendants by 2007, Izydore has continued to be integrally involved in all aspects of their activities to this very day.  (DE 19, ¶¶90(a)-(d), Exs. E-H).  For example, in 2004 Kugler formed his professional association and joined the scheme.  At that time, he entered into an agreement for Carroll and Izydore to manage his practice through a management company, PBPM.  (DE 19, ¶¶83-87, Ex. B).  Under this agreement, Izydore was required to be present at either the PBLSC or Kugler's practice at least four days a week, and Kugler's practice agreed to pay PBPM 50% of his profits for the first year and 45% of his profits for the second and third years.  (See id.).  Izydore's pervasive involvement in the defendants' activities is well documented in the affidavits of former Kugler associates which are described in and attached to the Amended Complaint.  (DE 19, ¶¶90(a)-(d), Exs. E-F).  In addition, two individuals who had been incarcerated with Izydore, Frank Camillo and Orlando Gomez, worked as "investigators" at the Steinger law firm.  In depositions, Dr. Kugler himself has admitted that Izydore is involved in the management, marketing and financial aspects of his practice.  (See 1/16/08 Kugler Dep., p. 42 attached as Ex. 32, 4/23/08 Kugler Dep., p. 54 attached as Ex. 33; 5/7/08 Kugler Dep., p. 10-11 attached as Ex. 34).

Despite this overwhelming evidence regarding the true nature and extent of Izydore's involvement in the scheme, Izydore and others have attempted to shield him from any discovery in other matters by gamesmanship to avoid service of a subpoena and falsely representing in affidavits and testimony that all Izydore's communications since at least July 2006 are shielded by the attorney-client privilege because Izydore was acting, at all times, as a "paralegal" for attorney Steve Robbins.[8]  For example, in *Mohammed Islam v. Alexander Anderson,* Case No.:

---

[8] It is not clear whether Izydore or the other defendants will similarly assert an attorney-client privilege for communications with Izydore in this case.

CACE 07-013797 (09), in the Circuit Court of the 17th Judicial Circuit in and for Broward County ("the Islam Case"), the plaintiff purportedly received a discogram from Dr. Bistline and a PD from Dr. Kugler at the PBLSC.  When process servers attempted to serve Izydore with a deposition subpoena at the PBLSC, State Farm's surveillance caught Izydore slipping out the back door of the PBLSC and, while he thought nobody was looking, "**kick[ed] the front passenger door" of the process server's car "denting and scratching it**."  (Motion to Show Cause and Supporting Affidavits at p. 10, attached as Ex. "35").  Ultimately, to avoid having to give a deposition, Izydore filed an affidavit in the Islam Case, dated March 7, 2008, representing that he was not employed by Kugler.  (DE 19, Ex. C).  Obviously, in light of the above-described evidence, including contemporaneous testimony from Kugler in other matters, Izydore's affidavit was not true.  The court in the Islam Case held a hearing on May 1, 2008 to address these matters, issued an order to show cause why Izydore should not be held in criminal contempt, and ordered Izydore to appear for deposition on March 10, 2008.  (*See* 5/13/08 Order, attached as Exhibit "36").  To avoid the deposition, the plaintiff's attorneys, Steinger Iscoe & Greene, suddenly dismissed the Islam Case on May 9, 2008, the day before Izydore was ordered to appear for deposition.  (*See* 5/9/08 Dismissal, attached as Exhibit "37").[9]

More recently, in *Jeffrey Kugler, MD, PA dba National Orthopedics v. Rajendran Naidoo, MC aka Rajen Nidoo and Esther Naidoo*, Case No. 502010CA001707XXXXMBAF, in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County ("the Naidoo Case"), attorney Robbins and Izydore both filed false affidavits to prevent the defendant from taking Izydore's deposition.  The Naidoo Case involved a dispute between Kugler and a former surgeon employee, Dr. Naidoo, who worked for Kugler in 2008 and 2009.  Dr. Naidoo served a deposition subpoena on Izydore.  Kugler and Izydore had substantial reasons for Izydore to avoid a deposition because Dr. Naidoo had testified in the Naidoo case that:

- After May 2009, Dr. Naidoo was informed by Leslie Heater, who worked in Kugler's billing department, "that a lot of the billing practices were illegal."
- Around early 2008, Dr. Naidoo did three PDs while at Kugler's practice.  He does not believe in their efficacy or that patients got relief from them.

---

[9] Although Izydore avoided his deposition in the Islam Case, he was unable to avoid a deposition in another prior personal injury case involving discograms and PDs.  There, however, Izydore asserted the Fifth Amendment in response to all questions about his involvement with the defendants.  (*See* 9/24/09 Izydore Dep. Excerpt, attached as Ex. "38").

- In May-June 2009, "Mark Izydore came to me [Dr. Naidoo] and forced me to start doing [more] percutaneous discectomies."

(*See* Naidoo Dep. Excerpt, pp. 85-90, attached as Ex. "39").

In the Naidoo Case, attorney Steven Robbins filed a motion to quash the deposition for Izydore.  In support, Robbins filed his own affidavit, which he signed on September 17, 2010, representing that all communications between Izydore and Kugler were covered by the attorney-client privilege because Izydore was acting as Robbins' paralegal at all times since at least July 2006.  (*See* Ex. 27).  Similarly, Izydore filed an affidavit dated July 7, 2010, representing that he could not testify because all his communications with Kugler and others associated with Kugler's practice were made in his role as a "paralegal" for Robbins.  (*See* Ex. 40).  Again, based upon the foregoing evidence, Robbins' and Izydore's affidavits from the Naidoo Case were not true.[10]

To remove any doubt about the untruthfulness of the above-described Robbins and Izydore affidavits, State Farm issued a subpoena to Robbins in this case, seeking all documents relating to Izydore's employment as a paralegal, or for any other purpose, by Robbins.  (DE 287, Ex. A).  Robbins response was that "**none exists**."  Given Robbins' affidavit representing that Izydore has been his paralegal since 2006 and that they communicated countless times by texts and e-mails while Izydore was at Kugler's practice or the PBLSC, it is remarkable that neither Robbins nor Izydore has documents showing what Izydore did in his role as a paralegal.

In addition to the above-described acts of obstruction, a mere ***one day*** before the present suit was filed, and as pre-suit discussions were ending, Kugler's office reported a burglary.  (*See* Police Report, attached as Ex. "41").  According to the police report, someone went through the effort of sawing through the back door to gain access, stole approximately 70 patient files and accessed the only non-password protected computer in the office, which was connected to the mainframe for all office computers.  Nothing else was reported taken in the burglary.  The timing and circumstances of this burglary are highly suspicious, and may represent other affirmative acts of concealment.

---

[10] In another case, Dr. Bistline has also followed the company line by testifying that she only knows Izydore in connection with his role as a paralegal for attorney Robbins.  (*See* Bistline 10/14/08 Dep., pp. 61-62 attached as Ex. "42").

## II.   THE REQUEST CATEGORIES

With the foregoing history in mind, State Farm turns to the Requests.  Although the form and numbering of certain portions of the Requests differ slightly from defendant to defendant, State Farm is generally seeking the same document categories from each of the defendants in this case.  For efficiency, State Farm has grouped the Requests into document categories for the purposes of this motion.   Those document categories (collectively referred to as the "Categories") are as follows:[11]

(1)   Documents regarding the patients referenced in Exhibit A to State Farm's Amended Complaint, and any other State Farm insured, who received discograms or PDs at the PBLSC;

(2)   Documents regarding all patients who received discograms and PDs, or recommendations for these procedures, at the PBLSC since 2004, with personal identifying information redacted if State Farm was not involved in the claim;

(3)   Documents reflecting charges, accounts receivable, and the type and amount of policy benefits available for patients who received discograms and PDs at the PBLSC since 2004;

(4)   Documents regarding the propriety of the billing codes submitted to State Farm for discograms and PDs;

(5)   Documents regarding to the nature and extent of referral relationships and related payments between the defendants and specific law firms and healthcare providers with whom they appear to have significant referral relationships;

(6)   Documents reflecting the nature of the services received by patients who were referred by specific law firms;

(7)   Documents regarding the duration, nature and terms of arrangements among the defendants;

(8)   Documents regarding the duration, nature and terms of arrangements among the defendants and others such as doctors and individuals who provided management, billing marketing and administrative services;

(9)   Documents reflecting the defendants' financial information;

(10)  Documents reflecting information regarding policy limits and types of insurance which had to be reviewed for approval by Izydore and Carroll, who are not physicians, or Mark Nathanson, who worked for the defendants and is the brother-

---

[11] A chart which lists the specific document request numbers for each defendant that correspond to the document categories listed herein is attached as Exhibit "43" for ease of reference.

in-law of personal injury attorney Michael Steinger, before patients were allowed to receive surgeries at the PBLSC;

(11) Documents regarding the defendants' relationships with Arthrocare and Discocare, which were a critical component of the defendants' scheme. (DE 19, ¶¶100-31);

(12) Documents reflecting the defendants' communications regarding the September 2008 decision by Medicare that it would not pay for PDs because their benefits were unproven;

(13) Documents regarding a study purportedly performed by Kugler and Bistline supporting the benefits of PDs, which purports to support defendants' defense that PDs have a documented success rate of about 80% (DE 162, CC at ¶51, DE 154, CC at ¶76) and representation in the reports submitted to State Farm that PDs have a documented success rate of about 95%. State Farm contends this study was a sham. (DE 19 at ¶18);

(14) Documents regarding an Arthrocare sponsored study purporting to show benefits of PDs for a limited patient population;

(15) Documents supporting defendants' defense that PDs are beneficial;

(16) Documents regarding Bistline's prior worker's compensation and disability claims in which she testified that she lacked the cognitive and physical ability to practice medicine, but suddenly recovered when she met the defendants and proceeded to perform a massive number of delicate discograms over the next several years;

(17) Documents regarding specific lawsuits between various defendants and others relating to activities and relationships described in State Farm's Complaint and in the defendants' counterclaim in this case (DE 162, CC at ¶ 79; DE 154, CC at ¶¶109-10; DE 155, CC at ¶107);

(18) Documents reflecting the types of and amounts of benefits available to patients treated as a result of auto accidents;

(19) Documents regarding items allegedly taken or other claims made as a result of a burglary that allegedly occurred at Kugler's office the day before State Farm's Complaint was filed in which patient and computer files were allegedly accessed;

(20) Documents regarding the retention of or services performed by attorney Steve Robbins, who knowingly facilitated the defendants' affirmative steps to thwart discovery in other matters by falsely swearing under oath that Izydore could not testify regarding matters relating to the defendants because Izydore was allegedly, at all times, acting as Robbins paralegal;

(21)   Documents regarding any criminal, disciplinary or other investigations relating to the defendants performance of discograms and PDs, or relationships with Arthrocare and Discocare;

(22)   Documents regarding any threatened or actual complaint or claim made against the defendants regarding their performance of discograms and PDs; and

(23)   Documents identified by the defendants in response to State Farm's interrogatories.

## III.   **LEGAL STANDARD**

Rule 26 of the Federal Rules of Civil Procedure allows discovery on "any nonprivileged matter that is relevant to any party's claim or defense." *Fed. R. Civ. P.* 26(b)(1).  The United States Supreme Court has stated that the permissible scope of discovery extends to "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *See Hickman v. Taylor,* 329 U.S. 495, 501 (1947); *accord U.S. v. Real Property,* 444 F. Supp. 2d 1258, 1262 (S.D. Fla. 2006) (citation omitted) (emphasis added).  The overall purpose of discovery under the Federal Rules is to require full disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result. *Felker v. Zampatti,* Case No. 3:10-cv-459 (M.D. Fla. March 11, 2011) (citations omitted).  The party "resisting discovery has a heavy burden of showing why the requested discovery should not be permitted." *Henderson v. Holiday CVS, L.L.C.*, 269 F.R.D. 682, 686 (S.D. Fla. 2010).  For example, the objecting party "must 'show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.'" *L.M.P. ex rel. E.P. v. School Bd. of Broward Cnty., Fla.*, No. 05-60845-CIV, 2009 WL 2578987, at *4 (S.D. Fla. Aug. 18, 2009).

## IV.   **ARGUMENT**

### A.   **State Farm's Document Requests Properly Seek Documents Which Are Calculated To Lead To The Discovery Of Admissible Evidence.**

As explained below, the Requests seek highly relevant information evidencing the nature and scope of the defendants' enterprise and pattern of racketeering activities involving the same or similar fraudulent acts targeting many insurance companies over more than six years.  At the

same time, the Requests also seek documents that are highly relevant to the defendants' defenses. This Court should order them to produce all responsive documents.[12]

### 1. Documents Regarding Patients Involved In State Farm Claims Who Received A Discogram or PD At The PBLSC (Categories 1 and 4).

State Farm seeks documents regarding the patients referenced in Exhibit A to State Farm's Complaint, and any other State Farm insured, who received discograms and PDs at the PBLSC since 2004.[13]  State Farm also seeks documents regarding the billing codes submitted to State Farm for these discograms and PDs.[14]  Documents relating to discograms and PDs performed on patients involved in State Farm claims are at the very core of this case.  These are among the reasons that this Court has already ordered certain non-party law firms to produce documents relating to patients involved in State Farm claims.  (DE 303).  Defendants should likewise be compelled to produce all documents called for by these Requests.

### 2. Documents Relating To All Discograms And PDs Performed Or Recommended At The PBLSC Since 2004 (Categories 2 and 3).

State Farm also seeks documents regarding all patients who received discograms or PDs, or recommendations for these procedures, at the PBLSC since 2004, with personal identifying information redacted if State Farm was not involved in the claim.[15]  State Farm also seeks documents evidencing the defendants' charges and accounts receivable for all such procedures, as well as the type and amount of policy benefits available for the patients who received these procedures.[16]  As discussed *supra* at pp. 5-7, these documents are extremely relevant to State Farm's claims and the defendants' defenses for many reasons.  In sum, they will establish the extent to which the patterns identified in the State Farm claims identified in Ex. A to State Farm's Amended Complaint extend to more than 1,550 PDs that they performed during the same period and the extent to which the defendants have used the same or similar methods against

---

[12] State Farm's arguments addressing the defendants' deficient objections to the Requests are addressed *supra* at pp. 3-5.  To avoid repetition, those arguments are not repeated in this section.

[13] *See* Request Nos. 6, 9-12.  Unless otherwise stated, references to "Request Nos." mean that the numbering of the applicable Requests in State Farm's First Requests for Production are the same for each of the defendants in this case.

[14] *See* Request Nos. 14-16.

[15] *See* Request Nos. 7-8.

[16] *See* Request Nos. 13-14, 17; Kugler, Gomez, Cutler, PBLSC and PBPM Request No. 82; Carroll Request No. 85; Bistline Request No. 86; Izydore Request No. 88.

multiple victims over that period--more than six years. This evidence may potentially support or undermine State Farm's claims regarding the existence and meaning to be drawn from any patterns in the claims. This is particularly important evidence because the "pattern of racketeering activity" in which the defendants engaged is an element of State Farm's RICO claims, and at the hearing on the defendants' motions to dismiss, the defendants argued: "[State Farm] *cherry picked* a certain number of cases to bring in this complaint. This is not the universe of people who have been treated. This is a small number." (5/16/11 Hr'g Tr., p. 28) (emphasis added). The defendants made this argument because, in 198 out of 199 State Farm claims, Bistline reported positive discograms which, in turn, were used to justify the purported necessity of the PDs that immediately followed those positive discograms.[17]

Moreover, several courts have compelled *non-party* doctors, attorneys, and hospitals to produce similar information concerning both their charges for PDs (including the amounts charged for patients with and without insurance) and their relationships with personal injury firms for whom they perform large numbers of these procedures. *See, e.g., Crable v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 5525361, at *7 (M.D. Fla. Nov. 14, 2011) (ordering a law firm to produce information concerning its financial relationship with a doctor who was alleged to have prescribed medically unnecessary PDs, including the invoices from the doctor to the law firm and a "vendor history" report showing the amounts the law firm paid to the doctor for 176 patients); *Katzman v. Rediron Fabrication, Inc.*, 2011 WL 6373037, at *1 (Fla. 4th DCA Dec. 21, 2011) (affirming order requiring doctor to disclose "how often [he] has ordered discectomies over the past four years and what he has charged in litigation and non-litigation cases"); *Columbia Hosp. (Palm Beaches) Ltd. Partnership v. Hasson*, 33 So.3d 148, 149 (Fla. 4th DCA 2010) (affirming order requiring hospital to produce information regarding charges for PDs, including "the amount the hospital has charged patients with and without insurance, those with letters of protection, and differences in billing for litigation patients versus non-litigation patients"). Given the importance of whether an overarching pattern exists to both State Farm's

---

[17] If the same incredible pattern exists with respect to all 1,550 of the procedures that the defendants performed at the PBLSC, it will make all the reported results even more improbable. If the defendants are correct and patterns do not exist, however, it might support the defendants' defense that no such pattern exists and that the patterns in the State Farm claims are not so improbable when viewed in the context of their overall claims. Either way, the only way to resolve this critical dispute is by the defendants actually producing the documents.

claims and the defendants' defenses, and the existence of several orders allowing similar discovery with respect to these same exact procedures even where ***non-parties*** were concerned, the defendants' should be compelled to produce all documents in response to these Requests.

### 3.    All Relevant Financial Documents (Category 9).

State Farm also seeks financial documents from the defendants, including federal income tax returns, K-1s, W-2s and 1099s for the years 2004 through the present, as well as documents reflecting the defendants' daily receipts (which a former Kugler employee has testified were reported to Izydore daily).[18]   (*See* D.E. 19 at ¶90(c)(ii); Ex. G).   This information is highly relevant to:  (a) the defendants' financial relationships and roles; (b) the financial success and magnitude of the scheme; (c) the extent to which discograms and PDs contributed to the defendants' overall revenues and profits; and (d) the defendants' financial relationships with each other and third parties, such as (i) attorney Robbins, (ii) personal injury law firms with which the defendants had significant financial relationships, (iii) various individuals who worked for or at the defendants' premises and have connections to personal injury firms, and (iv) other key players like Arthrocare and Discocare.  In fact, the importance of this information in driving the defendants' activities was expressly set forth in the affidavits submitted by several of Kugler's former employees, which are attached to State Farm's Amended Complaint.  (D.E. 19, ¶¶90(a)-(d); Exs. E-H).[19]

Although income tax returns and financial information are sensitive documents, they often are produced in cases, especially those involving racketeering and fraud claims. *See, e.g.*, *MOMOT v. Mastro*, 2011 WL 1833349 (D. Nev. May 13, 2011) (RICO defendants ordered to produce tax returns, income/loss statements and balance sheets, because plaintiff was entitled to have a clear picture of the defendants' overall financial condition); *State Farm Mutual Auto Ins.*

---

[18] *See* Request Nos. 1 and 19.

[19] For example, Dr. Naidoo, who worked for Kugler in 2008-09, swore in an affidavit that (a) Izydore kept books and computer records reflecting revenue and other financial informing concerning Kugler's practice, including the billing and collections for each physician; (b) Izydore monitored the financial success of Kugler's practice, and kept computer records on the financials; (c) Izydore monitored the number of new patients scheduled at Kugler's practice and constantly complained to Dr. Naidoo's staff that they needed to schedule more new patients; and (d) Izydore told Dr. Naidoo's staff that they would not get new patients if they did not do more spine surgeries, undoubtedly implying that personal attorneys would not refer patients to the practice if they felt it was unlikely that surgeries would be performed.  (DE 90, ¶90; Ex. H 5-10, 13).  This is far cry from Izydore's claim he was attorney Robbins' paralegal.

*Co. v. Midtown Medical Center, Inc.,* Case No. 02-7389 [DEs 65 & 66] (E.D. Pa. Jan. 8, 2004) (ordering RICO defendants to produce tax returns because they were relevant to the defendants' financial status before and during the alleged fraud scheme); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.*, 375 F. Supp. 2d 141, 156 (E.D.N.Y. 2005) (ordering production of tax returns in RICO action because they were relevant to plaintiff's claim that medical tests were performed not out of medical necessity, but for defendants' financial gain); *Airmont Homes Inc. et al. v. Nalitt*, 1995 WL 313147, at *2 (E.D.N.Y. May 12, 1995) (compelling tax returns in RICO case because they were relevant to understanding the "transfers of money [among] defendants" and provide a "financial history of defendants' affairs."); *Cavalier Clothes, Inc. v. Major Coat Co.*, 1991 WL 125179, at *4 (E.D. Pa. June 26, 1991); *United States v. Bonanno Crime Family of La Cosa Nostra*, 119 F.R.D. 625 (E.D.N.Y. 1988); *Halperin v. Berlandi*, 114 F.R.D. 8, 11 (D. Mass. 1986).

Financial information, including tax returns, is highly relevant to show a defendant's economic motive for engaging in a fraud or racketeering scheme. *See Ferguson v. Lurie*, 1993 WL 68101, at *2 (N.D. Ill. Mar. 10, 1992); *Meyers v. State Farm Fire & Cas. Co.*, 801 F. Supp. 709, 716 (N.D. Ga. 1992) (it is "merely a matter of common sense" that where a defendant allegedly defrauded an insurance company, his "financial status and potential gain" is relevant); *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991) (defendant's "financial condition … was properly admitted under Rule 404(b) to show a motive in participating in a scheme to defraud an insurance company").  Accordingly, the defendants should be compelled to produce all financial information responsive to these Requests.

### 4.    Documents Reflecting Arrangements Among Defendants And With Third Parties Who Provided Services To Defendants (Categories 7 and 8).

State Farm seeks documents regarding the duration, nature and terms of arrangements among the defendants.[20]  State Farm also seeks documents regarding the duration, nature and terms of defendants' arrangements with others, such as doctors and individuals who provided medical, management, billing marketing and administrative services for them.[21]   This information is relevant to establish the true scope, nature and financial incentives for each

---

[20] *See* Request Nos. 2-5, 22-23, and 30-31.

[21] *See* Request Nos. 23-26, 28-29; Bistline Request Nos. 82-84; Izydore Request Nos. 34-35 and 85-87; and Carroll Request Nos. 82-84.

defendant to participate in the scheme with others, the extent to which others were compensated to promote the scheme, and to identify others who have worked for the defendants during the relevant period and may have relevant information about the defendants' relationships, roles and activities. *See Hope for Families & Community Svcs., Inc. v. Warren*, 2009 WL 174970, at *15-16 (M.D. Ala. Jan. 26, 2009) (ordering production of documents reflecting ownership interests and transfer of ownership interests to and from defendants because they are relevant to the plaintiff's racketeering enterprise and conspiratorial acts alleged in plaintiff's RICO claims).

These documents are also relevant because at least some former employees and doctors have ended their relationships with the defendants and complained regarding the types of fraudulent practices at issue in this litigation. Such documents will allow State Farm to identify further individuals that may have knowledge regarding the operation of the scheme from the inside. For example, as explained above, one doctor that was previously employed by the defendants, Dr. Naidoo, testified in a prior deposition that he stopped during PDs after determining they were not effective, he is still of the opinion that they are not effective today, and that in May-June 2009, "Mark Izydore came to me [Dr. Naidoo] and forced me to start doing [more] percutaneous discectomies." (*See* Ex. 39).

State Farm has the right to know the identity of individuals who have worked for the defendants and may have information relevant to the relationships and activities at issue in this case. The potential importance of these witnesses and related documentation is illustrated by the testimony and affidavits of Dr. Naidoo and former Kugler employees which are described in State Farm's Amended Complaint. (DE 19, ¶90(a)-(d)). Therefore, the defendants' should be compelled to produce all documents responsive to these Requests.

### 5.     Documents Relating To The Defendants' Major Referral Sources And The Services Rendered To Patients Referred By Those Referral Sources (Categories 5 and 6).

State Farm seeks documents regarding the duration, nature and extent of referral relationships and related payments between the defendants and specific law firms and healthcare providers with whom they appear to have significant referral relationships.[22] State Farm also seeks documents reflecting the nature of the services that the defendants provided to patients who were referred by the specific law firms with which they appear to have significant referral

---

[22] *See* Request Nos. 20-21, 27, 33-44, and 46-53.

relationships. [23]   State Farm has attached example documents demonstrating that the defendants did, in fact, track attorney referral, insurance carrier, and policy limits information for their patients.  (*See* Ex. 26).  Another example of such evidence is an undated fax cover sheet from Izydore to Michael Steinger (of Steinger and Iscoe) asking the attorneys "**Do you want disco - IDET**," which appears to be a request for direction from the attorneys with respect to how a patient should be treated.[24]   (*See* Undated Izydore Fax, attached as Ex. "44").   Yet another example is the attached Exemplar February 7, 2007 Memorandum from "**Patricia at Kugler Orthopedic Group**" to "**Kelly at Steinger & Iscoe**" asking the attorneys to give the doctors "referral information" for 16 of Dr. Kugler's patients.   (*See* 2/7/07 Memo., attached as Ex. "45"). The Exemplar February 7, 2007 Memorandum was not an isolated occurrence, but instead is an example of Kugler's regular and on-going requests for patient referral information from Steinger and Iscoe.  (*See* Composite Kugler Memoranda, attached as Ex. "46").   As these Kugler Memoranda demonstrate, the defendants did, in fact, regularly track their patients by referring attorney, and in many instances actually communicated with those referring attorneys about large batches of patients at a single time.   These documents are entirely consistent with the multiple affidavits from Kugler's former employees that are attached to State Farm's Complaint, confirming these types of documents and practices exist.   (DE 19, ¶90(a)-(d), Exs. E-H). Therefore, defendants' should be compelled to produce all documents responsive to these Requests.

### 6.      Important Documents Reviewed By Non-Physicians (Category 10).

State Farm also seeks documents reflecting information regarding policy limits and types of insurance which had to be reviewed for approval by Izydore and Carroll who are not physicians, and Mark Nathanson who worked for the defendants and is the brother-in-law of attorney Michael Steinger, before patients were allowed to receive surgeries at the PBLSC.[25] One former employee of the defendants has provided a sworn statement confirming that she "needed Izydore's approval before she could schedule certain surgeries."   (*See* DE 19, Ex. E ¶13).  Another former employee similarly stated in an affidavit that she was required to maintain

---

[23] *See* Request No. 45; Izydore Request No. 48.

[24] IDET is the acronym used to describe a procedure known as intradiscal electrothermic therapy, which is similar to the PDs at issue here.

[25] *See* Request No. 18.

approval logs listing potential surgeries for patients referred by personal injury attorneys, which had to be reviewed and pre-approved by Izydore or Mark Nathanson.  (*See* DE 19, Ex. F ¶¶8, 14-15).

Those former employees' affidavits are supported by documents State Farm knows exist. For example, attached is an exemplar list of patients, medical procedures, and referring attorney contact information which clearly states in its header, "**MARK PLEASE REVIEW**" (apparently referring to Mark Izydore or Mark Nathanson).  (*See* Undated Patient Approval List, attached as Ex. 47).  Yet another example is the attached "basic information" summary that a personal injury law firm submitted to Izydore "**in order to proceed with the percutaneous lumbar Disektomy [sic]**."  (*See* 4/15/04 Stafford Fax, attached as Ex. "48").  That summary indicates not only the patient's name, but also a representation that liability is "clear," the name of the carrier, and the policy limits for Izydore's review in order to proceed with the procedures—the same types of information State Farm has alleged the defendants required from their attorney referral sources as part of this scheme, proof of which is demonstrated by the exemplar Kugler Schedules attached as Exhibit 26.  Yet another example is the attached "**SURGERY FINAL CHECKLIST**" that states a surgery was being performed under a "blanket LOP" which was "**ok[ed] by Mark I.**"  (*See* Surgery Final Checklist, attached as Ex. "49").  As these examples illustrate, the defendants clearly have documents responsive to these Requests and should be compelled to produce them.

### 7.     Documents Relating To Defendants' Relationships With Arthrocare And Discocare (Category 11).

State Farm seeks documents regarding the defendants' relationships with Arthrocare and Discocare, which were a critical component of the Defendants' scheme as alleged and explained in detail in State Farm's Amended Complaint.[26]  (DE 19, ¶¶3, 100-131).  Specifically Arthrocare manufactured the Spine Wand device that was used to perform the medically unnecessary PDs, and it forged a partnership with the defendants to market the Spine Wand *directly to personal injury attorneys*, as well as doctors and surgery centers, across the country, utilizing what was referred to as the "Discocare Model."[27]  (DE 19, ¶¶3, and 100-131).  Discocare was owned by

---

[26] *See* Request Nos. 54-63; Izydore Request Nos. 57-66.

[27] Example points listed in the joint marketing materials created and used by Arthrocare and Discocare for sales presentations to doctors and surgical facilities are as follows:  (a) PDs offer a "new opportunity that can significantly increase the profitability of your practice"; (b) PDs "can

defendant Jonathan Cutler, and was the exclusive Arthrocare distributor for the Spine Wand until December 2007 when Arthrocare suddenly paid $25 million to buy Discocare.

The circumstances of the relationship between Arthrocare, Discocare and the defendants is discussed in detail in State Farm's Amended Complaint.  (DE 19, ¶¶1100-31).  Through that relationship, the defendants helped market PDs to personal injury attorneys, doctors and surgery centers.  Through Discocare, Cutler permitted Arthrocare to manipulate its reported revenues and profits attributable to supposed sales of the Spine Wands.  When these facts were revealed, Arthrocare was forced to restate its earning for every quarter from 2006 through March 31, 2008 and several senior officials resigned from the company.  (*See id.*).

These facts cannot be seriously disputed, as substantial documents exist evidencing how the Discocare Model worked.  For example, State Farm attached Discocare Model marketing materials to its Complaint in which Arthrocare and Discocare stated PDs offer a "new opportunity that can significantly increase the profitability of your practice" and "Discocare will be able to provide the Spine Wand to your facility *at no charge*."  (*See* DE 19, ¶119; Exs. O, P. and Q) (emphasis added).  State Farm also attached form letters from Arthrocare and Discocare created for doctors who are interested in PDs to send to personal injury attorneys to generate referrals to its Amended Complaint.  One such letter states that "[w]e will require the following from you in order to treat the patient … the liability limits on your client's auto policy or the responsible party's auto policy…."  (DE 19, Ex. R).  As explained above, this is the very same type of information attorneys did, in fact, provide to the defendants "**in order to proceed with the percutaneous lumbar Disektomy [sic]**."  (*See* Ex. 48).

The attached exemplar SpineWand invoice from Arthrocare and Discocare further demonstrates that the defendants were directly involved in these activities.  (*See* Exemplar SpineWand Invoice, attached as Ex. "50").  Page 1 of the Exemplar SpineWand Invoice shows

---

also be the most profitable procedure you perform per hour of [operating room] time"; (c) "Because [PDs are] a relatively quick procedure, many experienced surgeons report that they consistently perform eight or more procedures by noon on an [operating room] day"; (d) "[T]he benefits of [PDs] include … quick outpatient procedure—fast operating room turnover"; (e) "[PDs] can be performed quickly in [surgical centers] and … offers respectable professional reimbursement"; and (f) "Discocare will be able to provide the Spine Wand to your facility *at no charge*."  (*See* DE 19, ¶119 and Exs. O, P and Q) (emphasis added).

Discocare as the sender of the SpineWand invoice directly to State Farm's claims department. The address listed for Discocare is 2047 Palm Beach Lakes Boulevard, **the same address used by the defendants**.  Page 2 of the Exemplar SpineWand Invoice is a CMS-1500 form showing Kugler as the referring doctor (in Box 17) and Discocare as the supplier (in Box 31).  Page 3 of the Exemplar SpineWand Invoice shows a $7,500 charge to the PBLSC from Discocare, even though pursuant to Discocare's own written marketing materials the SpineWand is provided to the doctors "**at no charge**."  (*See* DE 19, ¶119; Exs. O, P. and Q) (emphasis added).

As these examples demonstrate, the aggressive marketing of the SpineWind, the false invoices Arthrocare and Discocare issued to the defendants for submission to State Farm, the *quid pro quo* relationships among the defendants, Arthrocare, and Discocare, are critical parts of the scheme.  The defendants' should therefore be compelled to produce all documents responsive to these Requests.

### 8.      Documents Relating To Purported Studies And Research Regarding The Benefits Of PDs For Defendants' Patient Population (Categories 12-15).

State Farm seeks documents supporting the defendants' defense that PDs are beneficial for their patient population, as well as documents relating to more specific studies relating to discograms and PDs.[28]   For example, one Request seeks documents regarding a study purportedly performed by Kugler and Bistline, which the defendants, along with Arthrocare and Discocare, used to support PDs, and which State Farm has alleged is a sham.[29]  (DE 19, ¶118). Another Request seeks documents reflecting communications regarding the September 2008 decision by Medicare that it would **not** pay for PDs because their benefits were unproven.[30] (DE 19, ¶52).   All these documents, bearing on the purported validity (or invalidity) of the discograms and PDs in dispute, are indisputably relevant.  To the extent they support the validity of these procedures, they may support the defendants' defenses.  To the extent they show these procedures were ineffective or inappropriate for the defendants' patient population, they may support State Farm's claims.  Either way, the defendants should be compelled to produce all documents responsive to these Requests.

---

[28] *See* Request Nos. 64-66 and 81; Izydore Request Nos. 67-69 and 84.

[29] *See* Request No. 81; Izydore Request No. 84.

[30] *See* Request No. 64; Izydore Request No. 67.

**9.     Documents Regarding Bistline's Prior Worker's Compensation And Disability Claims In Which She Testified That She Lacked The Cognitive And Physical Ability To Practice Medicine (Category 16).**

State Farm also seeks documents regarding Bistline's prior worker's compensation and disability claims.[31]  Bistline had been unemployed and receiving disability benefits for several years in connection with an injury she allegedly sustained at work before she was recruited by Carroll and Izydore to join this scheme.  To obtain those benefits, as alleged in State Farm's Amended Complaint, Bistline:

> testified multiple times in order to obtain [those] benefits, that she had horrible memory loss, pain, numbness problems concentrating, as well as serious problems with her visual perception and cognitive functioning.  She further stated that she must continue to receive disability benefits because she did not have the manual dexterity to do an epidural and that practicing anesthesiology remained impossible because her hands had only gotten worse.

(DE 19, ¶¶76-78).

If Bistline's sworn testimony in support of her claim were true, it is inconceivable how she miraculously recovered the moment she was invited to join the defendants' fraud scheme. When considering the validity of the discograms and PDs that Bistline purportedly performed at the PBLSC since 2004, a jury should be entitled to know the representations that she made about her purported conditions in the years immediately before 2004.  This evidence will be extremely relevant to whether she was being truthful when pursuing her own injury claims, and in assessing her competence to perform the discograms and PDs at issue in this suit.  *See Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.,* 2007 WL 1526649, *2 (S.D. Fla. May 22, 2007) ("Impeachment evidence is a classic example of the type of evidence that should be discoverable in litigation."). These documents are also necessary to shed light on when Bistline supposedly overcame her disabilities which enabled her to join the scheme and perform the incredible number of delicate discograms and related medical procedures for which she has billed State Farm and other insurance carriers.  Accordingly, this Court should compel Bistline to produce all depositions, affidavits, or other written representations she made describing her mental and physical limitations in connection with her benefits claims, as well as all documents relating to whether Bistline's receipt of those benefits has ended and, if so, how, when, and why those benefits ended.

---

[31] *See* Bistline Request No. 85.

      **10.**    **Documents Relating T Specific Lawsuits Between The Defendants And Others Relating To Key Events In The Evolution Of The Scheme (Category 17).**

State Farm seeks documents regarding specific lawsuits (including written discovery requests, written discovery responses, documents produced, affidavits, and deposition transcripts which are not publically available) between various defendants and others relating to activities and relationships described in State Farm's Amended Complaint and the defendants' counterclaims.[32]   (DE 154, CC at ¶¶8-9, 81-82, 103-120; DE 155, CC at ¶¶8-9, 81-82, 103-120; DE 162, CC at ¶¶11-12, 77-89; Ex. 6).  Those lawsuits are summarized below.

      **a.**    *The Litigations Involving Alleged Co-conspirator Dr. Rogers.*

The vast majority of these requests are directed towards the at least 5 separate suits between one or more defendant and their former partner, Dr. Rogers.  As alleged in the Amended Complaint, Dr. Rogers is a key witness in this case because he has information relating to the beginning and early periods of the scheme. He hired Carroll and Izydore to manage his medical practice before they quit to work for the defendants. He also was a founding member of the PBLSC until the defendants terminated his ownership interest.   (DE 19, ¶¶73-80, 91-94). Further, Dr. Rogers is specifically alleged in the defendants' counterclaims as one of the individuals who supposedly engaged with State Farm in a scheme to defame the defendants. (DE 154, CC at ¶¶8-9, 81-82, 103-120; DE 155, CC at ¶¶8-9, 81-82, 103-120; DE 162, CC at ¶¶11-12, 77-89; Ex. 6).  As a result, documents regarding the litigation between Rogers and the defendants are relevant to the relationships and key events that occurred in the evolution of the scheme as well as the defendants' apparent defense that State Farm was engaged in a conspiracy with Dr. Rogers.

      **b.**    *The Litigation Involving Alleged Co-conspirator TheStreet.com.*

State Farm also seeks documents relating to the defamation lawsuit Gary Carroll filed against TheStreet.com, a financial publication which the defendants allege in their counterclaims is another participant of State Farm's alleged scheme to defame them.  (*See id.*).  In that case, Carroll alleges TheStreet.com published defamatory articles describing individuals linked with Arthrocare as "suspected con artists," and further stating that "Discocare relied on two key sources – Palm Beach Lakes Surgery Center and the Palm Beach, Fla., personal injury firm of

---

[32] *See* Request Nos. 70-80; Izydore Request Nos 73-83.

Steinger, Iscoe & Greene – for a huge chunk of business."  (DE 162-3).  That same article explains that "Kugler boasted he wrote Arthrocare's training protocol for [PDs] requiring the company's SpineWands" and that "Cutler, a podiatrist … has pocketed $25 million for [Discocare's] sale."  (*See id.*).   The article also describes efforts by the Defendants' employees, including Michael Steinger's brother-in-law "Mark Nathanson," to "help[] Izydore escape without being served" for deposition.  (*See id.*).   The defendants have attached these very same articles as exhibits to their counterclaims, and point to them as evidence of a scheme to defame them.  (DE 162-4; 162-5).  As these examples demonstrate, documents relating to this litigation are relevant to State Farm's claims regarding the true role of and relationships between Gary Carroll and the other defendants, as well as to defendants' allegation that TheStreet.com conspired with State Farm.

**c.**    ***The Islam Case.***

As explained in further detail *supra* at pp. 10-11, the Islam Case is a personal injury case referenced in State Farm's Amended Complaint (DE 19, ¶88-89) where the plaintiff supposedly received a discogram and PD from the defendants, Izydore damaged a process server's car while evading service of a subpoena for a deposition, and Steinger and Iscoe unexpectedly dismissed the case after the court issued order to show cause why Izydore should not be held in criminal contempt and ordered Izydore to appear for deposition.   State Farm should be entitled to documents relating to communications among the defendants regarding this case and why they went to great lengths to avoid discovery.

**d.**    ***The Naidoo Case.***

As discussed *supra* at pp. 11-12, and alleged in State Farm's Amended Complaint (DE 19, ¶88-90), the Naidoo Case involves a dispute between Kugler and his former employee, Dr. Naidoo.  In the Naidoo Case, Dr. Naidoo and other former employees presented sworn evidence that (among other things):

(a)    they "needed Izydore's approval before she could schedule certain surgeries;"

(b)    they were required to maintain approval logs listing potential surgeries for patients referred by personal injury attorneys which had to be reviewed and pre-approved by Izydore or Mark Nathanson (who is attorney Michael Steinger's brother-in-law); and

(c)    Izydore stated that Dr. Naidoo should perform more disc procedures because the reimbursement was high.

(DE 19, ¶90; Ex. F ¶¶8, 14-15; Ex. E ¶13). Dr. Naidoo also testified that Izydore pressured him to perform more PDs, even though Dr. Naidoo felt PDs were not effective. (*See* Ex. 39). As these examples demonstrate, this case is likely to have generated additional evidence (most of which is not publically available and is currently unknown to State Farm) which is directly relevant to the key allegations State Farm has raised in this case.

### e.   *Additional Litigation Between The Defendants.*

State Farm also seeks documents relating to litigation involving the Defendants PBPM and Carroll. At some point, defendants and Carroll ended their relationship. Documents relating to the litigation involving Carroll and PBPM could lead to evidence regarding the circumstances surrounding the relationship between Carroll and the other defendants, from beginning to end. Carroll was a key player in the formation and organization of scheme, was an owner of both Defendants PBPM and the PBLSC while the scheme was in full swing, and State Farm is entitled to documents that will likely explain the circumstances under which their relationship ended.

Accordingly, the defendants should be compelled to produce all documents responsive to these Requests, including discovery requests and responses, affidavits, and deposition transcripts which are not publically available, regarding these specific suits.

### 11.   Documents Relating To Services Provided To Patients Who Were In Auto Accidents And The Benefits Available To Those Patients (Category 18).

State Farm also seeks documents showing the types of and amounts of benefits available to patients treated as a result of auto accidents.[33] These documents go to a key aspect of State Farm's claims and the defendants' defenses—whether the services rendered to auto accident patients were dictated by policy benefits. As demonstrated by the Exemplar Kugler Schedules attached as Exhibit 26, it is clear that the defendants' have, in fact, maintained this information. Therefore, the defendants should be compelled to produce all documents responsive to these Requests.

### 12.   Documents Relating To An Alleged Burglary At Kugler's Office The Day Before State Farm Filed Its Complaint (Category 19).

State Farm also seeks documents regarding items allegedly taken or other claims made as a result of the alleged burglary at Kugler's office the day before State Farm's Complaint was

---

[33] *See* Request No. 83; Carroll Request No. 86; Bistline Request No. 87; Izydore Request No. 89.

filed, in which patient computer files were allegedly accessed and/or taken.[34]  According to a police report dated January 17, 2011, Kugler's office was burglarized between 5:00 pm on January 16, 2011 and 8:00 am on January 17, 2011. The police report attached as Exhibit 41 states that approximately 70 patient files were stolen and that one office computer (which was not locked or password protected) was accessed.  The subject computer was used by the alleged burglar to input information into the office's mainframe.  (*See id.*).  The alleged burglary took place just *one day after* State Farm notified the defendants it was filing suit and *one day before* the present lawsuit was filed.  Nothing else besides the patient files and the computer was touched or stolen during the break-in, based on the publicly available information.  Upon learning of the reported burglary, State Farm's counsel sent an email to Kugler's attorney requesting that all videos and other evidence be preserved.  (*See* 1/22/11 Email to Defendants' Counsel, attached as Ex. "51").

Documents relating to the alleged burglary of Dr. Kugler's office are directly relevant to whether evidence has been lost or destroyed, and such circumstances are relevant and may lead to the discovery of admissible evidence.[35]  Although Kugler's counsel represented to the Court that his clients were not involved in this burglary, State Farm is entitled to confirm that representation through discovery and further investigate whether any of the other defendants or their agents were involved as well as the identification of the alleged stolen information.  As there is a potential for spoliation sanctions where a party destroys evidence, *see, e.g., Graff v. Baja Marine Corp.,* 310 Fed.Appx. 298, 301-02 (11th Cir. 2009), the defendants should be compelled to produce all documents responsive to these Requests.

---

[34] *See* Kugler Request No. 85.

[35] As Magistrate Hopkins correctly stated during the December 23, 2011 hearing:

> In a case like this with the type of allegations involved, and where there has been some corroboration vis-à-vis the timing of the burglary and the details of the burglary that there may very well be -- even before I heard about the burglary we discussed at the prior hearing that there may very well be motivation for some of the defendants to not produce documents.  That's true in any case, but particularly in a case like this, as I say, with these type of allegations and with the burglary incident involved.

(11/17/11 Hr'g. Tr., p. 40).

13.     **Documents Relating To The Validity Of Izydore's Privilege Assertions Based Upon His Alleged Role As Paralegal For Attorney Steven Robbins. (Category 20).**

These requests seek documents regarding the retention of, or services performed by, attorney Steve Robbins.[36]  Robbins knowingly facilitated the defendants' affirmative steps to thwart discovery in other matters by falsely swearing under oath that Izydore could not testify regarding any matters relating to the defendants because Izydore was allegedly, at all times, acting as Robbins "paralegal" when dealing with the defendants.  These documents are necessary to test the truthfulness of Robbins' and Izydore's repeated contention that Izydore was merely a "paralegal," to determine whether this purported paralegal arrangement was used to funnel fraud scheme profits to Izydore, and to evaluate Robbins and Izydore's credibility, which will be key issues in this case.  Moreover, these documents will evidence active concealment on the part of the defendants, which raises a strong inference of culpability and intent on their part.  The defendants' should therefore be compelled to produce all documents in these Requests.

14.     **Documents Relating To Government And Other Investigations Regarding The Defendants' Performance Of Discograms And PDs (Categories 21-22).**

State Farm seeks documents regarding any criminal, disciplinary or other investigations relating to the defendants performance of discograms and PDs, or relationships with Arthrocare and Discocare.[37]  State Farm also seeks documents regarding any threatened or actual complaint or claim made against the defendants regarding their performance of discograms and PDs.[38]  These documents clearly go to the defendants' knowledge that their practices were fraudulent, and to their defenses and counterclaims that State Farm's lawsuit is part of scheme to defame their reputations and drive them out of business by making false accusations to federal, state and local government agencies.  These documents are also directly relevant to the defendants' claims that they have been injured as a result of State Farm's actions, as opposed to the actions of independent agencies and other insurers.  The defendants' should therefore be compelled to produce all documents in these Categories that are within their possession, custody, or control.

---

[36] *See* Request No. 32; Izydore Request Nos. 32-33 and 91.

[37] *See* Request Nos. 57 and 67; Izydore Request Nos. 64 and 70.

[38] *See* Request Nos. 68-69; Izydore Request Nos. 71-72.

**15.    Documents Identified By The Defendants In Response To State Farm's Interrogatories (Category 23).**

State Farm also seeks copies of the documents identified in, or supporting, the Defendants' interrogatory answers.[39]  Although certain of the defendants stated in their responses that they would produce such documents, they failed to meaningfully respond to interrogatories as set forth more fully in State Farm's separate Motions to Compel interrogatory answers.  The defendants' should therefore be compelled to produce all documents responsive to these Requests based on their current interrogatory answers, and make supplemental productions if their interrogatory answers change.

**B.    Defendants Should Be Required To Submit Affidavits Confirming Their Productions Are Complete.**

In addition to ordering the defendants to produce all responsive documents, State Farm respectfully suggests that the defendants should be ordered to submit affidavits confirming their productions are complete.  As demonstrated above, the defendants have denied the existence of critical documents, such as documents tracking referring attorney, insurance carrier, and policy limits information for their patients, which do, in fact, exist.  Given the fraud allegations set forth in the Amended Complaint, the defendants documented history of intentionally evading legitimate discovery, and the documents attached to this motion illustrating the existence of key documents which the defendants failed to disclose, the defendants should be ordered to submit affidavits:  (a) describing the efforts the defendants undertook to search for such documents; (b) affirming that the defendants conducted a diligent search of all responsive documents within the defendants' possession, custody, or control; (c) confirming that no responsive documents were located during said search; and (d) if responsive documents previously existed which have now been lost or destroyed, explaining in detail the date and circumstances leading to the document loss/destruction.  *See, e.g., U & I Corp. v. Advanced Med. Design, Inc.,* 2007 WL 4181900, at *5-6 (M.D. Fla. 2007) (ordering a party to submit an affidavit to explain its assertion that it had produced all responsive documents in its possession and that further documents could not be produced).

---

[39] *See* PBPM and 2047 Request No. 84; Gomez and Cutler Request No. 85; Kugler Request No. 86; Carroll Request No. 88; Bistline Request No. 89; Izydore Request No. 92.

## VI.  CONCLUSION

Based on the foregoing, State Farm respectfully request that this Court grant this Motion and enter and Order as follows:

(1)    overruling the defendants' objections;

(2)    ordering the defendants to produce all responsive documents within their possession, custody, or control to State Farm within ten (10) days;

(3)    ordering the defendants to submit an affidavit to State Farm within ten (10) days: (a) describing the efforts the defendants undertook to search for such documents; (b) affirming that the defendants conducted a diligent search of all responsive documents within the defendants' possession, custody, or control; (c) confirming that no responsive documents were located during said search; and (d) if responsive documents previously existed which have now been lost or destroyed, explaining in detail the date and circumstances leading to the document loss/destruction; and

(4)    requiring the defendants to provide a privilege log with respect to any and all responsive documents withheld as privileged within 10 days.

## RULE 7.1 CERTIFICATION

Counsel for State Farm certifies that State Farm asked the defendants' to engage in a "meet and confer" by letter dated December 16, 2011.  None of the defendants' counsel, other than the Bistline defendants' counsel, responded to that meet and confer request until the last business day before this Motion to Compel was previously due on January 9, 2012.  When the defendants did respond, they stated they were unavailable to confer with State Farm until after the January 9 filing deadline had passed.  To accommodate the defendants, State Farm sought a one week an extension of time to file its Motions to Compel, which was granted.  (DE 298). During the meet and confers that followed, several of the defendants indicated that they may amend or supplement their discovery responses in various respects, or that they would "inquire" into whether responsive documents exist with their clients.  As of this filing, no such amendments or supplements have been served.  State Farm will continue its efforts to confer with the defendants and report the status of those discussions to the Court no later than Monday, January 23, 2011 pursuant to this Court's Order Setting Hearing on Discovery Matters.  (DE 328).

Dated:   January 17, 2012

By:/s/   *David I. Spector*
    DAVID I. SPECTOR
    Fla. Bar No. 086540
    david.spector@akerman.com
    SCOTT W. ATHERTON
    Fla. Bar No. 0749591
    scott.atherton@akerman.com
    **AKERMAN SENTERFITT**
    222 Lakeview Avenue, Suite 400
    West Palm Beach, Florida  33401
    Telephone:  (561) 653-5000
    Facsimile:  (561) 659-6313

    --and--

    ROSS O. SILVERMAN
    ross.silverman@kattenlaw.com
    (*admitted pro hac vice*)
    CHARLES CHEJFEC
    charles.chejfec@kattenlaw.com
    (*admitted pro hac vice*)
    JOHN W. REALE
    john.reale@kattenlaw.com
    (*admitted pro hac vice*)
    EMILY J. PRENTICE
    emily.prentice@kattenlaw.com
    (*admitted pro hac vice*)
    KATHY L. KOTTOS
    kathy.kottos@kattenlaw.com
    (*admitted pro hac vice*)
    **KATTEN MUCHIN ROSENMAN LLP**
    525 West Monroe Street
    Chicago, IL 60661-3693
    Telephone:  (312) 902-5200
    Facsimile:  (312) 902-1061

    Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served on **January 17,**

**2012** on all counsel or parties of record on the Service List below in the manner specified.

_/s/ David I. Spector_____

DAVID I. SPECTOR

Fla. Bar No. 086540

## SERVICE LIST

| | |
|---|---|
| **Robert William Wilkins**<br>Jones, Foster, Johnston & Stubbs, P.A.<br>505 South Flagler Drive<br>Suite 1100<br>West Palm Beach, FL 33401<br>561-650-0400<br>Fax: 561-650-0490<br>Email: rwilkins@jones-foster.com<br><br>**Cristopher Stephen Rapp**<br>Jones Foster Johnston & Stubbs<br>505 S Flagler Drive<br>Suite 1100 PO Box 3475<br>West Palm Beach, FL 33401<br>561-659-3000<br>Fax: 650-0412<br>Email: csrapp@jones-foster.com<br><br>_Attorneys for Jeffrey Kugler, MD and Jeffrey L. Kugler, M.D., P.A._<br><br>_Service Via CM/ECF_ | **Anthony Conrad Vitale**<br>The health Law Office of Anthony C. Vitale, P.A.<br>2333 Brickell Avenue<br>Suite A-1<br>Miami, FL 33129<br>305-358-4500<br>Fax: 305-358-5113<br>Email: avitale@vitalehealthlaw.com<br><br>**Michael Joseph Napoleone**<br>Richman Greer Weil Brumbaugh Mirabito & Christensen<br>250 Australian Avenue, South<br>Suite 1504<br>West Palm Beach, FL 33401-5016<br>561-803-3500<br>Fax: 561-820-1608<br>Email: mnapoleone@richmangreer.com<br><br>_Attorneys or Jane Bistline, MD and Jane E. Bistline, M.D., P.A._<br><br>_Service via CM/ECF_ |

| | |
|---|---|
| **Robert N. Nicholson**<br>**Parker D. Eastin**<br>Nicholson Law Group<br>200 S Andrews Avenue<br>Suite 100<br>Fort Lauderdale, FL 33301<br>954-351-7474<br>Fax: 954-351-7475<br>Email: robert@nicholsonlawgroup.com<br>Email: parker@nicholsonlawgroup.com<br><br>*Attorneys for 2047 Palm Beach Lakes*<br>*Partners, LLC and Jonathan Cutler, MD*<br><br>*Service Via CM/ECF* | **Bruce David Green**<br>1313 S Andrews Avenue<br>Fort Lauderdale, FL 33316<br>954-522-8554<br>Fax: 522-8555<br>Email: bgreen@bdgreenpa.com<br><br>**Steven L. Robbins**<br>2047 Palm Beach Lakes Boulevard<br>Suite 250<br>West Palm Beach, FL 33409<br>561-686-0990<br>Fax: 686-0990<br>Email: counsel62@hotmail.com<br><br>*Attorneys for Gary Carroll and Palm Beach*<br>*Practice Management, Inc.*<br><br>*Service via CM/ECF* |
| **William Leon Richey**<br>**Catherine Shannon Christie**<br>2 South Biscayne Boulevard<br>One Biscayne Tower - 34th Floor<br>Miami, FL 33131<br>305-372-8808<br>Fax: 305-372-3669<br>Email: wlr@richeylaw.com<br>Email: csc@richeylaw.com<br><br>*Attorneys for Heldo Gomez, MD, Heldo*<br>*Gomez, M.D., P.A., and North Palm*<br>*Neurosurgery, P.L.*<br><br>*Service Via CM/ECF* | **Jose Quinon**<br>Jose M. Quinon, P.A.<br>2333 Brickell Avenue, Suite A-1<br>Miami, FL 33129<br>305-858-5700<br>Fax: 305-358-7848<br>Email: jquinon@quinonlaw.com<br><br>*Attorney for Mark Izydore*<br><br>*Service via CM/ECF* |